IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:20-CR-199 (LEK) |
| | ) | |
| **v.** | ) | **Plea Agreement** |
| | ) | |
| **MICHAEL T. MANN,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant **Michael T. Mann** (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1)      **The Defendant's Obligations:**

     a)    **Guilty Plea:** The defendant will waive indictment and plead guilty to Counts 1 through 12 of the information in Case No. 1:20-CR-199 (LEK), charging conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349, 1343 (Count 1); aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count 2); bank fraud, in violation of 18 U.S.C. § 1344 (Counts 3 through 11); and filing a false tax return, in violation of 26 U.S.C. § 7206(1) (Count 12).

     b)    **Special Assessment:** The defendant will pay an assessment of $100 per count of conviction pursuant to 18 U.S.C. § 3013. The defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $1,200, payable to the U.S. District Court, at the time of sentencing.

     c)    **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

d) **Restitution:** The defendant will consent to entry of an order directing the defendant's payment of $101,038,793.31 in restitution to his victims, whether or not the losses suffered by those victims resulted from the offenses of conviction. The parties agree that among the victims to receive restitution are the following:

(1) $3,062,515.23 payable to Financing Company-1;

(2) $9,905,989.99 payable to Financing Company-2;

(3) $4,131,699.27 payable to Financing Company-3;

(4) $35,839,912.81 payable to the lending consortium of Pioneer Bank, Berkshire Bank, and Chemung Canal Trust Company d/b/a/ Capital Bank;

(5) $850,545.00 payable to Bank of America, N.A.; and

(6) The distribution of the remainder, $47,248,131.01, to be determined by the Court at sentencing.

As provided in 18 U.S.C. § 3663A(b)(1)(B)(ii), the defendant's restitution obligation will be offset by the value of any property returned to the victims prior to sentencing.

e) **Forfeiture:** Pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p), the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegation in the information described above, or to any substitute assets, or to a money judgment, all as more fully set out below:

(1) Bank of America account bearing an account number ending in 9506
Account holder: ValueWise Corporation d/b/a Primacy Search Group
Balance: $1,444,975.16

(2) Bank of America account bearing an account number ending in 6843
Account holder: ValueWise Corporation d/b/a Optix Consulting
Balance: $5,363,936.77

(3) Bank of America account bearing an account number ending in 6103

Account holder: Heutmaker Business Advisors LLC
Balance: $7,713,562.99

(4) 30,000 common shares of Pioneer Bancorp Inc., owned by MyPayrollHR.com LLC

(5) Vehicle – a 2020 Jeep Gladiator, color black, Vehicle Identification Number 1C6HJTFG4LL115264

(6) A money judgment in the amount of $101,038,793.31. Upon final forfeiture of the specific assets described in paragraphs (1)(e)(1) through (5) above, the defendant shall receive credit against the money judgment amount for the net forfeited value of these specific assets.

If any of the property described above, as a result of any act or omission of the defendant, either: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p) and Fed. R. Crim. P. 32.2(e).

f) **Other obligations:**

(1) **Access to Records:** The defendant will provide any privacy waivers, consents, or releases requested by the United States Attorney's Office to access records to verify the defendant's financial disclosures. The defendant authorizes the United States Attorney's Office to inspect and copy all financial documents and information provided by the defendant to the U.S. Probation Office.

(2) **Plea to Criminal Charge in Saratoga County Court:** The defendant agrees that he will, within 90 days following his entry of a guilty plea in United States District Court,

enter a plea of guilty in Saratoga County Court, New York, to one count of Money Laundering in the First Degree, in violation of New York State Penal Law § 470.20, a class B felony, pursuant to a plea agreement to be entered into with the New York State Attorney General's Office.

**2)**     **The Government's Obligations:**

    a)   **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the information in Case No. 1:20-CR-199 (LEK) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement. This agreement does not prevent the government from seeking charges based on other conduct.

    b)   **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

**3)**     **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offenses to which the defendant agrees to plead guilty and may be required to impose mandatory minimum terms of imprisonment, all as set out below:

**Count 1 – Wire Fraud Conspiracy**

    a)   Maximum term of imprisonment: 20 years, pursuant to 18 U.S.C. §§ 1343, 1349.

    b)   Maximum fine: $250,000, pursuant to 18 U.S.C. § 3571(b)(3).

**Count 2 – Aggravated Identity Theft**

    a)   Maximum term of imprisonment: 2 years, pursuant to 18 U.S.C. § 1028A.

    b)   Mandatory minimum term of imprisonment: 2 years, to run consecutive to any term of imprisonment to be imposed for any other count of conviction, pursuant to 18 U.S.C. §§ 1028A(a)(1) and (b)(2).

4

**Counts 3 through 11 – Bank Fraud**

a)  Maximum term of imprisonment: 30 years, pursuant to 18 U.S.C. § 1344.

b)  Maximum fine: $1 million, pursuant to 18 U.S.C. § 1344.

**Count 12 – False Tax Filing**

a)  Maximum term of imprisonment: 3 years, pursuant to 26 U.S.C. § 7206.

b)  Maximum fine: $250,000, pursuant to 18 U.S.C. § 3571(b)(3).

**All Counts**

c)  Supervised release term: the court may require the defendant to serve a term of supervised release of up to 5 years, to begin after imprisonment. 18 U.S.C. § 3583(b)(1). A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to 3 years. 18 U.S.C. § 3583(e)(3).

d)  Other adverse consequences:  Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4)  **Elements of Offenses:** The defendant understands that the following are the elements of the offenses to which the defendant agrees to plead guilty. The defendant admits that the defendant's conduct satisfies each and every one of these elements.

**Count 1 – Wire Fraud Conspiracy**

a)  First, two or more persons conspired to knowingly and willfully participate in a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations, or promises, with knowledge of the scheme's fraudulent nature and specific intent to defraud, and reasonably foreseeing that one or more members of the conspiracy would use or cause to be used the interstate wires in furtherance of the scheme to defraud; and

b) Second, the defendant joined that conspiracy, either at its inception or sometime during its existence, knowing the purpose of the conspiracy and intending to help it succeed.

**Count 2 – Aggravated Identity Theft**

a) First, the defendant knowingly used a means of identification of another person;

b) Second, the defendant did so without lawful authority; and

c) Third, the defendant used the means of identification during and in relation to the qualifying predicate offense of conspiracy to commit wire fraud as alleged in Count 1 of the information.

**Counts 3 through 11 – Bank Fraud**

a) First, there was a scheme or artifice to defraud a financial institution, or to obtain any of the monies, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; and

b) Second, the defendant knowingly and willfully participated in the scheme and artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud.

**Count 12 – False Tax Filing**

a) First, the defendant subscribed and caused to be filed a tax return;

b) Second, the tax return contained a written declaration that it was made under penalties of perjury;

c) Third, the defendant did not believe the tax return to be true and correct as to every material fact; and

d) Fourth, the defendant acted willfully.

5) **Factual Basis for Guilty Plea:** The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offenses to which the defendant is pleading guilty, and

that there are no facts establishing a viable defense to those offenses:

**Overview**

a)  At all times relevant to the information, the defendant resided and worked in Saratoga County, New York, and owned and operated ValueWise Corporation ("ValueWise") and subsidiary companies based in Clifton Park, New York.

b)  From at least 2013 and until September 2019, the defendant engaged in a fraudulent scheme to deceive banks and financing companies into loaning his companies tens of millions of dollars under false pretenses. To obtain the loans, the defendant overstated his companies' revenue and receivables, as well as their business relationships and prospects, and created companies whose sole purpose was to further the fraud by generating fake invoices and disguising sources of funds.

c)  Because the defendant could not repay the loans with legitimate business revenues, he obtained new loans—predicated on similar misrepresentations—from other lenders and used the proceeds to repay the old loans. He also diverted millions of dollars in escrowed payroll funds, entrusted to payroll companies he owned, and used certain of the funds for his own ends.

**Fraud Against Financing Companies**

d)  Between at least 2013 and September 2019, the defendant worked with co-conspirators to obtain loans from financing companies by creating fake invoices indicating that a third party owed his companies money it did not owe, and then assigning those fake invoices to the financing companies as collateral. His victims included, among others, Financing Company-1, headquartered in New York and defrauded from October 2013 to August 2019; Financing Company-2, headquartered in Colorado and defrauded from October 2014 to August 2019; and Financing Company-3, headquartered in California and defrauded

from August 2018 to September 2019 (hereinafter, "the Financing Companies").

e) From at least 2013 to approximately May 2017, ValueWise performed consulting services for UnitedHealth Group Incorporated ("UHG") and its subsidiary, OptumInsight Inc. ("Optum"). Between at least 2013 and September 2019, the defendant's co-conspirator, Luke E. Steiner ("Steiner"), resided in Minnesota and worked for Optum/UHG in Eden Prairie, Minnesota. Another of the defendant's co-conspirators, Co-Conspirator-3 ("CC-3"), worked with Steiner at Optum/UHG until approximately October 2013, when CC-3 left Optum/UHG and began working for the defendant at ValueWise.

f) The defendant told the Financing Companies, falsely, that Optum/UHG owed millions of dollars to his companies, including FocalPointe Group, LLC ("FocalPointe") and Weitz & Associates, Inc. ("Weitz"), that Optum/UHG did not owe. The defendant created fake invoices reflecting the fictitious debt and assigned them to the Financing Companies as collateral for loans. Based on these false representations and fake invoices, the Financing Companies loaned the defendant millions of dollars, ostensibly secured by the fake invoices. The defendant used fraudulently obtained loans from other lenders—including a pre-existing line of credit from Pioneer Bank ("Pioneer") and other banks that grew to $42 million—to pay the fake invoices. To make the fake invoices appear legitimate to the Financing Companies, the defendant paid them through Automated Clearing House ("ACH") transfers, which the defendant manipulated to make it appear as if the payments came from Optum/UHG, when the payments in fact came from the defendant.

g) In October 2013, the defendant and CC-3 recruited Steiner to participate in the conspiracy. Steiner, purporting to act in his capacity as an Optum/UHG employee, sent emails and made telephone calls from Minnesota to Financing Company-1 in New York and Financing Company-2 in Colorado, assuring them that the fake invoices were legitimate and

8

UHG/Optum would be paying the amounts stated in the invoices.

h) The defendant, while in New York, used email, text message and telephone communications to instruct Steiner in Minnesota concerning the false information Steiner was to provide to Financing Company-1 and -2.

i) The defendant, without Steiner's assistance, obtained millions of dollars in loans from Financing Company-3 using similar fraudulent tactics. The defendant told Financing Company-3, falsely, that Optum/UHG owed millions of dollars to FocalPointe. The defendant created fake invoices reflecting the fictitious debt and assigned them to Financing Company-3 as collateral for loans.  Based on these false representations and fake invoices, Financing Company-3 loaned the defendant millions of dollars, ostensibly secured by the fake invoices. As with Financing Company-1 and 2, the defendant used other fraudulently obtained funds to pay the invoices assigned to Financing Company-3 and made it appear as if payment came from Optum/UHG, when the payments in fact came from the defendant.

j) As part of the fraud against Financing Company-3, the defendant impersonated Steiner, without Steiner's permission or knowledge, to certify to Financing Company-3 that Optum/UHG owed money to FocalPointe that it did not owe. Specifically, the defendant created the email address luke.steiner@optum-insight.com (the "Fake Steiner Email"), to mimic Steiner's actual email address at Optum/UHG. The defendant, while in New York, used the Fake Steiner Email to send emails to Financing Company-3 in California assuring its representatives that the fake invoices were legitimate.

k) For instance, on August 15, 2018, the defendant sent an email from his ValueWise email account to the Fake Steiner Email, copying an executive from Financing Company-3, and wrote in pertinent part: "Luke … Please review the attached letter and make sure that 1) the AR [accounts receivable] in the enclosed letter is approved[.]"

l) Later on August 15, 2018, the defendant, impersonating Steiner, responded from the Fake Steiner Email—replying to his own ValueWise email address and copying the executive from Financing Company-3—and wrote in pertinent part: "I did verify that the invoices in the document match our approved invoices in our system. … You should see payment … for invoices 1570 and 1571 between this Friday and next Tuesday."

m) The fraud against the Financing Companies resulted in $3,062,515.23 in losses to Financing Company-1; $9,905,989.99 in losses to Financing Company-2; and $4,131,699.27 in losses to Financing Company-3.

**Fraud Against Pioneer, Berkshire Bank, and Chemung Canal Trust Company**

n) At all times relevant to the information, Pioneer, Berkshire Bank ("Berkshire"), and Chemung Canal Trust Company d/b/a/ Capital Bank ("Chemung") (collectively, the "Banks"), were financial institutions insured by the Federal Deposit Insurance Corporation.

o) On or about November 2, 2009, ValueWise and certain of its subsidiaries entered into a $2 million revolving line of credit ("LOC") with Pioneer. By June 2015, the LOC was $15 million.

p) On or about June 28, 2017, the LOC was increased from $15 million to $22 million, and Berkshire became a co-lender with Pioneer. On or about June 27, 2018, Pioneer and Berkshire increased the LOC from $22 million to $32 million. On or about August 12, 2019, the LOC was increased from $32 million to $42 million, and Chemung became a co-lender with Pioneer and Berkshire.

q)  At some point in 2013, the defendant fraudulently obtained an increase in the amount of the LOC; each subsequent increase was also obtained through fraud. He created companies whose sole purpose was to further the fraud by generating fake invoices, disguising sources of funds, and artificially inflating the assets of the defendant's companies; fraudulently represented to the Banks that his fake businesses had revenues and receivables based on consulting work for Optum/UHG and other well-known companies, including 3M, Best Buy and T-Mobile; falsified monthly Borrowing Base Certificates by drastically inflating his companies' receivables; hid the tens of millions of dollars in loans he was receiving from the Financing Companies, and that he was using the LOC to pay down these loans; and provided false financial statements, receivables aging reports, individual and corporate tax returns, and other documents to his auditor, which in turn made inaccurate reports to the Banks.

r)  Under the terms of the LOC, the defendant was required to submit to the Banks a monthly Borrowing Base Certificate ("BBC") attesting to his companies' receivables. The BBCs were prerequisites to the defendant obtaining funds under the LOC. As part of his fraudulent scheme, the defendant submitted dozens of materially false BBCs in which he lied about his companies' receivables, and used those misrepresentations to maintain the LOC and obtain funds under the LOC.

s)  For instance,

(1) on March 6, 2017, the defendant submitted a BBC for ValueWise and its subsidiaries, falsely attesting to "Net Eligible Accounts Receivable" in the amount of $23,029,562.00;

(2) on December 12, 2017, the defendant submitted a BBC for ValueWise and its subsidiaries, falsely attesting to "Total Net Eligible Accounts [Receivable]" in the

11

amount of $24,758,247.00;

(3) on October 31, 2018, the defendant submitted a BBC for ValueWise and its subsidiaries, falsely attesting to "Total Net Eligible Accounts [Receivable]" in the amount of $36,510,687.00;

(4) on November 30, 2018, the defendant submitted a BBC for ValueWise and its subsidiaries, falsely attesting to "Total Net Eligible Accounts [Receivable]" in the amount of $37,480,433.00;

(5) on March 31, 2019, the defendant submitted a BBC for ValueWise and its subsidiaries, falsely attesting to "Total Net Eligible Accounts [Receivable]" in the amount of $40,052,334.00;

(6) on April 30, 2019, the defendant submitted a BBC for ValueWise and its subsidiaries, falsely attesting to "Total Net Eligible Accounts [Receivable]" in the amount of $40,114,005.00; and

(7) on July 31, 2019, the defendant submitted a BBC for ValueWise and its subsidiaries, falsely attesting to "Total Net Eligible Accounts [Receivable]" in the amount of $42,438,234.00.

t) At the time the defendant submitted each of the BBCs referenced above, ValueWise and its subsidiaries' accounts receivables were millions of dollars less than represented.

u) The defendant's scheme resulted in $35,839,912.81 in combined losses to Pioneer, Berkshire, and Chemung.

**Fraud Against Bank of America**

v) At all times relevant to the information, Bank of America, N.A. ("BANA") was a financial institution insured by the Federal Deposit Insurance Corporation.

w) From December 2010 through September 2019, BANA provided corporate credit card services to ValueWise, several of its subsidiaries, and dozens of their employees. As a material condition of extending credit, BANA required the defendant to periodically submit financial information for ValueWise and its subsidiaries.

x) From 2013 through 2019, the defendant provided BANA with falsified annual financial statements and receivables aging reports that overstated ValueWise's revenues and receivables by millions of dollars, and which omitted the defendant's receipt of tens of millions of dollars in loans from the Financing Companies.

y) For instance,

   (1) On May 22, 2018, the defendant provided BANA with the consolidated financial statements for ValueWise and its subsidiaries, for December 31, 2017 and 2016.

   (2) On May 22, 2019, the defendant provided BANA with the consolidated financial statements for ValueWise and its subsidiaries, for December 31, 2018 and 2017.

z) The defendant's scheme resulted in $850,545.00 in losses to BANA, equivalent to the total current account balance for the credit cards as of September 9, 2019.

**Fraud Against Cachet Financial Services, and Misappropriation of Payroll Funds**

aa) The defendant, through ValueWise, owned a payroll company, MyPayrollHR.com LLC, and related companies ("MyPayrollHR"). MyPayrollHR contracted with a third-party ACH processor, Cachet Financial Services ("Cachet"), to transmit payroll from MyPayrollHR's customers (employers) to the employees of the customers. The contract

with Cachet provided that ACH transfers would route payroll funds from the employers' accounts to a designated Cachet trust account—maintained at The Bancorp, Inc.—and then directly to the customers' employees.

bb) ACH files are electronic files that contain records detailing how to debit and credit accounts. As part of the scheme, the defendant changed the instructions inside ACH files provided by MyPayrollHR to Cachet, in order to deposit payroll funds from MyPayrollHR's customers into accounts he controlled at Pioneer, as opposed to the designated Cachet trust account. The defendant then used the diverted funds for his own purposes, including paying down the LOC.

cc) The defendant knew MyPayrollHR was required to route payroll funds to Cachet's trust account, and not through his accounts at Pioneer. After an incident in or about June 2015— in which Cachet detected that the defendant was improperly routing payroll through his accounts at Pioneer—the defendant wrote a letter to Cachet, dated June 4, 2015, in which he acknowledged: "I am aware that we did not submit payroll through the clearing account yesterday. I want to let you know that we understand that the direct deposits need to go through the clearing account. Additionally, we have addressed our issue/problem and will not let this happen again."

dd) The defendant, however, continued to route payroll funds through his accounts at Pioneer, in order to facilitate the fraud. When Cachet again instructed him to stop doing so in or about October 2017, a ValueWise employee ("Employee-1") sent an email—with the defendant's knowledge—to Cachet stating that the practice would stop. The defendant nevertheless continued to route payroll funds through his accounts at Pioneer, and when Cachet again instructed him to stop the practice in May 2018, Employee-1 sent another

14

email—with the defendant's knowledge—to Cachet stating that "this will not happen again."

ee) From on or about August 28, 2019 through on or about August 30, 2019, the defendant routed payroll funds through his accounts at Pioneer, instead of through Cachet's trust account. On or about August 30, 2019, Pioneer halted outgoing transfers from the defendant's accounts, and in doing so froze the payroll funds in those accounts. Cachet, as the guarantor of the payroll funds, was required to pay a total of approximately $7,219,341.34 to the employees of MyPayrollHR's customers.

**Additional Losses Caused by the Fraudulent Kiting of Funds**

ff) By 2019, the defendant could no longer obtain loans sufficient to sustain the fraud. To maintain cash flow, cover expenses, and continue the fraud scheme without detection, the defendant temporarily inflated his account balances, and fraudulently gained access to the "float," by rapidly transferring (a/k/a "kiting") millions of dollars among various accounts using checks, wire transfers, and the ACH system. This continued from at least January 2019 through on or about August 30, 2019.

gg) On or about August 30, 2019, as part of this effort, the defendant submitted a digital ACH file to Cachet with instructions to transfer approximately $19,199,175.74 among his accounts at Pioneer and BANA, as well as from his accounts to those of third parties to whom he owed money. Cachet effected those transfers using funds from its trust account. When Cachet attempted to debit $19,199,175.74 from the defendant's accounts, it could not do so because Pioneer and BANA had frozen the accounts.

**Misappropriation of Tax Money**

hh) The defendant (through ValueWise) owned a 51 percent stake in payroll company Southwestern Payroll Service, Inc. ("Southwestern Payroll") of Tulsa, Oklahoma. In addition to misappropriating payroll funds from MyPayrollHR, the defendant misappropriated tax monies entrusted to MyPayrollHR and Southwestern Payroll.

ii) Along with making payroll payments, MyPayrollHR and Southwestern Payroll processed tax payments for their customers (employers), and were entrusted with ensuring that taxes withheld from employees' paychecks were remitted to the Internal Revenue Service ("IRS"), and to state and local taxing authorities.

jj) MyPayrollHR and Southwestern Payroll each contracted with a third-party ACH processor, National Payment Corporation ("NatPay"), to process the ACH files that transferred tax payments from employers to the IRS and other taxing authorities. As part of MyPayrollHR's and Southwestern Payroll's respective arrangements with NatPay, tax payments were routed from the employers' accounts to accounts controlled by the defendant at Pioneer prior to disbursement to the relevant taxing authorities.

kk) As with the payroll funds, the defendant used the tax funds for his own purposes, including to pay down the LOC.

ll) After Pioneer halted outgoing transfers from the defendant's accounts on August 30, 2019, NatPay was unable to debit approximately $3,835,425.69 in tax payments—scheduled for transfer via the ACH system—from the defendant's account at Pioneer. As a result, NatPay paid the funds to the taxing authorities itself and suffered a loss of approximately $3,835,425.69.

mm) Further, when Pioneer halted outgoing transfers, at least $16,994,188.24 in tax payments were not paid over to taxing authorities; instead, the funds were frozen in the defendant's accounts at Pioneer.

**False Tax Filings**

nn) As part of his scheme to fraudulently obtain loans based on falsified revenues and receivables, the defendant filed, and caused to be filed, materially false tax returns for several of his corporate entities, including Weitz.

oo) For the tax years 2014 through 2017, the defendant overstated Weitz's revenues by millions of dollars. Weitz reported annual revenues (gross receipts) of between $9 million and $34 million for tax years 2014 through 2017, when in reality Weitz's annual revenue was close to zero.

pp) On or about the following dates, the defendant filed and caused to be filed U.S. Corporate Income Tax Returns (IRS Forms 1120) in tax years 2014 through 2017, falsely reporting total gross receipts for Weitz as follows:

| Date return electronically filed | Tax year | Total gross receipts |
|---|---|---|
| 9/10/2015 | 2014 | $9,165,331.00 |
| 8/2/2016 | 2015 | $14,651,049.00 |
| 8/9/2017 | 2016 | $23,154,582.00 |
| 10/5/2018 | 2017 | $33,986,405.00 |

qq) Each of these corporate tax returns was made, verified to be true, and signed by the defendant under the penalty of perjury, and was prepared and filed with the IRS from the Northern District of New York.

rr) At the time he submitted each return, the defendant knew that each return was false because it overstated Weitz's gross receipts by millions of dollars.

**Specific Assets to be Forfeited**

ss) The defendant used the following accounts, among others, to kite millions of dollars and otherwise facilitate the offenses of conviction:

   (1) Bank of America account XXXXXXXXXXXX9506 in the name of ValueWise Corporation d/b/a Primacy Search Group;

   (2) Bank of America account XXXXXXXXXXXX6843 in the name of ValueWise Corporation d/b/a Optix Consulting; and

   (3) Bank of America account XXXXXXXXXXXX6103 in the name of Heutmaker Business Advisors LLC.

tt) The defendant purchased the following property with proceeds from the offenses of conviction:

   (1) On July 17, 2019, through a Pioneer account in MyPayroll's name, he purchased 30,000 common shares of Pioneer Bancorp Inc.; and

   (2) On or about July 13, 2019, using a BANA credit card in his own name, he purchased a 2020 Jeep Gladiator, color black, Vehicle Identification Number 1C6HJTFG4LL115264.

6)   **<u>Sentencing Stipulations:</u>**

a) The parties agree that for Counts 1, and 3 through 11, the Base Offense Level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1).

b) The parties agree that for Counts 1, and 3 through 11, the defendant is responsible for a total loss of more than $65 million but less than $150 million, resulting in a 24-level upward adjustment, pursuant to U.S.S.G. § 2B1.1(b)(1)(M).

c) U.S.S.G. § 2B1.1(b)(2) is an "apply-the-greatest" provision.  Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), the parties agree that for Count 1, the offense conduct involved 10 or more victims, resulting in a 2-level upward adjustment. The parties dispute, however, whether the offense conduct resulted in substantial financial hardship to five or more victims pursuant to U.S.S.G. § 2B1.1(b)(2)(B); at sentencing, the government will argue that it did, and the defendant will argue it did not. If the government is successful, a total 4-point upward adjustment would apply under U.S.S.G. § 2B1.1(b)(2)(B).  If the defendant is successful, a total 2-point upward adjustment would apply under U.S.S.G. § 2B1.1(b)(2)(A)(i).

d) U.S.S.G. § 2B1.1(b)(17) is an "apply-the-greatest" provision.  Pursuant to U.S.S.G. § 2B1.1(b)(17)(A), the parties agree that for Count 1, the defendant derived more than $1 million in gross receipts from one or more financial institutions as a result of the offense, resulting in a 2- level upward adjustment. The parties dispute, however, whether the offense substantially jeopardized the safety and soundness of a financial institution pursuant to U.S.S.G. § 2B1.1(b)(17)(B)(i); the government will argue that it did, and the defendant will argue it did not. If the government is successful, a total 4-point upward adjustment would apply under U.S.S.G. § 2B1.1(b)(17)(B)(i). If the defendant is successful, a total 2-point upward adjustment would apply under U.S.S.G. § 2B1.1(b)(17)(A).

e) The parties agree that for Count 1, the offense involved sophisticated means and the defendant intentionally engaged in and caused the conduct constituting sophisticated means, resulting in a 2-level upward adjustment, pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

f) The parties agree that the defendant was an organizer, leader, manager and supervisor in criminal activity, resulting in a 2-level upward adjustment, pursuant to U.S.S.G. § 3B1.1(c).

g) The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense(s) to which the defendant is pleading guilty and all relevant conduct, as defined in U.S.S.G. § 1B1.3; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. §3C1.1.

h) The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. §3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 or more before receipt of any acceptance of responsibility adjustment under U.S.S.G. §3E1.1(a).

7)   **Waiver of Rights to Appeal and Collateral Attack:** The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following (except that the defendant does not waive the right to raise a claim based on alleged ineffective assistance of counsel):

a) The convictions resulting from the defendant's guilty plea;

b) Any claim that the statutes to which the defendant is pleading guilty are unconstitutional;

c) Any claim that the admitted conduct does not fall within the scope of the statutes;

d) Any sentence to a term of imprisonment of 212 months or less;

e) Any sentence to a fine within the maximum permitted by law;

f) Any sentence to a term of supervised release within the maximum permitted by law;

g) Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

A. **Right to Counsel:** The defendant has a right to assistance of counsel in connection with settlement of this case and understands that right. Defense counsel has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

B. **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination. The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the

federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties. If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

E. **Sentencing:**

    a. **Maximum terms of imprisonment:** The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement. If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other.  Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively. *See* 18 U.S.C. § 3584.

    b. **Mandatory minimum terms of imprisonment:** If specified in this agreement, the conviction on one or more charges to which the defendant has agreed to plead guilty may require imposition of a mandatory minimum term of imprisonment.  In such cases, the court must impose a term of imprisonment no less than the required mandatory

minimum term unless an exception to that requirement applies. Such exception may be dependent on a motion by the government.

c. **Section 851 Enhancements**: The defendant understands that if the government has filed an information against the defendant as provided 21 U.S.C. § 851, alleging that the defendant has one or more final convictions for a felony drug offense, and, as part of this agreement, the defendant has admitted and/or affirmed that the defendant was so convicted, then, by pleading guilty, the defendant will lose the right to attack any sentence the court imposes by challenging any such prior conviction.

d. **Sentencing guidelines:**

   i.   The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder. While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

   ii.  Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court. Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

iii.   Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines. If the presentence investigation reveals that the defendant's criminal history may support an offense level different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

e.  **Factual findings:** The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

f.  **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence. In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding. For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements

into evidence in any prosecution. If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement. To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

g. **Government's Discretion to Recommend a Sentence:** Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure (up or down), or guidelines range applies; from recommending a specific sentence within the applicable guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above or below the applicable guidelines range.

h. **Sentencing-Related Information:** The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. §1B1.8. No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence. The parties may provide any factual information relevant to sentencing to the Probation Office and/or to the Court, without

26

limitation, before or after the completion of the Presentence Investigation Report. The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

    i.   **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F.  **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

    j.   Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

    k.   If the defendant is not a United States citizen, such conviction may result in deportation or removal from the United States, may bar readmission to the United States if the defendant leaves the country, and may result in a denial of a pending or future application for citizenship. If the defendant is a naturalized citizen, such conviction may result in denaturalization, followed by deportation or removal from the United States. Under federal law, removal or deportation may be an almost certain consequence of a conviction for a broad range of federal offenses, including, but not limited to, aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), and crimes of moral turpitude, which includes crimes involving fraud. Removal and other immigration consequences are the subject of a separate proceeding. No one, including the defendant's attorney and the Court, can predict with certainty the effect of the

conviction resulting from this agreement on the defendant's immigration status. The defendant understands this uncertainty and nonetheless wishes to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is the defendant's automatic removal from the United States.

l.  A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G.  **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664.  In any case involving a conviction for a sexual exploitation offense in chapter 110 of title 18 of the United States Code, the Court must order restitution for the full amount of the victim's losses as determined by the court.  The victim's losses include, but are not limited to medical services related to physical, psychiatric, or psychological care; physical or occupational therapy or rehabilitation; necessary transportation, temporary housing, and child

care expenses; lost income; attorney's fees and other costs; and any other losses suffered by the victim as a proximate result of the offense. The restitution payment will be in addition to any other civil or criminal penalty authorized by law.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

   m.   The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

   n.   The defendant consents to the entry of an order of forfeiture of the assets described above.

   o.   The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents. The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court. The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

   p.   Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture. Satisfaction of all, or any portion of, any restitution, fine, or

other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

q. In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party. The defendant agrees that forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

r. The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

s. The defendant waives the right to a jury trial on the forfeiture of assets. The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

t. The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

u.  The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

v.  In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property. The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

## I.  **Determination of Financial Condition and Payment of Interest and Penalties:**

w.  In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

x.  The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

y.  The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

z.  Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

## J.  **Remedies for Breach:**

aa. Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any

31

condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part. In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement.  The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

bb. If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

    i. To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement. The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement, notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

    ii. In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be

used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

iii.  To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

iv.  To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

v.  To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

vi.  To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

vii.  To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K.  **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant. References to "the government" in this agreement refer only to that Office. This agreement does not bind any other federal, state, or local prosecuting authorities. Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security,

33

Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L. **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

GRANT C. JAQUITH
United States Attorney

_____          8-12-20
Michael Barnett and Cyrus P.W. Rieck          _____
Assistant United States Attorneys          Date
Bar Roll Nos. 519140 and 518933

_____          08/11/2020
Michael T. Mann          _____
Defendant          Date

_____          8/11/2020
Michael L. Koenig          _____
Attorney for Defendant          Date
Bar Roll No. 507425

34