**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

                                         1:20-CR-0199

          v.                                (LEK/DJS)

MICHAEL T. MANN,

                       Defendant,

PIONEER BANK and CACHET
FINANCIAL SERVICES,

                       Third-Party Claimants.

---

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| OFFICE OF THE UNITED STATES ATTORNEY | CYRUS P. W. RIECK, ESQ. |
| 445 Broadway, Room 218 | MICHAEL S. BARNETT, ESQ. |
| James T. Foley Courthouse | ELIZABETH A. CONGER, ESQ. |
| Albany, New York 12207 | |
| | |
| LOEB & LOEB LLP | JAY K. MUSOFF, ESQ. |
| *Attorney for Cachet Financial Services* | MATTHEW ANDERSON, ESQ. |
| 345 Park Avenue | |
| New York, New York 10154 | |
| | |
| DLA PIPER LLP | ROBERT J. ALESSI, ESQ. |
| *Attorney for Pioneer Bank* | |
| 677 Broadway - Suite 1205 | |
| Albany, New York 12207 | |

**DANIEL J. STEWART**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

## I.  INTRODUCTION

The instant matter has been referred to the undersigned for a Report-Recommendation on two Third-Party Petitions filed in connection with the District Court's August 26, 2020 Preliminary Order of Forfeiture.  Dkt. Nos. 54, 56, 86, 120.  The Petitions seek to adjudicate the legal interests of Pioneer Bank and Cachet Financial Services in various assets identified in the Preliminary Order.  The Government has moved to dismiss both Petitions upon the grounds that the allegations do not set forth a sufficient right, title, and interest in the funds or property and that the two corporate Petitioners, as mere creditors, are not statutorily entitled to the relief sought.  Dkt. Nos. 65, 67 & 121.

For the reasons that follow, it is recommended that the Government's Motion to Dismiss the Petition of Pioneer Bank, Dkt. No. 65, be denied in part and granted in part; the Motion to Dismiss the Amended Petition of Cachet Financial Services, Dkt. No. 121, be denied; and that the matters that remain proceed to a hearing pursuant to 21 U.S.C. § 853(n).

### A.  Factual Background

On August 12, 2020, Defendant Michael Mann was charged by Information with, *inter alia*, conspiracy to commit wire fraud, aggravated identity theft, and bank fraud. Dkt. No. 28.  The factual allegations contained in the Information are as follows: Defendant Mann was the owner and operator of ValueWise Corporation and various subsidiary companies, including several payroll companies.  *Id.* at ¶¶ 1, 7.  From 2013 to

September of 2019, Defendant and others conspired to commit wire fraud by obtaining money and property utilizing materially false and fraudulent pretenses, representations, and promises. *Id.* at ¶ 10. The fraud involved financing companies, banks, and automated clearinghouse payment processors ("ACH Processors"). *Id.* at ¶¶ 4-9. According to the Government, Mann used fictitious paperwork to mislead finance companies and banks about the financial status of his companies, and as a result, was able to obtain millions of dollars throughs loans and lines of credit. *Id.* at ¶¶ 12-13. In addition, Defendant, through his payroll company, MyPayrollHR.com LLC, diverted and misappropriated payroll and tax money belonging to customers for his own purposes, which included paying down other lines of credit. *Id.* at ¶¶ 14-15.

In addition to the numerous felonies charged, the Criminal Information also included forfeiture allegations pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A), and 28 U.S.C. § 2461(c), related to the following assets:

(a) Bank of America Account # 9506
   a. Account Holder: ValueWise Corporation d/b/a/ Primary Search Group
   b. Account Balance: $1,444,975.16.

(b) Bank of America Account # 6843
   a. Account Holder: ValueWise Corporation d/b/a/ Optix Consulting
   b. Account Balance: $5,363,936.77

(c) Bank of America Account # 6103
   a. Account Holder: Heutmaker Business Advisors, LLC
   b. Account Balance: $7,713,562.99

(d) 30,000 Common Shares of Pioneer Bancorp Inc., owned by MyPayrollHR.com LLC

(e) A Black 2020 Jeep Gladiator

A money judgment was also sought against Defendant Mann in the amount of $101,038,793.31.  *Id.* at pp. 11-13, Forfeiture Allegation.

### B. Procedural History

On August 12, 2020, Defendant Mann waived indictment and pled guilty to Counts 1 through 12 of the Information.  Dkt. No. 29, Minute Entry dated August 12, 2020. Pursuant to the Plea Agreement, Defendant consented to an order of restitution and an Order of Forfeiture as set forth in the Information.  Dkt. No. 30.  Approximately one year after the plea, Defendant Mann was sentenced to a total term of imprisonment of twelve years and was ordered to pay restitution in the amount of $101,038,793.31.  Dkt. No. 89, Minute Entry dated August 4, 2021.

In the interim, a Preliminary Order of Forfeiture was signed by Senior United States District Court Judge Lawrence E. Kahn on August 26, 2020, following Defendant's plea.  Dkt. No. 35.  The Forfeiture Order covered certain specified assets, including, as relevant here, the three (3) Bank of America Accounts referenced above and the 30,000 common shares of Pioneer Bancorp Inc. owned by MyPayrollHR.com LLC.  *Id.* at pp. 1-2.  The Preliminary Order also provided that any entity asserting a legal interest in the subject property could petition the Court to conduct a hearing to adjudicate the validity of its interest in the subject property, and if successful, seek an amendment of the Order of Forfeiture pursuant to 21 U.S.C. § 853(n)(6).  *Id.* at p. 4.  Petitions brought under § 853 must be sworn and contain the following statements: the petitioner's asserted right, title or interest in the subject property; any additional facts supporting the petitioner's claim; and the relief sought.  *Id.*

On May 13, 2021, Cachet Financial Services filed a Verified Petition pursuant to 21 U.S.C. § 853(n)(2), requesting a hearing to adjudicate its interest in two of the Bank of America accounts: Account ## 6103 and 6843. Dkt. No. 51. On May 14, 2021, Pioneer Bank submitted a Verified Petition requesting a hearing to adjudicate its interest in all three Bank of America accounts, as well as the 30,000 common shares of Pioneer Bancorp, Inc. stock. Dkt. No. 54.

The Government moved to dismiss the Petitions of both Pioneer Bank and Cachet. Dkt. Nos. 65 & 67. The Third-Party Petitioners opposed the Government's Motions, and the Government replied. Dkt. Nos. 80, 81, 91, 92, & 103. The District Court referred the matter to this Court for report and recommendation on the preliminary Motions and, if necessary, to conduct a hearing. Dkt. Nos. 53, 56, & 86. While the Government's Motion to Dismiss was pending, Cachet filed a letter request, on consent of the Government, to serve an Amended Petition. Dkt. No. 116. That Amended Petition was filed on February 22, 2022. Dkt. No. 120. At that time the Government renewed its Motion to Dismiss Cachet's Amended Petition. Dkt. No. 121. Cachet has again opposed the Motion, and the Government has replied. Dkt. Nos. 124, 125, & 126.

## II.  LEGAL STANDARD

### A.  Forfeiture Statute

Forfeiture proceedings pursuant to 18 U.S.C. §§ 981(a)(1) and 982(a)(2) are governed by 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal Procedure. *United States v. Daugerdas*, 892 F.3d 545, 548 (2d Cir. 2018) (citing 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c)). Under 21 U.S.C. § 853, any person convicted of a

qualifying violation shall forfeit to the United States "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." *U.S. v. Watts*, 786 F.3d 152, 160 (2d Cir. 2015) (quoting 18 U.S.C. § 982(a)(2)).  This right to forfeiture "gives the government an independent legal claim to any assets traceable to the defendant's crime." *Id.* at 164.  The claim "does not arise because the government 'inherits' the defendant's interests through the forfeiture order; it arises because the government has an independent interest in that property that is *superior* to the defendant's own claims." *Id.* (emphasis in original).

Under § 853, forfeitable property is categorized as either offense property[1] or substitute property.[2]  21 U.S.C. § 853(a)(1), (p).  The category distinction is important because it determines when the government's interest in the forfeitable property vests. *U.S. v. Peterson*, 820 F. Supp. 2d 576, 584 (S.D.N.Y. 2011); 21 U.S.C. § 853(c), (n)(2). Notably, under the relation-back doctrine of § 853(c), the government's interest in offense property "vests in the United States upon commission of the act giving rise to forfeiture." 21 U.S.C. § 853(c).

Recognizing the possibility that a third party may also assert an interest in property subject to forfeiture, 21 U.S.C. § 853(n) allows an "innocent third party [to] claim a legal interest in the forfeitable property" through an ancillary proceeding.  *U.S. v. Watts*, 786 at 160.  The third-party petitioner, however, must first establish standing to challenge the

---

[1] Offense property is defined as "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly," as the result of the crime.  21 U.S.C. § 853(a)(1); 18 U.S.C. § 982(a)(1).

[2] Substitute property includes assets that have been transferred to a third party or that have been dissipated or are otherwise unable to be located.  21 U.S.C. § 853(p).

order of forfeiture by demonstrating a sufficient legal interest in the forfeited property. *U.S. v. Watts*, 786 F.3d at 160 (citing *U.S. v. Ribadeneira*, 105 F.3d 833, 835 (2d Cir. 1997)).  This is because "Congress did not intend section 853(n) to serve as a vehicle by which *all* innocent third parties who are aggrieved by an order of criminal forfeiture can petition for judicial relief. Rather, it seems … that Congress, in enacting section 853(n)(6)(A) and (B), intended to accord standing to only two narrow classes of third parties, and intended to require all other third parties to petition the Attorney General for relief." *DSI Assocs. LLC v. United States*, 496 F.3d 175, 186 (2d Cir. 2007) (quoting *United States v. Lavin*, 942 F.2d 177, 185 (3rd Cir. 1991)).  General creditors, in particular, lack a sufficient legal interest in forfeited property to establish standing.  *U.S. v. Ribadeneira*, 105 F.3d at 835.

Consequently, under § 853(n)(6), a petitioner must plead either that

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section …

21 U.S.C. § 853(n)(6).

The procedure dictated by § 853 provides the exclusive means for third parties to intervene in forfeiture proceedings.  *DSI Assocs. LLC v. United States,* 496 F.3d at 183.

It is clear, therefore, that victims of a qualifying offense may sustain significant financial harm yet fail to satisfy the elements of § 853(n). In such cases, however, a remedy still exists. In particular, "[f]ollowing the seizure of property ordered forfeited under this section, the Attorney General shall direct the disposition of the property… making due provision for the rights of any innocent persons." 21 U.S.C. § 853(h). Further, the Attorney General is authorized to "restore forfeited property to victims of a violation of this subchapter, or to take any other action to protect the rights of the innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section." 21 U.S.C. § 853(i).

The specific procedures governing ancillary proceedings under § 853(n) are provided by Rule 32.2(c) of the Federal Rules of Criminal Procedure. *U.S. v. Watts*, 786 F.3d at 161. Rule 32.2(c)(1) states that where "a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding." FED. R. CRIM. P. 32.2(c)(1). Notwithstanding that requirement, a court "may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason," without proceeding to a formal hearing. *Id.* 32.2(c)(1)(A). A motion to dismiss a third-party petition is treated procedurally "like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)." *U.S. v. Watts*, 786 F.3d at 161 (quoting *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 241 (2d Cir. 2011)).

### B. Motion to Dismiss Standard

On a motion to dismiss under FED. R. CIV. P. 12(b)(6), "the court reads the facts alleged in the [petition], assumes the truth of those facts, and decides whether those facts

state a claim under the applicable legal standard." *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 235 (2d Cir. 2015). In doing so, the court draws all inferences in favor of the non-moving party. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006). "To survive a motion to dismiss, a [petition] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. DISCUSSION

### A. Cachet Financial Services

Cachet Financial Services ("Cachet") has filed an Amended Verified Petition, asserting an interest in all the funds in two of the three Bank of America accounts subject to the Preliminary Order of Forfeiture, specifically, Accounts ## 6103 and 6843. Dkt. No. 120, Cachet Am. Pet. at p. 1. Cachet alleges that its interest arises under § 853(n)(6)(A) and is traceable to Account ## 6103 and 6843 through a record of ACH transfers between banks. *Id.* at ¶¶ 3, 20. In response, the Government has asserted that Cachet's Petition should be dismissed due to a lack of standing, arguing that Cachet is a general, unsecured creditor lacking any specific interest in the forfeited property. Dkt. No. 121-1, Govt.'s Mem. of Law at p. 2.

Cachet alleges that Mann essentially stole nineteen million dollars of Cachet's own money using altered computer codes. Cachet Am. Pet. at ¶ 14. At the time of the fraud, Cachet operated as an ACH processor that "effectuated ACH payroll transactions." *Id.* at ¶ 3. As a processor, Cachet contracted with payroll companies also known as "remarketers," such as the Mann-owned MyPayrollHR, LLC. *Id.* Payroll companies would prepare and submit digital files to Cachet containing the bank account information of employers, the amount to be debited from those employers' accounts and the corresponding amount to be credited to Cachet's settlement account, as well as the amount to be debited from the settlement account and credited to the employees' accounts. *Id.* at ¶ 4. On "pay day," Cachet's ACH system would automatically debit funds from the employers' accounts, credit them to the settlement account, and then debit funds from that settlement account and credit them to the employee accounts. *Id.* at ¶ 5. Cachet would effectuate these transfers based upon information provided by the payroll companies, such as the Mann-controlled MyPayrollHR. *Id.* at ¶ 4.

Cachet alleges that between August 30, 2019, and September 3, 2019, Mann used "ACH kiting techniques" to steal more than $19 million from Cachet. *Id.* at ¶ 6. During this time frame, Mann "fraudulently manipulated" the digital files sent to Cachet's server, causing millions of dollars to be diverted to bank accounts controlled by Mann, rather than being deposited to the bank accounts of employees of the companies MyPayrollHR serviced. Dkt. No. 122, Cachet's Mem. of Law at pp. 2-3. Specifically, on August 30, 2019, Mann uploaded digital files to Cachet's server which caused more than $19 million to be debited from various Mann-controlled accounts at Pioneer Bank and "credited" to

Cachet's settlement account. *Am. Pet.* at ¶ 9. The digital file also caused the same amount to be debited from Cachet's settlement account and credited to Mann-controlled accounts on September 3, 2019. *Id.* at ¶ 11. However, no funds were actually received by Cachet's settlement accounts because Pioneer had frozen Mann's accounts and retroactively rejected the $19 million in debits on September 4, 2019. *Id.* at ¶¶ 7, 11. As a result, two of the Bank of America accounts subject to forfeiture (##6103 and 6843) were credited $15,374,287.80 out of Cachet's own settlement account funds while no corresponding funds were received by the settlement account.[3] *Id.* at ¶ 8. Cachet alleges, therefore, that it can specifically trace its own funds into those accounts, and that it is the beneficiary of a constructive trust over those funds due to Mann's theft. Accordingly, and as noted in Mann's plea agreement, the money allegedly deposited into the seized accounts was "money belonging to Cachet." Dkt. No. 30, Plea Agreement at ¶¶ 5(a)(a)-(g)(g). Cachet also notes that in accordance with well-established tracing rules, there is an irrebuttable presumption that Mann's funds were used to pay the September 6 debits, thereby leaving only Cachet's money remaining in the account. Dkt. No. 92, Cachet Opp. at p. 5.

The Government has moved to dismiss Cachet's Amended Petition, asserting that its interest is superior because Cachet's interest is equivalent to that of an unsecured general creditor. Dkt. No. 121-1, Gov't Mem. of Law, at pp. 11-14. Accordingly, the Government argues that the Amended Petition should be dismissed at the pleading stage

---

[3] There appears to be some factual dispute as to the amount of funds present in the Bank of America accounts prior to Cachet's transfer of funds. *Compare* Govt.'s Mem. of Law at pp. 13-14 *with* Cachet's Am. Pet. at ¶¶ 24-26. However, taking the facts alleged by Cachet as true, as the Court must at this stage, Cachet has plausibly alleged that its funds are traceable to those accounts.

due to lack of standing. *Id.* The Government asserts that Cachet's interest is inferior because Cachet has failed to establish the elements of a constructive trust under New York law, specifically with regard to showing a sufficient fiduciary or confidential relationship. *Id.* at pp. 14-17. Finally, the Government claims that the fraudulent funds were co-mingled together in a way that makes tracing impossible, and that it would be fundamentally inequitable to provide all the assets to Cachet in a case involving many similarly situated victims. *Id.* at pp. 17-23.

Cachet asserts that its interest in the funds arises under § 853(n)(6)(A). Am. Pet. at ¶ 20. "To establish a claim to property subject to forfeiture under § 853(n)(6)(A), a petitioner must demonstrate that he 'has a legal right, title, or interest in the property … [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant *at the time of the commission of the acts* which gave rise to the forfeiture of the property.'" *U.S. v. Watts*, 786 F.3d at 166 (quoting 21 U.S.C. § 853(n)(6)(A)). This requirement that the petitioner's interest be evaluated "at the time of the commission of the acts" governs the analysis of both when the property became "vested in the petitioner" and when the petitioner's interest became "superior to any … interest of the defendant." *U.S. v. Watts*, 786 F.3d at 166. Subsection (n)(6)(A) must be read together with the "relation-back" doctrine of § 853(c). *Id.* As a result, where a petitioner "obtains his interest in the property *after* the commission of the crime giving rise to forfeiture, he may defend his right to the property only under § 853(n)(6)(B), by establishing that he acquired the interest as a bona fide purchaser for value without cause to believe that the property was forfeitable." *Id.* "For this reason, courts have recognized

that a petitioner is unlikely ever to prevail at an ancillary hearing under § 853(n)(6)(A) where the forfeited property consists of 'proceeds' derived from or traceable to a criminal offense." *Id.* "Accordingly, § 853(n)(6)(A) is better suited to defending a third party's right to the 'instrumentalities' of a crime—property used by a defendant to facilitate his criminal acts, but that pre-exists those acts themselves—than to proceeds that necessarily arise only after or upon the commission of the crime." *Id.* at 167.

Accepting the non-conclusory facts stated in the Petition as true, as the Court must on a motion to dismiss, Cachet has plausibly alleged that the funds in the two Bank of America accounts are not proceeds of Mann's crimes, but are instead Cachet's own funds, stolen and transferred directly from its settlement account. Cachet's Am. Pet. at ¶¶ 6-14. Rather than alleging this transfer in a conclusory manner, Cachet has provided a specific breakdown of exactly how its funds were transferred into the accounts subject to forfeiture. Dkt. No. 120-1, Ex. A.

As a result of the foregoing, Cachet asserts that it has a superior interest in the seized funds as the beneficiary of a constructive trust. *Id.* at ¶¶ 20-28. The Second Circuit confirmed in *Willis* that "a constructive trust qualifies as a 'legal right, title, or interest in the property' that 'may be a superior interest' to a defendant's interest for the purposes of … § 853(n)(6)(A)." *Willis Mgmt. v. U.S.*, 652 F.3d at 242. This is because "if a constructive trust properly should be imposed on particular property that was in the possession of the defendant, it was never truly the defendant's property and is not subject to forfeiture to the United States in the first instance." *Willis Mgmt. v. U.S.*, 652 F.3d at 245. District courts "should evaluate whether a constructive trust should be recognized

pursuant to the applicable state law and based on the facts of the particular case at issue." *Id.* An important consideration in this regard is whether the imposition of a constructive trust "would unfairly elevate the petitioners' claims over those of multiple similarly situated victims." *Id.* at 246 (internal quotation marks omitted).

New York law recognizes constructive trusts, and requires, at a minimum, "a showing that property is held under circumstances that render unconscionable and inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 362 (2d Cir. 1999). "[A] constructive trust arises 'when, in the eyes of equity, a plaintiff is the true owner of … [the] property' at issue due to his right to the underlying assets from which it derives." *U.S. v. Watts*, 786 F.3d at 168. "In these circumstances, the trust confers on the true owner of the property an equitable interest in the property superior to that of anyone who claims a later interest, … including, in effect, the government under § 853(c)." *Id.* (internal quotes and citation omitted). The Second Circuit has held that "beneficiaries of properly traced constructive trusts [can] claim third-party interests under the forfeiture statute, while other victims, who [are] not entitled to constructive trusts, and [do] not otherwise have a legal interest in the property, should utilize the remission process instead." *Willis Mgmt. v. U.S.*, 652 F.3d at 243.

The Government's position is that Cachet's constructive trust claim fails as a matter of law. Gov't Mem. of Law at pp. 1, 14-23. The Government bases this argument primarily on its assertion that Cachet *must* establish the existence of all four elements of a constructive trust under New York law in order to state a claim. *Id.* at pp. 15-17. Under

New York law, the elements for imposing a constructive trust are: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Counihan v. Allstate Ins. Co.*, 194 F.3d at 361-62 (quoting *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (1976). The Government contests the "fiduciary/confidential relationship" factor specifically but does not address the presence or absence of the remaining three elements. Gov't Mem. of Law at pp. 16-17. Upon review, the cases that the Government relies upon to assert that the elements of a constructive trust must be strictly met are not persuasive in this context.[4]

Given that the imposition of a constructive trust is governed by state law, the Court looks to how New York courts have interpreted the requirements. *See Willis Mgmt. v. U.S.*, 652 F.3d at 242 (noting that Vermont law governed whether a constructive trust should be recognized). New York appellate courts have recently confirmed the "flexible spirit" of the constructive trust doctrine. *Baker v. Harrison*, 180 A.D.3d 1210, 1211 (3rd Dep't 2020) ("As a constructive trust is an equitable remedy, courts do not rigidly apply the elements but use them as flexible guidelines."); *Harounian v. Harounian,* 198 A.D.3d 734, 735 (2d Dep't 2021) (stating that the factors should be applied flexibly because they

---

[4]  For example, the Government quotes *In re Ades and Berg Group Investors* for the proposition that "New York law requires [these] four elements to prove a constructive trust." Dkt. No. 126, Govt.'s Reply at p. 2. However, the Second Circuit in *Ades* evaluated a constructive trust claim within the specific context of bankruptcy proceedings. *In re Ades and Berg Group Investors*, 550 F.3d 240, 245 (2d Cir. 2008). The Court pointedly noted that when "applying state constructive trust law, … the 'equities of bankruptcy are not the equities of the common law.'"  *Id.* (quoting *In re First Cent. Fin. Corp.*, 377 F.3d 209, 218 (2d Cir. 2004)). Given the stated reluctance of bankruptcy courts "to impose constructive trusts without a substantial reason to do so," *id.* at 243, the Court is not convinced that the interpretation of the constructive trust requirements by the *Ades* court translates well to the facts at bar.  Nor is the Court persuaded by the quote from *Amusement Industry v. Stern*, which cited *Ades* in dicta for the proposition that a confidential or fiduciary relationship is a required element of a constructive trust under New York law. *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 785 n. 7 (S.D.N.Y. 2011).

"serve only as a guideline, and a constructive trust may still be imposed even if all four elements are not established"); *ELM Suspension Sys., Inc., v. 45 E. 33rd St. Condominium*, 201 A.D.3d 498, 499 (1st Dep't 2022) (noting that "courts have observed that a constructive trust may be imposed even where some of the[] traditional elements are not present"). Given that a constructive trust is equitable in nature, New York courts have clearly stated that the facts need not fit exactly within the framework of these elements. *Id.* Instead, New York courts "insist upon [ ] a showing that property is held under circumstances that render unconscionable and inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment." *Counihan v. Allstate Ins. Co.*, 194 F.3d at 362. "[T]he lack of a fiduciary relationship does not defeat the imposition of a constructive trust." *Id.*

While the Court, therefore, is not persuaded that it is necessary to strictly establish all four elements prior to recognizing a constructive trust, it also finds that Cachet has sufficiently alleged, at least at this stage of the proceeding, a confidential relationship with Mann and MyPayrollHR. Cachet's Petition alleges a relationship of trust and confidence with Mann and MyPayrollHR pursuant to a "decade-long business and contractual relationship." Pet. at ¶¶ 3, 22. Cachet's contractual relationship with MyPayrollHR was subject to confidentiality agreements due to the sensitive nature of the information being exchanged between the companies. Dkt. No. 122, Cachet's Mem. of Law at pp. 14-15. The agreements indicated that MyPayrollHR would have access to Cachet's "methods, procedures, pricing, agreements, forms, operations, work methods and other confidential data." *Id.* at p. 14. Moreover, it appears that Cachet substantially

relied on the accuracy of Mann's data input for the digital files in its automated processes. *Id.* at p. 15.  Cachet alleges that on September 3, 2019, it transferred the money from its own settlement account in reliance on MyPayrollHR's digital representations contained within the batch files.  *Id.*  In turn, Mann abused that relationship of trust and confidence and caused Cachet to transfer its own funds while not receiving the equivalent amount of funds from Mann or MyPayrollHR.

The most important considerations for deciding whether to recognize a constructive trust are equitable in nature.  *Sharp v. Kosmalski*, 40 N.Y.2d at 123 ("The salutary purpose of the constructive trust remedy is to prevent unjust enrichment").  The Government asserts that Cachet is similarly situated to all of Mann's other victims and so equitable considerations do not support the imposition of a constructive trust here.  The Court is not persuaded by this view.  For example, Mann's fraudulent scheme with banks and lending companies was based on an overstatement of his companies' revenue and receivables, which induced lenders to loan his companies money under false pretenses. Plea Agreement at ¶ 5(b).  Mann then obtained new loans based on similar misrepresentations and used the proceeds to repay the older loans.  *Id.* at ¶ 5(c).  These lenders chose to loan Mann and his companies money, and in some cases, received at least some payment in exchange for doing so.  *Id.* at ¶¶ 5(c), (f), (i), (q).  In contrast, Cachet points out that it did not voluntarily give or loan Mann or MyPayrollHR money at any point.  Cachet's Am. Pet. at ¶ 31.  Instead, Cachet's funds were stolen when Mann manipulated ACH data files and caused money to be transferred from Cachet's own settlement accounts and routed into the Mann-controlled accounts at Bank of America

which are the subject of the present forfeiture order.  *Id.* at ¶¶ 9-12.  Assuming the facts as set forth in Cachet's Petition as true, there is an arguable basis for the Court to conclude that the funds in the Bank of America accounts did not belong to Mann and instead were held in a constructive trust for Cachet as the beneficiary.  *See Willis Mgmt. v. U.S.*, 652 F.3d at 244 ("While it is true that a court evaluates the equities after the fact, if the circumstances are such that a constructive trust should be recognized, the defendant never truly acquired an interest in the property at issue and only held it as a trustee for the beneficiaries.").  As a result, the Court finds that Cachet has plausibly alleged a superior interest in Bank of America Accounts ##6103 and 6843 and recommends that the Government's Motion to Dismiss be denied.

The Government's final argument is that its Motion to Dismiss Cachet's Amended Petition should be granted because Cachet's money was co-mingled with other funds in the subject BOA accounts, and therefore is not traceable.  As the Government's brief succinctly states: "With money constantly in motion, it is not plausible to allege that any one dollar belonged to any particular victim."  Dkt. No. 126, Govt.'s Reply Brief at p. 9. But the Government has opposed such an argument when proffered by criminal defendants seeking to prevent seizure of bank assets, and the Second Circuit has agreed with that position.  "The cash in the hands of the bank does not cease to be 'traceable proceeds' just because it is commingled with the bank's other cash."  *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1161 (2d Cir. 1986).  Courts and accountants have adopted various accounting principles to address this situation, including applying the lowest intermediate balance rule or the drugs-in, last-out rule; the pro rata share

withdrawal rule; and the drugs-in, first-out rule. *Id.* at 1158-1160. Therefore, while the fungibility of money may make it difficult for Cachet to succeed with its burden at the hearing, these matters are best left to be decided once the proof is presented.

## B. Pioneer Bank

Pioneer Bank has asserted two claims in its Petition, premised on two separate theories of entitlement to the forfeited assets. The first claim is specifically asserted against all the funds in the three Bank of America accounts subject to forfeiture, whereas the second claim is asserted against the three accounts in addition to 30,000 shares of Pioneer stock. Dkt. No. 54, Pioneer Pet. at pp. 3-15. According to the Petition, Defendant Mann and his co-conspirators committed a massive, premeditated fraud on Pioneer Bank causing it to incur millions of dollars in losses. Pioneer Pet. at ¶ 3. The losses arose in part out of the business lending relationship Pioneer had with Mann, and in part due to the collapse of a check-kiting scheme[5] Mann engaged in. *Id.* at ¶ 4.

### 1.  Claim 1

Pioneer's first claim is asserted against all of the funds in Bank of America Accounts ## 9506, 6843, and 6103. Pioneer Pet. at pp. 2-3. Pioneer alleges that it was a bona fide purchaser for value of a security interest in those accounts pursuant to N.Y.

---

[5] "By check kiting a person can mislead a bank into thinking that an account balance is higher than it actually is. A prerequisite to this type of criminal activity is to deal with banks whose policy is to credit a deposit when made, rather than crediting a check when it clears through the bank on which it is drawn. A person kiting checks revolves the same money through two or more accounts by, for example, depositing a check drawn on bank A into bank B, then depositing a check drawn on bank B into bank A to cover the originally deposited check. Timing is of the essence to prevent checks from being returned for insufficient funds. The purpose of such an illegal scheme is to keep artificially high balances in more than one account so that 'legitimate' checks (to entities other than the principal) can be drawn on accounts that actually have negative balances, while preventing the banks from discovering that these accounts are overdrawn." *U.S. v. Burnett*, 989 F.2d 100, 102 (2d Cir. 1993).

U.C.C. § 4-208.[6]  Dkt. No. 54, Pioneer Pet. at p. 3.  The facts underlying this claim are as follows.   On August 29, 2019, Michael Mann deposited thirty-six Bank of America checks drawn from three accounts (#9506, #6843, and #6103) into twelve recipient accounts at Pioneer Bank.  Pioneer Pet. at ¶ 9.  The check deposits totaled $15,588,000, of which Pioneer extended a corresponding amount of provisional credit that same day.  *Id.* at ¶ 11.  Mann then used the provisional credit provided by Pioneer to write thirty-nine checks from those twelve recipient Pioneer accounts, in an amount totaling $18,043,000.  *Id.*  At the end of the day on August 29, 2019, Pioneer Bank paid out $18 million on the checks, and that money was deposited into Account #4559 held by ValueWise at Bank of America.  *Id.* at ¶ 13, 21.  The next day, on August 30, 2019, Bank of America returned and called back the thirty-six checks.  *Id.* at ¶ 14.  This resulted in the twelve Pioneer accounts becoming overdrawn, as Mann/ValueWise had already utilized and withdrawn the provisional credit from the check deposits.  *Id.* at ¶¶ 14-15.

Starting on September 4, 2019, Pioneer took actions to recover the overdrafts and negative net balances resulting from the dishonored checks.  *Id.* at ¶ 27.  Pursuant to relevant account agreements, Pioneer was able to recover a total of $15,975,018.25 from other Mann-controlled general deposit accounts that were held at Pioneer.  *Id.*  Although Pioneer was able to collect more than the amount of the dishonored checks through self-help measures, those actions are currently the subject of litigation initiated by the United

---

[6] This provision of the UCC establishes the rights of a collecting bank in a deposited item, and states that a bank has a security interest in an item deposited into an account "to the extent to which credit given for the item has been withdrawn or applied."  N.Y. U.C.C. § 4-208(1)(A).

States in a separate proceeding. *United States v. Pioneer Bank et al.*, 20-CV-487 (N.D.N.Y.), Dkt. Nos. 1, 13.

According to Pioneer Bank, even though the funds from the Pioneer checks were deposited in the #4559 account, which is not subject to the forfeiture action, upon Pioneer's "information and belief," the funds that are contained in the Bank of America accounts that have been forfeited (## 9506, 6843, and 6103) to the United States are comprised entirely of the "proceeds" of the thirty-six Bank of America checks. *Id.* at ¶ 23. Pioneer Bank argues that it is entitled to the funds in the three accounts for two related reasons. First, the Bank asserts that when it provided ValueWise provisional credit for the thirty-six deposited checks, it automatically obtained a perfected security interest in the proceeds of those checks, "wherever those proceeds are and in whatever form those proceeds may take." *Id.* at ¶ 16. Second, Pioneer maintains that the security interest in those checks was given to Pioneer in exchange for an antecedent debt, namely, the "negative balances in the overdrawn accounts." *Id.* at ¶ 17. Pioneer further alleges that it "purchased" this security interest without knowledge of Mann's crimes or that the funds were subject to forfeiture and therefore was a bona fide purchaser. *Id.* at ¶¶ 15, 19, 25.

The Government disputes Pioneer's claim and has moved to dismiss the Bank's Petition. Dkt. No. 65. The Government argues initially that Pioneer has already satisfied its claim of loss through self-help measures, and therefore it would be particularly inequitable to allow the Bank to effectively prevent hundreds of other small businesses from covering even a small portion of their loss. *See* Dkt. No. 65-1, Govt.'s Mem. of Law at pp. 1-2 (noting that the Government intends to distribute the assets among Mann's

victims, including Pioneer).  Next, the Government asserts that as a general creditor of Mann, Pioneer lacks standing to pursue a third-party claim under this forfeiture provision. Finally, the Government argues that Pioneer has failed to plausibly allege how its purported interest can be traced to the accounts subject to forfeiture.

### a. Constitutional Standing

The Government argues initially that Pioneer Bank has no Article III Constitutional standing as to Claim 1 because any injury is purely hypothetical in light of Pioneer's successful use of self-help remedies to cover its overdraft losses.  Govt.'s Mem. of Law at p. 13.  Federal courts are limited in their subject matter jurisdiction under Article III to the decision of actual cases or controversies.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper v. Amnesty Intern. USA,* 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife,* 504 U.S. at 561.

At issue here is whether Pioneer's alleged injury specific to the thirty-six dishonored Bank of America checks is actual or imminent, as opposed to conjectural or hypothetical.  *See* Govt.'s Mem. of Law at pp. 13-14.  The Court disagrees that Pioneer has failed to *allege* a concrete, particularized injury and thus recommends that the Motion to Dismiss on this basis be denied.

- 22 -

Pioneer alleges that it has an ownership interest in property that the Government has forfeited to itself. Pioneer Pet. at ¶ 26. The Government's argument with respect to constitutional standing presupposes its ultimate conclusion on the merits – that Pioneer does not have a legally protected interest in the subject property. If the Government is correct, then Pioneer lacks standing. Pioneer, however, has pled such an interest, and, as outlined below, it has done so sufficiently to warrant a hearing. "A party who asserts a colorable claim of ownership to the forfeited property meets the requirement of Article III standing." *United States v. Tyrrell*, 2012 WL 5989344, at *3 (M.D. Fla. Nov. 29, 2012). Accordingly, the Court recommends that given how standing "for the § 853(n) petition issue - ends up being intertwined with the merits question," *United States v. Furando*, 40 F.4th 567, 575 (7th Cir. 2022), dismissal on constitutional standing grounds is not warranted here.

A large part of the Government's argument relates not so much to Pioneer's claim of ownership in the forfeited property, but to the actions Pioneer has taken to recover losses it suffered as a result of Mr. Mann's crimes. By its own admission, Pioneer was able to recover over $387,000 more than the amount of the dishonored checks from other Mann-controlled general deposit accounts. Pioneer Pet. at ¶ 27. The Government argues that permitting Pioneer to proceed with this claim may result in a double recovery for Pioneer on a single loss and thus it should be denied standing to proceed. This analysis, however, improperly focuses on the merits, not standing. The Government argues, in essence, that because Pioneer might prevail on the merits of its § 853(n) claim and that would, in its view, be inequitable, Pioneer should be denied standing. The question of

whether Pioneer might receive a double recovery, however, is not a question of injury for purposes of Article III standing. *Cf. Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*, 2021 WL 2716307, at *4 n. 3 (S.D.N.Y. July 1, 2021) ("the distribution of any resulting damages among interested parties is . . . not a question affecting its standing to pursue this lawsuit.").[7]

The Government also argues that the claimed injury is not imminent because it is tied to the result of litigation brought by the United States against Pioneer Bank that involves the manner in which Pioneer sought to recoup losses allegedly caused by Mann. Govt.'s Mem. of Law at pp. 13-14; *United States v. Pioneer Bank, et al.*, 20-CV-487 (N.D.N.Y.) ("the Payroll Litigation").  In summary, that litigation alleges that Pioneer's recovery actions resulted in the wrongful seizure of funds that were properly attributable to payroll taxes and that as result, a sum in excess of seven million dollars, plus interest, is owed by Pioneer to the Internal Revenue Service. *United States v. Pioneer Bank, et al.*, 20-CV-487, Dkt. No. 1, Compl. at ¶¶ 27-37 & Wherefore Clause.  Contrary to the Government's position, however, the injury claimed by Pioneer here is not a speculative injury that it might lose the Payroll Litigation and thus suffer a future harm, but the very concrete claim that the Government has already forfeited funds to which it has a legal claim. Dkt. No. 80, Pioneer Mem. of Law at pp. 10-12.  The impact of the Government's litigation against Pioneer no doubt bears on any recovery Pioneer might be entitled to

---

[7] Once the merits are reached, "a district court may exercise its equitable discretion to prevent an inequitable result in an ancillary forfeiture proceeding." *United States v. Egan*, 2012 WL 3705013, at *8 (S.D.N.Y. Aug. 28, 2012) (citing *U.S. v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996)).  The Government's double recovery concern, therefore, could be addressed on its merits if Pioneer is able to establish its claim.

here, but that again is a merits question, not one that should preclude Pioneer from even having an opportunity to litigate the claim.

Here, the Government seeks to use Pioneer's self-help actions as both a sword and shield. The Government contends that because Pioneer has already recouped more than the amount forfeited, it has suffered no injury, while at the same time arguing through different counsel that Pioneer's recovery efforts were at least partially unlawful, and therefore the bank must turn over more than seven million dollars of the funds it recovered to the Government. *United States v. Pioneer Bank, et al.*, Compl. at ¶¶ 27-37 & Wherefore Clause. The Government's affirmative litigation was commenced prior to Pioneer's filing of the present Petition. As a result, it would be particularly inequitable for this Court to allow the Government to proceed as it has done here and not permit Pioneer to seek to protect its asserted legal interest in this proceeding. While Pioneer is confident that it will prevail in the action brought against it by the Government, Pioneer Pet. at ¶ 28, the Government is presumably equally confident of its likelihood of success. Whether Pioneer will be able to establish an actual injury at the time of the hearing will be determined by the Court after considering the admissible evidence.

*b. Pioneer's Legal Interest*

As noted above, the third-party claims process in forfeiture cases is limited to a certain class of cases, and not all those who assert a claim in seized assets are able to benefit from the statutory right to seek their return. In particular, the claimant must establish that they have a legal interest in the property superior to that of the Government, either because it predates the Government's interest, or because the interest was acquired

as a subsequent bona fide purchaser.  *U.S. v. Watts*, 786 F.3d at 160.  As stated in the first

claim of the Petition, Pioneer alleges a superior right as a bona fide purchaser of a

continuing perfected security interest in the thirty-six dishonored checks and their

proceeds pursuant to N.Y. U.C.C. § 4-208.  Pet. at ¶ 16.  Pioneer relies upon the third

subsection of that provision of the N.Y. U.C.C. to claim that, despite the election to utilize

self-help measures, it has a continuing and perfected security interest in the checks and

their proceeds.  This section states:

> Receipt by a collecting bank of a final settlement for an item is a realization
> on its security interest in the item, accompanying documents and proceeds.
> To the extent and so long as the bank does not receive final settlement for
> the item or give up possession of the item or accompanying documents for
> purposes other than collection, the security interest continues and is subject
> to the provisions of Article 9 . . .

N.Y. U.C.C. § 4-208(3).

The Government seeks dismissal of this claim on the merits, arguing only that

"Pioneer has not sufficiently alleged an interest in the Subject Accounts."  Govt.'s Mem.

of Law at p. 14.  The Government's position generally is that Pioneer has failed to make

sufficiently specific allegations to support its claimed ownership interest, despite

presumably having the ability to do so.  *Id.* at pp. 14-17.  The Government takes particular

exception to the Petition's pleading of certain allegations "upon information and belief."

*Id.* at pp. 15 & 17.[8]

---

[8] The Government makes no substantive argument regarding Pioneer's claimed legal interest in Claim 1, but instead asserts only that Pioneer has not sufficiently pled that interest.

Pioneer's pleading "upon information and belief" is not a basis for dismissal. "When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are based on secondhand information that [it] believes to be true." *United States v. Daugerdas*, 2020 WL 364601, at *3 (S.D.N.Y. Jan. 22, 2020) (quoting *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 431 (S.D.N.Y. 2014)). The Government does not dispute, nor could it, that Pioneer engaged in significant financial transactions involving Mr. Mann. Instead, it contends that the Petition, in relying on factual allegations set forth upon information and belief, fails to allege with sufficient specificity the exact path of funds between several particular bank accounts involved in the August 2019 transaction at issue. That argument, whatever its ultimate merit might be,[9] holds Pioneer to too high a standard at the pleadings stage.

A petition must "set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property." 21 U.S.C. § 853(n)(3). "To survive a motion to dismiss, the petition need only 'state [ ] enough facts to state a claim to relief that is plausible on its face.'" *U.S. v. Watts*, 786 F.3d at 161 (quoting *Willis Mgmt. v. U.S.*, 652 F.3d at 241-42). The Petition recounts in significant detail the financial transactions from August 29-30, 2019 upon which Pioneer rests its claimed interest. Pioneer Pet. at ¶¶ 9-

---

[9] The points raised by the Government in this Court's view raise serious questions about Pioneer's ability to meet that ultimate burden. Given the legal standard applied to dismissal motions and the fact that a hearing is warranted with respect to Cachet's Amended Petition, the Court recommends that the most judicious course here is to direct a hearing on Pioneer's claim as well and put it to its burden of proof.

14.  It also recites in detail Pioneer's legal basis for asserting that those facts establish a legal interest under New York law.  *Id.* at ¶¶ 15-26.

This Court must accept these facts as true and "construe all reasonable inferences in the petitioner's favor."  *United States v. Daugerdas*, 2020 WL 3472447, at *1.  "And for a petitioner to defeat a motion to dismiss, the court must find that the petition's factual allegations 'raise a right to relief above the speculative level.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   The facts as alleged satisfy that requirement.  While this Court need not accept the legal conclusions set forth by Pioneer in the Petition regarding whether these facts establish a protected legal interest, the Government does not presently challenge that assertion as to this claim.  It is, therefore, enough for the Court to recommend that the facts asserted sufficiently allege such an interest to warrant a hearing.

### 2.  Claim 2

Pioneer's second claim is asserted against three Bank of America deposit accounts, as well as 30,000 shares of Pioneer stock subject to forfeiture.  Pioneer Pet. at p. 10. Pioneer's claim of entitlement on this basis is predicated on the August 12, 2019, Loan and Security agreement it entered with the Mann-associated ValueWise entities (hereinafter, "Borrowers").  *Id.* at ¶ 29 and Dkt. No. 54-3.  In exchange for extending a $42 million line of credit to the Borrowers, Pioneer took a security interest in a broad variety of collateral, including deposit accounts and general intangibles.  *Id.* at ¶ 36.  As a result, Pioneer claims that it purchased an interest in all the assets subject to forfeiture, as a bona fide purchaser.  *Id.* at ¶ 28.  The Government contends that Pioneer's second

claim fails as a matter of law because it lacks a perfected security interest in the subject assets, and therefore both lacks standing and fails to state a claim under the statute. Govt.'s Mem. of Law at pp. 17-20.  Pioneer responds that its interest is legally sufficient to withstand the Motion.  Pioneer Mem. of Law at pp. 21-23.

Pioneer's legal interest here is asserted by virtue of the collateral agreement it entered with the Borrower, which purported to give it a security interest in "any and all" personal property belonging to the Borrower, including "deposit accounts."  Pet. at ¶ 36. Pioneer alleges that it purchased[10] an interest in the Borrower's assets in exchange for valuable consideration given, namely, the extension of a $42 million line of credit. Pioneer further alleged that it took this interest in good faith and without notice of competing claims.  Pioneer Pet. at ¶¶ 46-47.  Per its own admission, however, Pioneer never perfected its security interest in any of the assets in question.  Dkt. No. 80, Pet.'s Mem. of Law at pp. 20-21.  Rather, it alleges that when the Borrower defaulted, it "acquired the right to take possession of the collateral."  Pioneer Pet. at ¶ 48.  According to the Government this failure to perfect the interest precludes Pioneer's claim and its entitlement to a hearing under § 853(n).  Dkt. No. 102, Govt.'s Reply Mem. of Law at pp. 6-7.[11]  The Court agrees that the failure to perfect the security interest deprives Pioneer of standing on this claim.

---

[10] Purchase, as defined in the N.Y. U.C.C., "means taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property."  N.Y. U.C.C. § 1-201(29).

Any property interest created by a security interest must still meet the general requirements for standing. A "bare assertion of ownership in the property, without more, is not enough to prove an ownership interest sufficient to establish standing." *United States v. Thomas*, 2021 WL 5278725, at *5 (M.D. Ala. July 13, 2021), *report and recommendation adopted*, 2021 WL 4127750 (M.D. Ala. Sept. 9, 2021) (quoting *United States v. $11,320.00 in U.S. Currency*, 880 F. Supp. 2d 1310, 1323 (N.D. Ga. 2012); *United States v. Coffman*, 612 F. App'x 278, 286 (6th Cir. 2015). Nor is bare legal title sufficient, "in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property." *Id.* Most courts require, at a minimum, some evidence of a possessory interest in order to have standing to challenge an order of forfeiture. *United States v. Tardon*, 493 F. Supp. 3d 1188, 1208 (S.D. Fla. 2020).

Pioneer relies primarily upon a Sixth Circuit decision to show that it is entitled to bona fide purchaser status as a secured creditor. As the Sixth Circuit noted in that case, "Section 853(b) defines the term 'property' to include 'rights, privileges, *interests*, claims, and securities.'" *United States v. Huntington Nat. Bank*, 682 F.3d 429, 434 (6th Cir. 2012). Accordingly, "[b]ecause a security interest is a type of specific 'interest' in property, the purchaser of a security interest could potentially qualify as a BFP under the statute." *Id.* But the facts at bar are distinguishable from those asserted in *Huntington,* which involved the seizure of funds held in an account at Huntington Bank. Huntington had, at a minimum, plausibly alleged both a perfected security interest and a presently vested right to possession of the funds at the time that they were seized by the Government. *See United States v. Huntington Nat. Bank*, 682 F.3d at 433 ("Huntington

asserts it is therefore entitled to the **return** of the forfeited Cyberco account proceeds.") (emphasis added).

In contrast, Pioneer's claim here is asserted against interests over which Pioneer does not allege it ever had possession or control.  "[A] security interest in a deposit account may be perfected only by control under Section 9-314."  N.Y. U.C.C. Law § 9-312(b)(1).  At the time the funds were seized, Pioneer had no present right to possession of the accounts at Bank of America or any funds in that account.  Pioneer had, at most, a right to demand payment from the Borrower that could potentially be satisfied from the funds in the account following an appropriate judgment.  Such an interest is akin to that of a general creditor, or at best an unsecured creditor.  The Second Circuit has specifically held that a general creditor cannot establish standing as a bona fide purchaser under section 853(n).  *United States v. Ribadeneira*, 105 F.3d at 836; *see also United States v. Watkins*, 320 F.3d 1279, 1283 (11th Cir. 2003) (same for "unsecured or general creditor").  In reaching that conclusion, the Second Circuit concluded that the "interest in the property required" under section 853(n)(6)(B) "must be an interest in a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account."  *United States v. Ribadeneira*, 105 F.3d at 836.  It is the latter, rather than the former, type of interest Pioneer asserts here.

Because Pioneer maintains no claim to any particular Bank of America asset, it may not maintain its status as a bona fide purchaser.  *United States v. Madoff*, 2012 WL 1142292, at *5 (S.D.N.Y. Apr. 3, 2012) (citing *United States v. Ribadeneira*, 105 F.3d at

836). The Court, therefore, recommends that the Government's Motion to Dismiss claim 2 be granted.

## IV. CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Government's Motion to Dismiss the Amended Third-Party Petition of Cachet Financial Services, Dkt. No. 121, be **DENIED**, and it is further

**RECOMMENDED**, that the Government's Motion to Dismiss the Third-Party Petition of Pioneer Bank, Dkt. No. 65, **BE GRANTED IN PART AND DENIED IN PART**; and it is further

**RECOMMENDED**, that these matters proceed to a hearing pursuant to 21 U.S.C. §853(n)(5) as set forth above; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*,

892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Dated:   October 14, 2022
         Albany, New York

_____
Daniel J. Stewart
U.S. Magistrate Judge