IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL T. MANN,<br><br>Defendant. | ) | Criminal No. 1:20-CR-199 (LEK) (DJS) |
| CACHET FINANCIAL SERVICES,<br><br>Third-Party Claimant. | ) | |

# UNITED STATES OF AMERICA'S POST-HEARING BRIEF

TODD BLANCHE
Deputy Attorney General

JOHN A. SARCONE III
Acting United States Attorney

Christopher R. Moran
Assistant United States Attorney
Bar Roll No. 700767

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........ 2

I. DISPUTED FACTS RAISED BY CACHET ........ 2

A. Mann Did Not "Steal" Money from Cachet. ........ 2

B. Mann Did Not Own and Control MyPayrollHR at all Relevant Times. ........ 3

C. Mann's Diversion of Funds from Cachet's Account in August 2019 was a Not a Sudden Change that Violated Cachet's Reasonable Trust. ........ 4

II. ADDITIONAL RELEVANT FACTS ........ 4

A. Cachet's ACH Process ........ 4

B. Cachet Learns that Mann is using its ACH system for improper purposes. ........ 6

C. Cachet Turns a Blind Eye to Mann's Continued use of its ACH System for Improper Purposes. ........ 9

ARGUMENT ........ 12

I. CACHET FAILS TO PROVE IT IS THE BENEFICIARY OF A CONSTRUCTIVE TRUST. ........ 12

A. Neither Mann, nor MyPayrollHR were unjustly enriched. (Fourth Element) ........ 12

B. Cachet fails to show a confidential or fiduciary relationship between itself and Mann or MyPayrollHR. (First Element) ........ 18

C. Cachet did not reasonably rely on Mann's purported "promise" to only use its ACH system for payroll transactions. (Second and Third Elements.) ........ 20

II. THE COURT HAS DISCRETION TO DENY A CONSTRUCTIVE TRUST WHEN THERE ARE NUMEROUS FRAUD VICTIMS, EVEN WHEN ONE VICTIM CAN TRACE THEIR ASSETS. ........ 21

CONCLUSION ........ 25

The United States submits this brief in response to Cachet Financial Services' ("Cachet") post-hearing brief, following the October 14, 2025 Hearing in this matter.[1]

## PRELIMINARY STATEMENT

Michael Mann ran a financial fraud scheme that abused the trust of multiple financial institutions. He imperiled innocent people's paychecks, threatened the financial security of small businesses and exposed the vulnerabilities of the unregulated payroll industry within which Cachet chose to do business. *See generally*, United States' Sentencing Memorandum, ECF No. 70. Every financial institution that had a role in Mann's scheme, including Cachet, bears some responsibility for allowing it to go on for years. The most impacted victims are people like Bonnie Rosengrant, who had to leave her dying mother's bedside in early September 2019 and use $30,000 of her own money to pay employees and cover payroll taxes at the Hometown Diner in Rindge, New Hampshire. ECF No. 170, at 1-2. Ms. Rosengrant is one of thousands nationwide who suffered tremendously because of Michael Mann. *Id*., at 2. Most of Mann's victims have accepted that they will only recover pennies on the dollar and are patiently waiting for that recovery. In this ancillary proceeding, Cachet is trying to jump to the head of the line and recover over $14 million that was present in the seized accounts for no reason other than chance. Cachet failed to prove the elements of the constructive trust to which it claims entitlement. The Court can dispose of Cachet's claims on that basis alone. Cachet insists that the fact the seized funds can be traced to Cachet's settlement account is dispositive but ignores its own role in perpetuating Mann's fraudulent

[1] Citations to "Cachet Prehearing Br." are to Cachet's pre-hearing brief, dated October 3, 2025 (ECF No. 237). Citations to "Cachet Posthearing Br." are to Cachet's post-hearing brief, dated December 5, 2025 (ECF No. 251). Citations to "JX __" are to the Joint Exhibits admitted into evidence at the Hearing by stipulation of the parties. Citations to "GX __" are to the Government Exhibits admitted into evidence at the Hearing. Citations to "PX __" are to the Petitioner Exhibit admitted into evidence at the Hearing Citations to "JPS ¶ __" are to the undisputed facts set forth in the Joint Pretrial Stipulation (ECF No. 234). Exhibit __, refers to 7 exhibits attached to the Declataion of Christopher R. Moran, which is filed contemporaneously herewith.

scheme. Allowing Cachet, who turned a blind eye to Mann's fraud for years, to recover $14 million while thousands of innocent victims recover nothing would be a gross inequity.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts are largely undisputed and were set forth in a detailed joint pretrial stipulation. ECF No. 234. However, the government disputes certain additional facts contained in Cachet's post-hearing brief,[2] and submits for the Court's consideration certain additional facts that were established at the hearing.

### I. DISPUTED FACTS RAISED BY CACHET

#### A. Mann Did Not "Steal" Money from Cachet.

Cachet's post-hearing brief contains a section captioned, "Mann Steals $19 Million From Cachet, The Majority of Which is Directly Traceable To The BOA Accounts." Cachet Post-Hearing Br., at 3-4.[3] This mischaracterizes Mann's actions, incorrectly suggesting that Mann intended to steal money *from Cachet*. Rather, the evidence demonstrates that for a period of several years Mann used Cachet's ACH system to facilitate a long-running kiting scheme, and money was diverted from Cachet's settlement account to the seized accounts at the end. As discussed below, the diversion of $19 million followed an established pattern Mann started well earlier, of inappropriately using Cachet's ACH system contrary to Cachet's policies. See JPS¶¶14-17; JX 1 (Plea Agreement) ¶5(aa)-(ee). Cachet's management was aware that Mann was violating its policies as early as 2015 and tolerated his illicit practices for several years. *Id.* Additionally, in the 20 months prior to August 30, 2019, Mann had used Cachet's ACH system to process over $2.7 *billion* in non-payroll transactions, contrary to Cachet's policies. Tr. 185:2-197:12 (Daversa

---

[2] Except as set forth in section I., below, the government does not dispute the facts asserted in Cachet's post-hearing brief.

[3] Cachet incorrectly represents that the government stipulated to the fact that Mann "stole $19 million from Cachet." Cachet Posthearing Br., at 7. The term "stole" does not appear in the stipulated facts. ECF No. 234.

testimony summarizing nonpayroll transactions); JX 2,3; GX 4,5. The eventual diversion of $19 million from Cachet's settlement was a by-product of the broader kiting scheme to which Mann pled guilty. JX 1, ¶ 5(ff)-(gg). Mann did not steal money from Cachet. Rather, Cachet was one of thousands of other victims that lost money as a result of Mann's kiting scheme. Moreover, as to the specific funds at issue, Mann could not have stolen the funds because they "sat unspent in frozen Bank of America accounts until the government seized them." Tr. 151:19-24 (Asfaw testimony); ECF No. 252-3 (TRO in Mann Civil Action enjoining Bank of America from transferring any funds in any account controlled by Mann, including the 6103 Account and the 6843 Account). Mann did not steal the money because he did not, and could not, possess it.

**B. Mann Did Not Own and Control MyPayrollHR at all Relevant Times.**

Cachet states that "MyPayrollHR, LLC ("MyPayrollHR"), a payroll processing company *owned and controlled by Mann*, contracted with Cachet to transmit payroll from MyPayrollHR's customers (employers) to the employees of the customers." Cachet Post-Hearing Br. at 3 (emphasis added). Mann did not own and control MyPayrollHR for the entirety of Cachet's relationship with MyPayrollHR. The relationship started in March 2007, when Cachet and MyPayrollHR signed a "Remarketer Agreement." Tr. 110:24-111:5. JX 4. Mann was not involved with MyPayrollHR in 2007 and did not assume ownership or control until October 2013. JPS ¶ 7; Tr. 55:8-14. This is significant because the evidence established that when Mann took control in 2013, Cachet did not follow its typical set-up process for a new remarketer, which usually includes performing due diligence. Tr. 133:14-136:5; JX 13 (Operations Department's Policies and Procedures Manual, Section 8.3, Due Diligence, AF-CACHET0000024). Had this process been followed, it would have included reviewing tax returns and financial statements, and verifying that the remarketer was a legitimate business. Tr. 17:8-17. Hanan Succar, Cachet's Director of Operations, testified that Cachet's practice is to periodically re-verify that remarketers

are legitimate businesses, Tr. 110:6-13, and these re-verifications include reviewing tax returns and audited financial statements. Tr. 110:16-23. But Succar could not recall any MyPayrollHR re-verifications at any time after 2007, including in 2015, 2018, or 2019, tr. 111:6-25, when Cachet had reason to believe that MyPayrollHR was violating its policies and procedures.

### C. Mann's Diversion of Funds from Cachet's Account in August 2019 was a Not a Sudden Change that Violated Cachet's Reasonable Trust.

Cachet states that it "trusted MyPayrollHR and Mann to use Cachet's ACH services to satisfy the payroll and payroll-related needs of MyPayrollHR's employer-clients." Cachet Post-Hearing Br. at 4. While this statement accurately reflects the self-serving testimony of Cachet's principals, Succar and Aberash Asfaw (Cachet's President), this trust was not reasonable for all the reasons discussed below. *See* Argument, Section I, *infra*. Cachet further states "[t]hat all changed at the end of August 2019, when MyPayrollHR and Mann fraudulently manipulated batch files to cause millions of dollars to be diverted to numerous bank accounts." Cachet Post-Hearing Br. at 4. The government agrees that Mann manipulated batch files and diverted millions of dollars to bank accounts he controlled, but Mann's practice was not new in August 2019. Mann moved *billions* of dollars among accounts he controlled through Cachet's ACH system in the years leading up to August 2019, including billions in non-payroll transactions. Cachet knew and turned a blind eye.

## II. ADDITIONAL RELEVANT FACTS

### A. Cachet's ACH Process

Cachet's ACH process used a "settlement account" – also referred to as a "clearing account," which is a Cachet-owned bank account at Bancorp – to move funds from an employer's account to the employee's account. Tr. 8:10-19, 13:4-9; JX 14 (ACH Specifications Guide), at 7 (AF-CACHET0000938). Remarketers (such as MyPayrollHR) initiate ACH transactions by

creating digital batch files, which are uploaded to Cachet through an electronic portal that instructs which bank accounts to debit and credit. Tr. 138:2-9. Batches are identified as either a "collection batch," which causes money to be withdrawn from the employer's account and deposited into Cachet's settlement account, Tr. 11:19-25, or a "disbursement batch," which causes money to be taken from the settlement account and deposited into employees' bank accounts. Tr. 12:1-6; JX 14, at 7 (AF-CACHET000937). Cachet's system uses Standard Entry Class (SEC) codes to track and identify whether transactions pertain to consumer accounts or corporate accounts. Tr. 9:20-24. "CCD" is an SEC code that refers to corporate accounts, which should be associated with collection batches that are drawn from employers (corporate accounts). Tr. 13:25-14:12; JX 14, at 15. "PPD" is an SEC code for personal, or consumer, accounts, which should be associated with the disbursement batches that are paid to individual employees. *Id.*

In any batch file, the total collections must equal the total disbursements, JX 14, at 7., Tr. 12:15-20. Cachet's settlement account is supposed to receive a credit (from the remarketer's customer via the collection batch) before the settlement account is debited to pay the employees' bank accounts. Tr. 140:14-18. When a credit into Cachet's settlement account is reversed because of non-sufficient funds in the employer's bank account, Cachet is potentially out money because it has already deposited money from the settlement account into the employees' bank account. Tr. 141:3-11. In that situation, Cachet looks to the remarketer (i.e., MyPayrollHR) to make up the shortfall pursuant to the contract between Cachet and the remarketer. Tr. 141:12-25. Remarketers are required to maintain a "reserve account" that Cachet can automatically debit when there's a shortfall. Tr. 114:2-8. Although MyPayrollHR moved billions of dollars through Cachet, Cachet's required MyPayrollHR to maintain a minimum of only $5,000 in its reserve account. JX 4, at 3 (AF-CACHET00001046); Tr. 51:9-52:15.

Cachet used an automated system to ensure that remarketers were complying with Cachet's rules, Tr. 61:3-5, and that only transactions coded for payroll were permitted. JX 11 (Cachet's Interrogatory Responses), Nos. 1 & 2. Cachet also possessed an "automatic review" process, which "was a system review that performed a check and balance of transactions, validated the transaction codes, and made sure that they complied with the ACH Specifications that set forth detailed requirements that needed to be met for Cachet's system to accept a batch file." JX 11, Nos. 6, 7.

**B. Cachet Learns that Mann is using its ACH system for improper purposes.**

Beginning no later than 2015 – four years before the scheme collapsed – Mann was violating Cachet's policies. In June 2015, Cachet detected that Mann was improperly routing payroll though his accounts at Pioneer rather than to the Settlement Account, in violation of Cachet's policies and its contract with MyPayrollHR. JPS ¶ 16; Tr. 63:9-20. Mann acknowledged the problem and assured Cachet it would not happen again. *Id.*; JX 9 & 10.

But the problem did happen again. On April 10, 2018, Cachet again noticed "that the funds were not flowing through Cachet's clearing [settlement] account for the direct deposits as our agreement states." JX 7, at 6 (AF-CACHET0000323); Tr. 65:24-67:25. Cachet discovered that this practice implicated seven batch files through which $56,769,335.74 (the total of the batch files described in JX 7, at 6-7) had been transferred in violation of its contract and policies. Tr. 68:1-15. When Cachet inquired, MyPayrollHR employee Michael McAuliffe's "initial speculation" that the $56.7 million violation of its policies occurred because "the person who normally processes ACH was on vacation, we may have inadvertently ran them through our account since that is the process for handling employee returns." JX 7, at 5 (AF-CACHET000322). Cachet accepted this explanation at face value. There is no evidence in the record that Cachet further

investigated this $56.7 million violation of its policies; it simply accepted MyPayrollHR's "initial speculation." *Id.* Cachet did not trust MyPayrollHR any less, nor did Cachet increase MyPayrollHR's required reserve amount. Tr. 70:19-71:4.

A month later, on May 10, 2018, Cachet again discovered that "7 files [ranging from $55,000 to $17 million] uploaded between 05/07/2018 to 05/09/2018 are not going thru the Cachet clearing account. They are going the Cloud Payroll account ending with 0212." JX 7, at 4 (AF-CACHET0000321). Hanan Succar explained that "[t]he larger files not going thru the clearing account are a huge exposure to Cachet and My payroll HR is in breach of the contract that requires that all direct deposit funds must settle to the Cachet clearing account." *Id.* Succar was "very much concerned about this" and agreed that this was not a new issue. Tr. 72:6-10. Michael McAuliffe gave a similar explanation as he had for the prior incident, , blaming MyPayrollHR's system for handling employee returns. Tr. 73:1-12.

That same day, on May 10, 2018, Hanan Succar discovered 10 additional batch files pertaining to "multi-million dollar transactions are moving funds from the clients account to an account ending with 7099 (P2binvestor For Weitz) or to an account ending with 5999 (Millennium Funding)." JX 7, at 3 (AF-CACHET0000320). Succar was "suspicious" because multi-million deposits into corporate accounts were not typical payroll transactions. Tr. 75:15-76:11. Succar was concerned that these transactions were not payroll transactions and were not allowed under Cachet's agreement with MyPayrollHR. Tr. 76:12-19. Asfaw advised that "Cachet does not service accounts payable transactions. Therefore, the transactions in question should be suspended and/or cancelled." JX 7, at 2. However, Mann explained to Cachet that "these transactions are actually vendor payments that are for 1099 contractors that get processed through our payroll system." JX 7, at 3. Cachet management accepted Mann's representation and collectively decided

MyPayrollHR and Mann could pay 1099 contractors through Cachet's system as long as they used the settlement account. JX 8, at 1 (AF-CACHET0000275); Tr. 80:18-81:17.

Throughout the email exchange, Cachet personnel represent that these matters were being referred to the "Risk Management" Department. JX 7, at 3, 5, 6; Tr. 76:17-19. But Cachet did not have a designated "Risk Management" Department. Tr. 16:1-3. The testimony at the hearing established that references to "Risk Management" simply mean that the matter was brought to the attention of Cachet's management team, including Succar, Asfaw, and David Taub, the Director of Sales. Tr. 15:17-25; 60:17-21; 80:25-81:5. Mr. Taub's duties included keeping current clients and attracting new clients. Tr. 60:9-13. Thus, it was Cachet's management team, including the Director of Sales, that accepted MyPayrollHR's explanations. During this time, MyPayrollHR's stature within Cachet's organization was becoming more prominent. It was not among Cachet's top 25 active remarketers by transaction volume in 2015, 2016, or 2017, but was its 17th most active remarketer by transaction volume in 2018. JPS ¶ 7. In other words, Cachet management, including the Director of Sales, blindly accepted Mann's representations that these suspicious transactions were actually 1099 contractor payments at the same time MyPayroll was giving it more business. Cachet management did not ask any more questions about Mann's activities, nor did they investigate the veracity of his representations. Tr. 88:11-13. They did not trust Mann or MyPayrollHR any less, nor did they consider terminating MyPayrollHR as a client. Tr. 88:25-89:8. Nor did they increase MyPayrollHR's reserve account, which would have avoided the loss they are now seeking to recover. Cachet continued to process what it purportedly understood were 1099 contractor payments. Tr. 88:4-7. Cachet did not do any substantive investigation into these contractor payments until after Mann's scheme collapsed and several millions of dollars were missing.

### C. Cachet Turns a Blind Eye to Mann's Continued use of its ACH System for Improper Purposes.

Cachet incorrectly claims that it did not learn that Mann was using its ACH system for non-payroll transactions until September 2019. Tr. 89:15-18, Cachet Post-Hearing Br. at 19 ("Cachet had no notice of Mann's fraudulent conduct before September 2019"). Succar and Asfaw knew on May 10, 2018. JX 7, at 1-3. Succar was "suspicious." Cachet did not substantively investigate until September 2019, when it discovered that there were "more than a hundred" non-payroll transactions between May 2018 and September 2019. Tr. 89:21- 90:5. Cachet prepared a spreadsheet that identified any incidents in which MyPayrollHR processed transactions that followed the same pattern as the $19 million that was diverted to the seized Bank of America accounts. JX 2; Tr. 40:10-41:7. JX 2 and JX 3 list all transactions that Cachet identified as non-payroll transactions from January 3, 2018 to May 23, 2019, and from May 29, 2019 through August 30, 2019, respectively. Tr. 94:2-14. The data for these transactions was within Cachet's ACH system, and its IT department took "a couple of days to maybe a week" to pull the information in JX 2 and JX3. Tr. 95:17-96:14. Succar agreed that the information was "readily accessible" and that information going back to 2015 was available. Tr. 96:16-17.

JX2 and JX 3 contain voluminous information sufficient to establish that Mann was carrying out a fraudulent scheme through Cachet's ACH system. At the hearing, Succar testified about Batch Nos. 192 and 193 (in JX 3, p. 1). Succar explained that on from May 30, 2019, a company called Optum transferred $2,420,098.66 to Cachet's settlement account (in Batch No. 192) and that same amount ($2,420,098.66) was debited from Cachet's settlement account, to multiple companies including Millenium Funding and P2B Inc. (in Batch No. 193).[4] JX3, at 1;

[4] Both Millennium Funding and P2B Inc. are also among Mann's victims. Tr. 190:20-191:7.

Tr. 99:5-104:25. Batch No. 193 included two payments to Millenium Funding of similar amounts ($175,472.31 and $174,747.91) to the same bank account. Tr. 103:1-104:9. Succar could not explain why, if these were payroll transactions, two payments were being made to the same bank account twice, Tr. 104:10-14, and agreed that she would not expect to see the indicated PPD codes going into a corporate account. Tr. 102:23-103:1. Succar testified that she "would have assumed" that these transactions were payroll transactions based on Mann's explanation from May 2018. Tr. 103:13-17. Succar's assumption that P2B Inc. and Millennium Funding were 1099 contractors is not reasonable. The table below represents the number of credit transactions and total funds credited from Optum to P2B Inc. and Millenium Funding during the time period January 3, 2018 – August 30, 2019:

| **Entity** | **Number of Credits (from JX 2 & 3)** | **Total Funds Credited (from GX 4 & 5)** |
|---|---|---|
| P2B Inc. | 165 | $ 50,522,001.18 |
| Millennium Funding | 148 | $ 29,090,374.99 |

Cachet inexplicably believed the same entity (Optum) was consistently paying P2B Inc. and Millennium Funding tens of millions of dollars in 1099 vendor payments, on the same days in varying amounts. JX 2 and 3. No reasonable person in Cachet's business should have believed these were payroll-related transactions. P2B Inc. and Millennium Funding are isolated examples of the broader scheme, involving dozens more entities, the majority of which were Mann's entities or were victim entities. In total, there are 622 PPD transactions listed on JX 2 and 3, the vast majority going to numerous corporate accounts.[5] Had Cachet reviewed its own records, it would have learned the same information that Alyssa Daversa compiled in GX 4 and 5, which summarizes the non-payroll transactions listed in JX 2 and 3 and lists numerous entities in addition to P2B and

[5] The sole exception pertains to a few individuals, including Ann Bauer, John Henning, and L'Abbe Daniel.

Millennium Funding that were involved in non-payroll transactions. Tr. 185:22-197:12. Cachet would have learned that Mann caused a grand total of $2,743,474,961.10[6] in non-payroll debit transactions and a corresponding $2,743,474,961.10 in credit transactions to flow through Cachet's ACH system. $2.7 billion in non-payroll transactions over a 20-month period is significant, considering that Cachet's total transaction volume per year is a "a little over" $200 billion, Tr. 43:1-5, and MyPayrollHR was one of 300 remarketers. Tr. 131:14-23.

GX 4 and GX 5 demonstrate that many of these transactions were circular in nature, because the same entities appear in both the Debit Summary and Credit Summary: MyPayrollHR; Ross Consultants; True Consulting Corp.; ValueWise Corporation; Viverant, and Heutmaker. In other words, Mann was causing money to be both credited and debited from the same accounts, further undermining Mann's explanation that these were 1099 contractor payments. Critically, two of the accounts at issue in this case, the 6103 and 6843 accounts were credited **and** debited millions of dollars between May 30, 2019 and August 30, 2019 (the same circular pattern discussed above). GX 5. The circular flow of money between the same accounts was indicative of the kiting scheme to which Mann pleaded guilty. JX 1, ¶ 5(ff). Pursuant to that kiting scheme, Mann rapidly transferred millions of dollars among various accounts using checks, wire transfers, and *Cachet's ACH system*. *Id*. (emphasis added). The scheme collapsed on or about August 30, 2019 when as part of Mann's kiting efforts, he transferred the $19 million among his accounts at Pioneer and Bank of America. JX 1, ¶ 5(gg).[7] Bank of America and Pioneer froze Mann's accounts when

[6] $ 2,743,474,961.10 is the sum of the "Grand Totals" from GX 4 and GX5.

[7] Cachet agrees. In its lawsuit against Pioneer, Cachet alleges that "**as part of** [the kiting] **effort**, [Mann] submitted a digital ACH file to Cachet with instructions to transfer approximately $19,199,175.74 among his accounts at Pioneer and Bank of America…" See First Amended Complaint in *Cachet Financial Services v. Pioneer Bancorp Inc*., et al., 2:22-ap-1029-VZ (Bankr. C.D. Cal.), Dkt. No. 76, ¶ ¶ 94-95 (**bold** in original) (**Exhibit G**).

the scheme collapsed, which simply caused Cachet to lose money because Mann was using its ACH system as a conduit for his kiting scheme.

Despite the voluminous information that existed within its ACH system, and the numerous red flags observed by Succar and Asfaw in 2018, Cachet is asking this Court to accept the premise that it "had no reason to suspect" that Mann's transactions were fraudulent. Cachet Post-Hearing Br., at 14. The evidence does not support Cachet's request.

## ARGUMENT

The governing law for asset forfeiture under 21 U.S.C. § 853(n)(6) was discussed at length in the government's pretrial brief, ECF No. 239, pp. 9-10, and will not be restated here.

### I. CACHET FAILS TO PROVE IT IS THE BENEFICIARY OF A CONSTRUCTIVE TRUST.

Cachet advances its § 853(n)(6)(A) claim under a constructive trust theory. "[i]n general, though as an equitable doctrine its application to particular circumstances is susceptible of some flexibility, to establish a constructive trust there must be provided: (1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment" *Morgan v. Kilroy*, 181 A.D.3d 1024, 1025 (3rd Dep't 2020); accord *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 362 (2d Cir. 1999).

#### A. Neither Mann, nor MyPayrollHR were unjustly enriched. (Fourth Element)

As this Court already noted, the "most important considerations for deciding whether to recognize a constructive trust are equitable in nature" *United States v. Mann*, 2022 U.S. Dist. LEXIS 250343, *21 (2022) (citing *Sharp v. Kosmalski*, 40 N.Y.2d at 123 ("The salutary purpose of the constructive trust remedy is to prevent unjust enrichment")). "What the New York courts do insist upon is a showing that property is held under circumstances that render unconscionable and

inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment." *Counihan v. Allstate Ins. Co*., 194 F.3d 357, 362 (2d Cir. 1999).

This factor weighs against a constructive trust here because Mann was never unjustly enriched. The "essence" of an unjust enrichment claim "is that one party has *received money or a benefit* at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (emphasis added). Mann never received the $14 million, nor did he benefit from it. The money moved from Cachet's settlement account to frozen Bank of America accounts, where it remained until the government seized it. Mann was arrested, pleaded guilty, agreed to forfeit the seized funds, and remains in prison to this day. He was never enriched, nor did he ever enjoy the benefit if the particular money at issue here. The only benefit Mann received from Cachet was the use of its ACH system for his kiting scheme, which he used to victimize numerous individuals and entities. The fact that Cachet is Mann's largest victim is irrelevant- if a *pro rata* distribution is approved, and Cachet remains the largest victim identified, Cachet will receive the largest distribution as compared to other victims.

The unjust enrichment factor favors the government's position. New York courts "insist upon [] a showing that property is held under circumstances that render unconscionable and inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment." *Counihan*, 194 F.3d 357, at 362. As discussed above, Mann never *held* the property. But given Cachet's acquiescence to Mann's use of its ACH system for his kiting scheme, it would be unconscionable and inequitable for Cachet to recover all the forfeiture proceeds while its fellow victims receive nothing. Cachet would be rewarded for burying its head in the sand and unjustly enriched vis à vis the other victims.

But most importantly, and dispositively, "the existence of a written agreement precludes a finding of unjust enrichment." *In re First Cent. Fin. Corp*., 377 F.3d 209, at 213-15. (2d Cir. 2004). Cachet had such a written agreement with MyPayrollHR. JX 4, 5, and 6. An equitable remedy, such as a constructive trust, does not apply when there is an adequate remedy at law. *Id*., at 215 (citing *Boyle v. Kelley*, 42 N.Y.2d 88, 91 (1977) (equity will not entertain jurisdiction where there is an adequate remedy at law)). See also *United States v. Pokerstars*, No. 11 Civ. 2564 (LBS), 2012 WL 1659177, *4 (S.D.N.Y. May 9, 2012) (customer of online poker company could not contest forfeiture by claiming an constructive trust because he had an adequate remedy at law) (citing *United States v. Khan*, 129 F.3d 114 (2d Cir. 1997)("a constructive trust, as a remedy of equity, is not appropriate when remedies exist at law and elsewhere")). See also *Cipciao, LLC v. M Chow One*, LLC, No. 20-CV-5982 (JMF), 2021 WL 1141567, *6 (S.D.N.Y. March 24, 2021) ("Under New York law, the existence of a valid and enforceable written contract generally precludes recovery on either an unjust enrichment or a constructive trust theory against another party to the contract"); *Northern Shipping Funds I, LLC v. Icon Capital Corp*., 921 F. Supp. 2d 94, 107 (S.D.N.Y. 2013) ("where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists, and a constructive trust should not be imposed. Northern has a contractual claim against Icon and there is no reason to believe that the legal remedy is inadequate this case.") (cleaned up); *Briggs v. Goodyear Tire & Rubber Co*., 79 F.Supp.2d 228, 236–37 (W.D.N.Y.1999) ("Where there exists a valid and enforceable written contract governing a particular subject matter, quasi contractual claims, including claims for unjust enrichment and constructive trust are not allowed . . . Settled law indicates that the equitable claims of unjust enrichment and constructive trust are unavailable where plaintiffs have rights under a valid and enforceable contract.") (internal quotation marks and citations omitted).

Not only does Cachet have adequate remedies at law, but it has also exercised them by obtaining money judgments against MyPayrollHR and Mann, recovering six-figure settlements from other parties, and continuing to litigate other claims. Cachet sued Mann and MyPayroll, asserting causes of action for, *inter alia*, breach of contract, fraud, and unjust enrichment. *Cachet Financial Services v. MyPayrollHR*, *Michael Mann, et al*, 1:19-CV-1181 (FJS/CFH) (N.D.N.Y.), Dkt. No. 1 (**Exhibit A**). This Court granted Cachet's motion for default judgment on its breach of contract claim against MyPayrollHR, finding that "the evidence clearly demonstrates that Defendant MyPayrollHR breached the Agreements Security Provisions by fraudulently manipulating Plaintiff's specifications batch files to cause the $19 Million to be diverted from Plaintiff to the Defaulting Defendants." *Cachet Fin. Servs. v. MyPayrollHR*, 2020 WL 5232275, at *6 (N.D.N.Y. Sept. 2, 2020) (Scullin, J.). Judge Scullin also granted default judgment against Mann on the fraud claim. *Id*. at *7. However, Judge Scullin denied Cachet's motion for entry of default judgment on its unjust enrichment claims against MyPayroll and Mann, ruling "[w]here the relationship of the parties is contractual, the plaintiff has no valid claim for unjust enrichment under New York law." *Id*., at *9 (citations omitted). This Court should not deviate from Judge Scullin's conclusion. *See also Akerson Advert. & Mktg., Inc. v. St. John & Partners Advert. & Pub. Rels., Inc*., 89 F. Supp. 3d 341, 356 (N.D.N.Y. 2015) (Scullin, J.) (constructive trust claim fails because Plaintiffs sought $5,000,000 in damages, demonstrating an adequate remedy at law). Similarly, Cachet's judgment for fraud forecloses a constructive trust claim against Mann. Equitable relief in the form of a constructive trust "usually was denied in equity in cases of fraud precisely because the legal remedy of an action at law for common law fraud ordinarily was

adequate." *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 144, n. 6 (2d Cir. 1999) (abrogated on other grounds).[8]

In addition to its judgments against Mann and MyPayrollHR, Cachet has received settlement payments from other financial institutions. P2BI Holdings paid Cachet $759,552.09 in settlement of Cachet's action against it for conversion, money had and received, unjust enrichment, declaratory relief for turn over of property and injunctive relief for money that was in P2BI's account in September 2019. *Cachet Financial Services v. P2BI Holdings, LLC* 2:20-ap-1028-VZ (Bankr. C.D. Cal.), Complaint, ¶¶ 10, 24 (**Exhibit C**) and Dkt No. 108, at 6 (**Exhibit D**).

And Cachet sued Axos Bank for avoidance and recovery of constructive fraudulent transfers, unjust enrichment, money had and received, conversion; and state law violations, claiming that Mann's diversion of the $19 million resulted in Axos' accounts being credited $574,758.15. That case settled for an undisclosed sum. *See Cachet Financial Services v. Axos Bank*, A.P. No. 2:22-ap-1025 (Bankr. C.D. Cal.), Complaint, Dkt. No. 1 (**Exhibit E**), Dkt. No. 79, Stipulation to Dismiss Adversary Proceeding with Prejudice Pursuant to FRCP 41 (**Exhibit F**).

Cachet also has a pending lawsuit against Pioneer, *Cachet Financial Services v. Pioneer Bancorp Inc.*, et al., 2:22-ap-1029-VZ (Bankr. C.D. Cal.), Second Amended Complaint (SAC), Dkt. No. 170 (**Exhibit B**). That case remains pending, which is scheduled for trial in August 2027. Moran Decl. ¶ 5. Finally, Cachet could have, but for unknown reasons did not, bring claims against Bank of America, which, like Pioneer froze accounts resulting in Cachet's loss.

[8] Cachet claims that the government "prevented Cachet from recovering any money on the default judgment" in this case because it executed seizure warrants on two of the accounts at issue, which were frozen pursuant to a preliminary injunction sought by Cachet. Cachet Posthearing Br., at 22-23. This argument is meritless. Under the relation-back theory, the government has an independent legal claim to any assets traceable to the defendant's crime, vesting such property in the government from the moment of the crime's commission." *United States v. Mann*, 729 F. Supp. 3d 257, 265 (N.D.N.Y. 2024). The government would have grounds to seek a seizure order against the same funds in Cachet's hands and Cachet's remedies would have been the same: a 21 U.S.C. § 853(n)(6)(A) petition.

Cachet assumes its legal remedies are inadequate, but it is possible that Cachet could be successful in its suit against Pioneer, and in conjunction with the settlements it obtained from P2Bi, Axos Bank, and others, and be made whole, or even obtain a windfall. This would be entirely inequitable to the victims in this criminal matter.

In any event, while Cachet may never be made whole, the fact that it has legal remedies available precludes unjust enrichment, or a constructive trust. Courts, including the Second Circuit, routinely deny constructive trusts in these scenarios. See *In re First Cent. Fin. Corp*., 377 F.3d at 216 ("FCIC, on the other hand, has a contractual claim directly against FCFC—arising out of the Agreement—which can be pursued in the bankruptcy proceeding. We concede that FCIC, like many other creditors, will not, in all probability, be made whole in the proceedings; *but that does not mean its remedy is legally inadequate*, simply that it is imperfect." (emphasis added); accord *Brenner v. Heller*, 2011 WL 6011786, at *3 (N.D.N.Y. Nov. 30, 2011) (affirming bankruptcy court decision to deny constructive trust when a written contract governed the parties' relationship even though the creditor would not be made whole). See also *Briggs*, 79 F. Supp. 2d, at 237 (rejecting argument that the court should ignore an agreement because their legal remedies were inadequate). The same is true under New York law. In *Knopf v. Stanford*, the plaintiff sought a constructive trust, which the trial court denied "because money damages would be inadequate." 123 A.D.3d 521, 522 (2014). Later, in affirming the cancellation of a *lis pendens*, the First Department noted "[w]hether defendants are able to pay such damages is irrelevant to the determination of whether they are the appropriate remedy." *Knopf v. Sanford*, 132 A.D.3d 416, 417 (2015) (citing *American Cities Power & Light Corp. v. Williams,* 189 Misc. 829, 835–836 (Sup. Ct., N.Y. County 1947)).

The cases Cachet cites on this point are easily distinguished. In *United States v. Vilar*, 2021 WL 4504699 (S.D.N.Y. Sept. 30, 2021) the investors had previously availed themselves to equitable, not legal, recoveries. "[T]he existence of *equitable* remedies does not preclude the imposition of a constructive trust. *Id*., at *5. *United States v. Diversified T.E.S.T. Techs., Inc*., No. 5:09-CV-718, 2010 WL 3761866, at *1 (N.D.N.Y. Sept. 20, 2010) did not involve a constructive trust, nor asset forfeiture. None of the state cases Cachet cites for this point involve constructive trusts or asset forfeiture. *See, e.g., New York TRW Title Ins. v. Wade's Canadian Inn & Cocktail Lounge, Inc*., 199 A.D.2d 661, 664 (1993); *North Hill Funding of N.Y., LLC v. Amincor Other Assets, Inc*., 2016 N.Y. Misc. LEXIS 4922, at *17 (Sup. Ct. N.Y. Cnty. Jan. 17, 2016); *Cargill Soluciones Empresariales, S.A. De C.V., SOFOM, E.N.R. v Desarrolladora Farallon S. de R.L. de C.V*., 2017 N.Y. Misc. LEXIS 2967, at *25 (Sup. Ct. N.Y. Cnty. July 21, 2017).

### B. Cachet fails to show a confidential or fiduciary relationship between itself and Mann or MyPayrollHR. (First Element)

To establish a confidential relationship with MyPayrollHR and Mann, Cachet relies on its extended prior business dealings and the terms of conditions of its agreements. Cachet Post-Hearing Br., at 9-10. In New York, no fiduciary relationship exists where parties were acting and contracting at arms-length to a business transaction.[9] *In re Ames Dep't Stores, Inc*., 274 B.R. 600, 626 (Bankr. S.D.N.Y. 2002) (rejecting a constructive trust). In affirming *Ames Dep't Stores*, the district court held that constructive trust claimants "cannot turn to the conclusory labels of the Agreement in an effort to construe the relationship between the parties in a manner sufficient to establish a constructive trust." *LFD Operating, Inc. v. Ames Dep't Stores, Inc*., No. 01-42217 (REG), 2004 WL 1948754, at *5 (S.D.N.Y. Sept. 1, 2004), aff'd sub nom. *In re Ames Dep't*

[9] *Coral Cap. Sols. LLC v. Disrupt Soc., LLC*, No. 24-CV-3940 (AS), 2025 WL 1424441, at *4 (S.D.N.Y. May 16, 2025) ("[c]ourts regularly dismiss claims for a constructive trust when addressing conventional business relationships" (citing *Staudinger+Franke GMBH v. Casey*, 2015 WL 3561409, at *13 (S.D.N.Y. June 8, 2015).

*Stores, Inc.*, 144 F. App'x 900 (2d Cir. 2005). In pointing to MyPayrollHR's supposed "access" to proprietary methods, procedures, pricing, agreements, forms, operations, work methods and other confidential data," Cachet Post-Hearing Br., at 10, Cachet offers nothing more than conclusory labels in meaningless agreements. Asfaw testified that the only access MyPayrollHR had to Cachet's system was the features that were necessary to upload batch files. Tr. 136:6-25. Remarketers did not have access to other customer's information. Tr. 137:1-3. Cachet claims its technology is proprietary, but it does not have any patents. Tr. 139:6-13. Asfaw testified that the only "proprietary" information a remarketer has access to is their user ID, password, bank account information for the remarketer's own clients, Tr. 139:14-140:13. Cachet also points to MyPayrollHR's supposed agreement to only use Cachet's services for payroll-related transactions, Cachet Post-Hearing Br., at 10, but Cachet knew all the facts suggesting that MyPayrollHR was using its services for non-payroll related transactions and nevertheless allowed over $2 billion in non-payroll transactions to proceed. Cachet chose not to thoroughly investigate what it concluded at the time to be evidence that MyPayrollHR likely was engaged in non-payroll transactions. It cannot now rely on contractual terms to save it from its recklessness (or, at best, negligence).

The cases Cachet cites are distinguishable. Most do not involve constructive trusts. *See In re Windsor Plumbing Supply Co*., 170 B.R. 503, 526 (Bankr. E.D.N.Y. 1994), *Beneficial Com. Corp. v. Murray Glick Datsun, Inc*., 601 F. Supp. 770, 772 (S.D.N.Y. 1985); *Hogan v. DC Comics*, No. 96-cv-1749, 1997 U.S. Dist. LEXIS 13799, at *16-17 (N.D.N.Y. Sep. 9, 1997), and *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 19-220 (S.D.N.Y. 2007). Although *Thomas v. Thomas*, 70 A.D.3d 588, 591-92 (1st Dep't 2010) is a constructive trust case involving a verbal agreement to temporarily take title to real property, but the quintessential factor in that case was that there was no written agreement, as there is in this case. The court in *Bausch*

*& Lomb, Inc. v. Alcon Lab., Inc.*, 64 F. Supp. 2d 233, 253 (W.D.N.Y. 1999) gave a confidentiality agreement some weight in allowing the case to go forward at the motion to dismiss stage, but, as discussed above, Cachet's confidentiality claims are conclusory, which is insufficient at this stage.

**C. Cachet did not reasonably rely on Mann's purported "promise" to only use its ACH system for payroll transactions. (Second and Third Elements.)**

Cachet next argues that Mann "promised to use Cachet's ACH processing system only for payroll-related purposes and in compliance with all laws, and to pay Cachet for all debits returned by a receiving bank." To establish a constructive trust, there must be "allegations that show a clear and unambiguous promise … upon which the plaintiff could have *reasonably relied*." *Scarlett-Brown v. Pilgrim Baptist Church, Inc.*, 208 A.D.3d 703, 705 (2nd Dep't 2022) (rejecting a constructive trust) (emphasis added). When asked to identify where, in Cachet's agreement, MyPayrollHR promised to only use the ACH system for payroll or payroll-related purposes, Succar responded that the first paragraph of Cachet's Terms and Conditions (JX 6) listed "various types of transactions, payroll tax processing, official bank checks." Tr.55:18-57:24. The first paragraph appears[10] to list the included services as "Payroll Tax Pay and File Reconciliation Services, Official Bank Checks ("OBC") Reconciliation Services or other payroll related services…" But Cachet knew, as of May 10, 2018, that Mann was using Cachet's ACH system for non-payroll purposes. Succar wrote via email "we reviewed the files uploaded today (10 files) and none of them are pertaining to direct deposit transactions. All of the multi-million dollar transactions are moving funds from the clients account to an account ending with 7099 (P2binvestor For Weitz) or to an account ending with 5999 (Millennium Funding)." JX 7, at 3.

[10] The contracts on which Cachet claims it relied are barely legible and contain nothing more than meaningless boilerplate language.

Asfaw viewed these transactions as "accounts payable transactions" that Cachet was not in the business of servicing. JX 7, at 2. Succar was "suspicious, "Tr. 75:15-76:11. Nonetheless, Succar, Asfaw, and David Taub, the director of sales who was responsible for keeping clients, decided to accept Mann's unsupported representations that the "multi-million dollar transactions" were actually 1099 vendor payments. The transactions listed in JX 2 and JX 3 show repeated, multi-million dollar transactions occurring on successive days, among the same companies. They do not follow the typical payroll pattern that Cachet would have been accustomed to seeing among its legitimate remarketers. Cachet assumed the risk of dealing with a bad actor in a risky and unregulated industry, burying its head in the sand and now asks the Court to rely on Mann's purported "promise" to claim it has a constructive trust. But Cachet did not seriously investigate Mann's activities until after his scheme collapsed and had lost millions of dollars. In the meantime, billions of dollars moved through their system, much of it in a circular pattern among the same accounts now at issue, see GX 5, undermining any explanation that these were 1099 vendor payments.

For all these reasons, the Court should deny Cachet's constructive trust claims.

## II. THE COURT HAS DISCRETION TO DENY A CONSTRUCTIVE TRUST WHEN THERE ARE NUMEROUS FRAUD VICTIMS, EVEN WHEN ONE VICTIM CAN TRACE THEIR ASSETS.

Cachet misconstrues the government's argument regarding pro rata distribution. It argues that pro rata distribution would be inappropriate here, relying primarily on *SEC v. Byers*, 637 F. Supp. 2d 166, 177 (S.D.N.Y. 2009) (aff'd, 609 F.3d 87 (2d Cir. 2010)) and *S.E.C. v. Credit Bancorp, Ltd.*[11], 290 F.3d 80, 88 (2d Cir. 2002). *Byers* and *Credit Bancorp* stand for the

[11] Cachet appears to have erroneously cited to "*S.E.C. v. Lowenson*." The correct case name is *S.E.C. v. Credit Bancorp, Ltd*. The reporter citation is correct.

proposition that pro rata distributions in securities fraud cases are appropriate if (1) investors' funds have been commingled, and (2) victims are similarly situated with respect to their relationship to the defrauders. But this is not a securities fraud case with defrauded investors. This is an asset forfeiture ancillary proceeding, where the Court must "evaluate whether a constructive trust should be recognized pursuant to the applicable state law and based on the facts of the particular case at issue." *Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 245 (2d Cir. 2011). Accordingly, the test is whether the Court, in its discretion, concludes that Cachet is the beneficiary of a constructive trust. "[C]onstructive trust[s] may be denied in cases involving multiple fraud victims *as a matter of discretion*. *United States v. Ovid*, No. 09-CR-216 JG ALC, 2012 WL 2087084, at *7 (E.D.N.Y. June 8, 2012) (emphasis added).

Cachet makes much of its ability to trace the funds, but tracing is merely a precondition for proving a constructive trust, which it has not done. "It is hornbook law that *before* a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer." *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985) (emphasis added); accord *In re Enf't Of Philippine Forfeiture Judgment Against All Assets Of Arelma, S.A.*, 153 F.4th 142, 166 (2d Cir. 2025). The fact that the money was in Cachet's settlement account directly before it was in the seized accounts (*i.e.*, it can traced) has no relevance if Cachet cannot meet the constructive trust elements. *Ovid* recognizes that "in some circumstances, it may make sense for similarly situated victims to share in the loss of a common fraud. In a Ponzi scheme, for instance, it will be entirely arbitrary that one investor can trace its assets while another investor cannot." *Ovid*, at *8.

This case presents facts analogous to the randomness of a Ponzi scheme. Alyssa Daversa analyzed a chronological transactional history of the accounts at issue in the 13 months leading up

to the collapse of Mann's scheme, and prepared summary exhibits to reflect the account activity. Tr. 167:1 GX 1, 2, and 3. Reviewing GX 1, 2, and 3 reveal a recurring pattern: the accounts consistently show disbursements out, resulting in negative balances, followed by same-day deposits to bring the account up to a positive balance. Tr. 171:8-17; 180:1-9; 183:17-23. Numerous entities (summarized on the first pages of GX 1, 2, 3,) had their money moving through the seized accounts, unknowingly supporting Mann's kiting scheme. Ms. Daversa's analysis shows that on many days this money was transferred using Cachet's ACH system (see highlighted rows in GX 1, 2, 3); Tr. 172:8-25; 179:8-25; 183:8-16. If Mann's scheme had collapsed on a different day, some other entity's money would have been in these accounts, possibly because Cachet's ACH system had put it there. In a case such as this, where money was constantly moving to maintain the kiting scheme, the claimant's ACH system was an instrumentality of the crime, and the claimant had notice of the fraud and turned a blind eye, tracing is immaterial. The Court has the discretion, under the *Ovid* analysis, to deny a constructive trust in a case involving multiple fraud victims. *Ovid*, at * 7.

Indeed, *Ovid* – a case Cachet highlights – recognizes that "[a] substantial body of relatively recent case law" supports the view that "a constructive trust should be rejected in favor of a more egalitarian distribution of the forfeited assets." *Id*. at *6. That body of recent caselaw includes several circuit court level decisions, including *S.E.C. v. Credit Bancorp, Ltd.,* 290 F.3d 80, 88–89 (2d Cir. 2002); *accord United States v. Wilson,* 659 F.3d 947, 956 (9th Cir. 2011); *United States v. Ramunno,* 599 F.3d 1269, 1275 (11th Cir.2010); *United States v. Andrews,* 530 F.3d 1232, 1238 (10th Cir. 2008); *S.E.C. v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 331 (5th Cir. 2001); *United States v. Durham,* 86 F.3d 70, 73 (5th Cir.1996). Several of these courts consider whether victims are similarly situated. *See e.g*., *Ramunno*, 599 F.3d, at 1275 (declining to award a constructive

trust to one of 90 victims who would fully recover his loss at the expense of the remaining 89 victims because "no victim be given priority over any other similarly situated victim.") citing *Andrews* 530 F.3d, at 1238-39 ("a court should not impose a constructive trust "to elevate [one] claim over the claims of other creditors if those creditors are similarly situated." A constructive trust in this situation "would not serve to prevent unjust enrichment, and would instead deliver inequitable results…"). On these facts, *Ramunno* and *Andrews* – both decided under 21 U.S.C. § 853(n)(6)(A) – are persuasive authority. Cachet is similarly situated to Mann's other victims, in that it was one of several financial companies who voluntarily chose to do business with Michael Mann and engage in complicated, high-stakes, high-dollar transactions despite numerous red flags that Mann was not operating a legitimate business. Any one of these entities could have had money in the seized accounts. The recent body of caselaw *Ovid* noted has prevailed in other district courts recently. *See United States v. Sharma*, No. 18-CR-340 (LGS), 2023 WL 1365138, at *4 (S.D.N.Y. Jan. 31, 2023) ("Courts have recognized that even when a victim of fraud can trace their investments in the criminal proceeds, it would be inequitable to prioritize their claims over those of other creditors") (citing *Andrews*, *Ramunno*, and *Durham*); *United States v. Sze*, No. CR 22-0141 (ES), 2024 WL 195468, at *10 (D.N.J. Jan. 18, 2024) ("even if the Petitioners could somehow trace their assets to the forfeited property, the practical effect of recognizing a constructive trust would be to prioritize the Petitioners' interests over other similarly situated claimants who may have entrusted Defendant to transmit funds into their accounts on their behalf.") (citing *Sharma* approvingly and rejecting *Ovid* because in *Ovid* the government did not dispute the constructive trust).

Finally, the Court should disregard Cachet's arguments based on its assertion that no bank disclosed suspicious activity reports (SARs) about Mann. Banks are prohibited from disclosing

SARs, or any information that would reveal the existence of a SAR. 31 C.F.R. § 1020.320(e). The Court should also disregard Mann's claims that its "outside auditor," WesPay found it was "fully compliant with the NACHA rules." The government objected to WesPay's report, PX 1, coming into evidence because it was disclosed late and contains out of court statements by WesPay, which are hearsay, and the government did not have the opportunity to cross examine the WesPay personnel who prepared the report. See Tr. 23:6-27:18. Moreover, the report specifically notes that "It is beyond the scope of this ACH Audit to fully test CFS's Know Your Customer processes." PX 1, at 12 (AF-CACHET0001054). Cachet's *knowledge of its customers* goes to the heart of the problem with MyPayrollHR. While the Court admitted PX 1 over the government's objection, this exhibit should not be afforded any weight supporting the facts for which Cachet is offering it.

**CONCLUSION**

For the foregoing reasons, Cachet fails to meet its burden of proving a constructive trust. The Court should deny Cachet's Second Amended Petition to Amend the Forfeiture Order and instead enter a Final Order of Forfeiture ordering that the seized accounts be forfeited to the government.

Dated: January 9, 2026

Respectfully submitted,

TODD BLANCHE
Deputy Attorney General

JOHN A. SARCONE III
Acting United States Attorney

*/s/ Christopher R. Moran*
Christopher R. Moran
Assistant United States Attorney
Bar Roll No. 700767