UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MICHAEL T. MANN,<br><br>Defendant. | Criminal No. 1:20-CR-199 (LEK) (DJS) |

**PETITIONER CACHET FINANCIAL SERVICES' POST-HEARING REPLY BRIEF**

**LOEB & LOEB LLP**
345 Park Avenue
New York, New York 10154
Tel. (212) 407-4000

*Attorneys for Petitioner*
*Cachet Financial Services*

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

I. CACHET IS ENTITLED TO A CONSTRUCTIVE TRUST ........ 2

A. Mann Was Unjustly Enriched ........ 2

B. Cachet And Mann Had A Relationship Of Trust And Confidence ........ 3

C. Cachet Reasonably Relied On Mann's Promises ........ 4

II. CACHET WAS NOT "WILLFULLY BLIND" TO MANN'S FRAUD ........ 5

III. THERE IS NO FACTUAL OR LEGAL BASIS FOR A *PRO RATA* DISTRIBUTION ........ 8

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fed. Ins. Co. v. Pixarbio Corp.*,
No. 20-cv-4659, 2022 U.S. Dist. LEXIS 39127 (S.D.N.Y. Mar. 3, 2022)....8

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)....6

*LFD Operating, Inc. v. Ames Dep't Stores, Inc.*,
144 F. App'x 900 (2d Cir. 2005)....4

*Meyers v. Crouse Health Sys.*,
274 F.R.D. 404 (N.D.N.Y. 2011)....5

*United States v. Andrews*,
530 F.3d 1232 (10th Cir. 2008)....10

*United States v. Durham*,
86 F.3d 70 (5th Cir. 1996)....10

*United States v. Ovid*,
No. 09-CR-216 (JG)(ALC), 2012 U.S. Dist. LEXIS 80049
(E.D.N.Y. June 8, 2012)....9

*United States v. Pokerstars*,
11 Civ. 2564 (LBS), 2012 U.S. Dist. LEXIS 66021 (S.D.N.Y. May 9, 2012)....3

*United States v. Ramunno*,
599 F.3d 1269 (11th Cir. 2010)....10

*United States v. Ribadeneira*,
920 F. Supp. 553 (S.D.N.Y. Apr. 1, 1996)....3

*United States v. Sohrab Sharma*, No. 18 Crim. 340 (LGS), 2023 U.S. Dist. LEXIS
16389 (S.D.N.Y. Jan. 31, 2023)....10

*United States v. Sze*,
No. 22-0141 (ES), 2024 U.S. Dist. LEXIS 9098 (D. N.J. Jan. 18, 2024)....10

## PRELIMINARY STATEMENT

Cachet's opening brief[1] set forth the following undisputed facts supporting Cachet's entitlement to a constructive trust over the seized funds: Mann defrauded Cachet of $26 million. The Government seized approximately $14 million of that amount from Mann's BOA Accounts. Cachet is the only victim that can trace its funds to that $14 million. Unlike Mann's other victims, Cachet did not suffer losses from Mann's long-running, loan-based Ponzi scheme.

Confronted with the foregoing facts, the Government quibbles over whether Mann's conduct fits the definition of "stealing." Worse yet, the Government resorts to victim blaming. Having previously acknowledged that "Cachet has suffered tremendously" and is Mann's "single-largest victim," the Government now claims that Cachet is barred from recovering its money because it purportedly "knew and turned a blind eye" to Mann's fraudulent conduct. Not only does the Government fail to make any effort to establish that Cachet's conduct meets the legal definition of "willful blindness," the Government's about-face is flatly contradicted by the evidence, which demonstrated that Cachet (i) had policies in place to detect and deter fraud; (ii) confronted Mann on the few occasions that Cachet discovered that MyPayrollHR had not adhered to those policies; and (iii) did not suspect that Mann was engaging in fraud until September 2019.

The Government's remaining arguments are just as baseless. For example, the Government advocates for a *pro rata* distribution of funds because Cachet is purportedly similarly situated with Mann's other victims – but completely ignores the body of law providing that Cachet's ability to trace its funds precludes a *pro rata* distribution. Furthermore, the Government's

[1] Capitalized terms and abbreviations not defined herein have the meaning given to them in Cachet's Post-Hearing Brief (ECF No. 251). Citations to "Gov't Br." are to the Government's Post-Hearing Brief (ECF No. 257). Citations to "Cachet Br." are to Cachet's Post-Hearing Brief (ECF No. 251).

grounds for claiming that Cachet is similarly situated with Mann's other victims – namely, that they all "did business" with Mann – is insufficient. It is well-settled that victims are not similarly situated solely by virtue of the fact that they have all been defrauded.

## ARGUMENT

## I. CACHET IS ENTITLED TO A CONSTRUCTIVE TRUST

### A. Mann Was Unjustly Enriched

The Government concedes that Mann diverted $14 million of Cachet's money to the BOA Accounts that he owned and controlled; Mann was not entitled to those funds; and Cachet was unable to recover that money. *See, e.g.*, Gov't Br. at 4 ("Mann manipulated batch files and diverted millions of dollars to bank accounts he controlled[.]"). Clearly, Mann was unjustly enriched.

Notwithstanding the foregoing, the Government argues that Mann was not unjustly enriched because (i) "Mann never received the $14 million nor did he benefit from it" because the money went "to frozen Bank of America accounts, where it remained until the government seized it" (*id.* at 13); (ii) "Cachet's acquiescence in Mann's use of its ACH system for his kiting scheme" makes it "inequitable for Cachet to recover" its money (*id.*); and (iii) Cachet's Agreements with MyPayrollHR are an adequate legal remedy (*id.* at 14). These arguments are meritless.

***First,*** there is no legal basis for the Government's assertion that a convicted criminal is not unjustly enriched by the illegal transfer of funds to his bank accounts, or that he must spend the funds for unjust enrichment to occur.[2] The Government does not cite a single case in support of these novel (to say the least) propositions.[3]

---

[2] Although Mann's conduct need not fit the definition of "stealing" (Gov't Br. at 3), Mann satisfies the definition of theft or larceny under New York law in any event. *See* NY CLS Penal § 155.05.

[3] The Government's assertion that the BOA Accounts were frozen *at the time Cachet's funds were transferred to them* is unsupported by the record. *See* JPS ¶¶ 25-26, 28 (indicating that the BOA Accounts were frozen at some point *after* Cachet's funds were transferred on September 3, 2019).

***Second,*** as explained below in Point II, Cachet did not "acquiesce[] to Mann's use of its ACH system for his kiting scheme" (Gov't Br. at 13). Furthermore, the proper inquiry is whether it would be unconscionable and inequitable for *Mann* to retain the funds. The answer is obviously yes, which is why the Government seized the funds in the first place.

***Finally,*** in arguing that Cachet has an adequate remedy at law, the Government ignores that in the Mann Civil Action Cachet obtained an injunction freezing the BOA Accounts but was unable to collect on the default judgment because the Government seized the funds. Under these circumstances, the Government cannot credibly claim that Cachet should not recover those same funds in this proceeding because Cachet had an adequate remedy at law. *See* Cachet Br. at 21-23 (citing cases); *United States v. Ribadeneira*, 920 F. Supp. 553, 556 (S.D.N.Y. Apr. 1, 1996) (claims "against a defunct institution whose assets are under government control" are inadequate).[4] Equally meritless is the Government's claim that Cachet's litigation against Pioneer, P2BI Holdings, and Axos Bank constitute an adequate remedy at law. Those cases do not concern Cachet's $14 million that was transferred to the BOA Accounts. *See* Tr. 49:20-50:4 (Pioneer case); Gov't Br. at 16 (money in "P2BI's account" and "Axos' accounts").

**B. Cachet And Mann Had A Relationship Of Trust And Confidence**

Relying solely on *In re Ames Dep't Stores, Inc.*, the Government argues that there was no confidential relationship between Cachet and Mann because it was an "arms-length . . . business transaction" with "meaningless" contracts containing "conclusory labels." Gov't Br. at 18-19.

---

[4] None of the cases cited by the Government involved circumstances remotely similar to those here, where a party pursued legal remedies, secured an injunction freezing funds, and those funds were subsequently seized by the Government notwithstanding the injunction. In the sole forfeiture case cited by the Government, *United States v. Pokerstars*, 11 Civ. 2564 (LBS), 2012 U.S. Dist. LEXIS 66021, at *12-13 (S.D.N.Y. May 9, 2012), the defendant was an operational business actively defending lawsuits against its customers. Here, Mann is in federal prison and the Government seized all of his assets.

These arguments are meritless. In *Ames*, the parties were in a "debtor-creditor relationship" and there was "nothing in the record to suggest a relationship of trust or confidence." 274 B.R. 600, 623, 628-29 (Bankr. S.D.N.Y. 2002), *aff'd*, 2004 U.S. Dist. LEXIS 17575 (S.D.N.Y. Sep. 1, 2004). In affirming this holding, the Second Circuit found that boilerplate language such as "trust" or "agency" in the parties' contract did not change the parties' relationship. *See LFD Operating, Inc. v. Ames Dep't Stores, Inc.*, 144 F. App'x 900, 901-02 (2d Cir. 2005). Here, by contrast, the evidence presented demonstrates that Cachet provided access to its confidential, proprietary ACH system and specifications, and MyPayrollHR provided access to confidential employer and employee bank account information.[5] Further, Cachet trusted that MyPayrollHR would use Cachet's ACH system for lawful, proper, payroll-related purposes. *See* Cachet Br. at 7-12. Indeed, the Government concedes throughout its brief that Cachet continued to trust MyPayrollHR until Mann's fraud was discovered. Unlike in *Ames*, the confidential nature of Cachet's relationship with MyPayrollHR was borne out by a prolonged course of dealing.[6]

### C. Cachet Reasonably Relied On Mann's Promises

The Government argues that Cachet did not reasonably rely on Mann's promises to use Cachet's ACH processing system only for payroll-related purposes because Cachet "knew" or was willfully blind to the fact "that Mann was using Cachet's ACH system for non-payroll purposes."

---

[5] The Government notes that Cachet's ACH system was not patented (Gov't Br. at 19), but patents are not required for information to be confidential or proprietary.

[6] The Government attempts to distinguish Cachet's cases because some "do not involve constructive trusts" (Gov't Br. at 19), but courts routinely determine the existence of a confidential relationship outside the context of a constructive trust. The Government gives no reason why such cases are inapposite. Furthermore, the lack of a written agreement in *Thomas v. Thomas* was irrelevant to the court's determination that a confidential relationship existed. Instead, the court in *Thomas* confirmed that a constructive trust can be imposed even when a written agreement exists. 70 A.D.3d 588, 591 (2010) ("it is accepted that a constructive trust … can be imposed even where an underlying agreement is not in writing").

Gov't Br. at 20. But Cachet did not know this, and this argument fails for the reasons set forth in Point II below. Furthermore, the Government ignores Mann's promises to use Cachet's ACH system in compliance with all laws and to pay Cachet for all debits returned by a receiving bank – both of which Cachet reasonably relied upon. *See* Cachet Br. at 12-13. Lastly, the Government ignores that Mann personally reiterated this promise to return the funds to Cachet. *Id.*

## II. CACHET WAS NOT "WILLFULLY BLIND" TO MANN'S FRAUD

Cachet's opening brief demonstrates that Cachet neither knew nor had reason to know that Mann was engaging in fraud, and that Cachet had measures in place to prevent and detect fraud. *See* Cachet Br. at 18-21. The Government nonetheless argues that Cachet is not entitled to recover its funds because Cachet purportedly was willfully blind to Mann's fraud. *See* Gov't Br. at 2, 4, 9-13, 20 (asserting that Cachet, *.e.g.*, "turned a blind eye" to or "blindly accepted" Mann's fraud).

As an initial matter, the Government is precluded from arguing that Cachet was willfully blind because the Government represented during discovery that whether Cachet or any other victim was willfully blind or knowingly contributed to Mann's conduct was "not relevant to any party's claim or defenses." JX 16 at Resp. 6. The Government should be bound by this judicial admission, particularly here because Cachet relied on that representation. *See Meyers v. Crouse Health Sys.*, 274 F.R.D. 404, 410-11 (N.D.N.Y. 2011).

In any event, the Government fails to demonstrate that Cachet was willfully blind to Mann's fraud. In support of its argument, the Government cites (i) three instances where Cachet questioned MyPayrollHR regarding its failure to route funds through Cachet's settlement account; (ii) an instance in May 2018 where Cachet questioned MyPayrollHR regarding certain transactions; and (iii) Daversa's testimony regarding determinations Cachet made *after* Mann's fraudulent conduct was discovered in September 2019. Gov't Br. at 6-12. The Government then attempts to tie these situations together to paint a picture that can only be seen with the benefit of

20/20 hindsight. Notably absent from the Government's brief is any legal support for its argument, let alone mention of "the two basic requirements" the Government must satisfy to demonstrate that Cachet was willfully blind: that Cachet "subjectively believe[d] that there [was] a high probability that" Mann was engaging in fraud, and that Cachet took "deliberate actions to avoid learning of" the fraud. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-70 (2011).

***First,*** in each of the three instances, Cachet confronted MyPayrollHR, stated that the failure to use Cachet's settlement account was unacceptable, and was provided with a reasonable explanation and assured that it would not happen again. *See* Tr. 38:13-39:10; JX 9-10; JX 7 at AF-CACHET0000321.[7] There is simply nothing about those isolated instances – which occurred over the course of Cachet's decade-long relationship with MyPayrollHR – that indicated that Cachet subjectively believed there was a high probability that Mann was engaging in fraud or that Cachet deliberately avoided learning of the fraud.[8]

***Second,*** in the sole instance that Cachet discovered certain large payments to business entities, Cachet again questioned MyPayrollHR about the transactions. *See* JX 7 at AF-CACH0000320.[9] Contrary to the Government's contention (*see* Gov't Br. at 7), the dollar amounts were consistent with direct deposit payroll transactions, but Cachet needed an explanation as to why the recipients were business entities. Tr. 75:15-76:11. After MyPayrollHR represented to

[7] May 10, 2018 email from MyPayrollHR representative stating in part: "We have just released a new set of enhancements to our payroll system . . . I have personally confirmed that the accounts are set up correctly and will be monitoring this for the next week or so to make sure this is working properly."

[8] The Government cites JPS ¶¶ 14-17 and JX1 ¶¶ 5(aa)-(ee) for the claim that Cachet "tolerated [Mann's] illicit practices." Gov't Br. at 2. But the cited evidence indicates just the opposite – that Cachet repeatedly demanded that Mann comply with Cachet's policies.

[9] The Government cites Ms. Succar's testimony that she was "suspicious" about these transactions (Tr. 75:15-17) – but that is precisely why she demanded an explanation.

Cachet that these were 1099 payments to contractors, Cachet's leadership team discussed the matter internally and determined that such payments were sufficiently related to payroll to fall within the scope of the Agreements. Tr. 39:11-40:9. The Government complains that there was no contemporaneous "substantive investigation" (Gov't Br. at 8) – but the foregoing demonstrates that an investigation in fact occurred.

***Third,*** Daversa's testimony does not support the Government's willful blindness argument. Indeed, Daversa admitted that nothing in her testimony concerned whether anyone was at fault or had knowledge of the fraudulent transactions. Tr. 202:15-24. This makes perfect sense, because Daversa's entire testimony was based on Cachet's post-mortem conducted *after* Mann's fraudulent conduct was discovered in September 2019. *See* Tr. 203:12-15. The Government claims that Cachet could have investigated sooner (Gov't Br. at 9), but the uncontradicted testimony of Cachet's witnesses was that no one at Cachet suspected that Mann was engaged in fraud before September 2019. Tr. 44:9-23, 129:3-22. And, the total amount of the transactions Daversa considered equaled less than 1% the total transactions processed by Cachet over the same relevant 20-month time period (*i.e.*, $2.7 billion/$333 billion = .08%). Tr. 43:1-5; Gov't Br. at 11.

***Fourth,*** the Government ignores Cachet's various fraud-prevention measures. *See* Cachet Br. at 19 (discussing, *e.g.*, WesPay Audit [PX 1];[10] Cachet ACH Specifications Guide [JX 14]; and Cachet Operations Department Manual [JX 13]). Furthermore, and contrary to the Government's contention (Gov't Br. at 25), the WesPay Audit confirmed that Cachet's "know your customer" procedures were "commercially reasonable." PX 1 at AF-CACHET0001054.[11]

---

[10] The Government's argument that the Court should disregard the WesPay Audit (Gov't Br. at 25) ignores that the Court already admitted the Audit into evidence over the Government's evidentiary objections (Tr. 27:15-18).

[11] The Government claims that when Mann acquired MyPayrollHR in 2013, "Cachet did not follow its typical set-up process for a new remarketer." Gov't Br. at 3. But MyPayrollHR was not a "new

***Fifth,*** the Government ignores that no bank ever warned Cachet that Mann might be engaging in fraud. Specifically, the receiving banks should have rejected the transactions if they were miscoded or not payroll-related, but never did. *See* Cachet Br. at 18-19. Nor did any bank inform Cachet that they suspected anything regarding any Mann-related accounts. *Id.* at 17-18.[12]

***Finally,*** the Government's unfounded accusations against Cachet at most appear to be claims that Cachet was negligent, not willfully blind. But even if Cachet were negligent (and it was not), the law is clear that "mere negligent conduct does not suffice" to preclude Cachet from obtaining equitable relief in the form a constructive trust. *See Fed. Ins. Co. v. Pixarbio Corp.*, No. 20-cv-4659, 2022 U.S. Dist. LEXIS 39127, at *24-25 (S.D.N.Y. Mar. 3, 2022). To the extent the Court reinterprets the Government's claim as one of "unclean hands," the Government would have had to show, *inter alia*, that Cachet is "guilty of immoral, unconscionable conduct," which the Government failed to and could not do. *See* Cachet's Pre-Hearing Br. at 21 (ECF 237).

## III. THERE IS NO FACTUAL OR LEGAL BASIS FOR A *PRO RATA* DISTRIBUTION

Cachet's opening brief established that neither of the two requirements for a *pro rata* distribution of the funds in the BOA Accounts have been satisfied because (i) Cachet's funds were not commingled, and (ii) Cachet is not similarly situated with Mann's other victims. Cachet Br. at 14-18. In an attempt to escape this conclusion, the Government claims that the two requirements apply only in securities fraud cases, whereas in forfeiture proceedings properly traced constructive trusts "may be denied in cases involving multiple fraud victims as a matter of discretion." Gov't

---

remarketer" and the Government cites no evidence that due diligence was needed for a new owner, nor does the Government even attempt to show how such due diligence in 2013 would have detected or prevented Mann's fraud in 2019.

[12] The Government asserts that the Court should disregard this information because "[b]anks are prohibited from disclosing SARs" (Gov't Br. at 24-25), but the Government asked Cachet in its Interrogatories to "[e]xplain whether Cachet ever discussed or communicated with Bancorp about the filing of a … (SAR)" regarding Mann. JX 12 at 8, Interrogatory No. 23.

Br. at 21-22 (quoting *United States v. Ovid*, No. 09-CR-216 (JG)(ALC), 2012 U.S. Dist. LEXIS 80049 (E.D.N.Y. June 8, 2012)). But both cases upon which the Government relies indicate that the imposition of a constructive trust in a forfeiture proceeding still depends upon whether the victim's funds can be traced and all victims are similarly situated. In *Ovid*, the court analyzed *SEC v. Credit Bancorp*, a securities fraud case, and noted that under "the *Credit Bancorp* line of cases" a constructive trust may be denied where "a *pro rata* distribution of remaining assets to all victims" is more appropriate, "[b]ut courts are not free to disregard the law of constructive trusts when a claimant can directly trace its property, even if this leaves one innocent victim better off than another equally innocent victim." 2012 U.S. Dist. LEXIS 80049, at *17, *21. The *Ovid* court further noted that "where one fraud victim can identify his property and another cannot, they are not similarly situated…." *Id.* at *20. And in *Willis*, the Second Circuit found that the petitioners' funds were "traceable" and "imposing a constructive trust would [not] unfairly elevate the petitioners' claims over those of multiple similarly situated victims." 652 F.3d 236, 243, 246 (2d Cir. 2011). There is simply no basis for the Government's argument that the two prerequisites for a *pro rata* distribution do not apply in forfeiture proceedings.

Tellingly, later in its brief the Government concedes that "courts consider whether victims are similarly situated" in determining whether to recognize a constructive trust or distribute funds *pro rata*. Gov't Br. at 23. In this regard, the Government argues that Cachet is similarly situated with Mann's other victims because Cachet "was one of several financial companies who voluntarily chose to do business with Michael Mann and engage in complicated, high-stakes, high-dollar transactions[.]" *Id.* at 24. This argument does not withstand even casual scrutiny. Cachet was not a "financial company," it was an ACH processor, whereas Mann's other victims mainly were banks and financing companies who voluntarily loaned Mann money and received significant

payments from Mann on those loans. *See* JX 1 ¶¶ 5(a)-(z). In fact, the Government notes that financing companies P2B and Millennium Funding received nearly $80 million dollars from Mann. *See* Gov't Br. at 9-10. Furthermore, the transactions here – routine ACH transactions – were not "complicated." And the Government's simplistic assertion that Cachet and the banks and financing companies all "voluntarily chose to do business with Mann" ignores all of the distinctions between the "long-term, loan-based Ponzi scheme" perpetrated by Mann against the financing companies (ECF No. 121-1 at 11; JX 1 ¶ 5(c)) and Mann's isolated theft of Cachet's money on August 30, 2019. *See* Cachet Br. at 15-18.

Notably, the Government does not attempt to distinguish the cases cited in Cachet's opening brief that drew distinctions among classes of victims on circumstances far less clear-cut than those present here. *See id.* at 17-18. In contrast, the cases cited by the Government involved victims with identical relationships with the defrauder.[13]

**CONCLUSION**

For the foregoing reasons and those set forth in Cachet's opening brief, the Court should amend the Preliminary Order to permit Cachet to recover $14,522,747.92 seized from the BOA Accounts.

[13] *See United States v. Ramunno*, 599 F.3d 1269, 1271 (11th Cir. 2010) (all victims were "fraudulently induced … to invest in a fund" as part of a "Ponzi scheme"); *United States v. Andrews*, 530 F.3d 1232, 1234 (10th Cir. 2008) (all victims lost "funds that they believed were being invested in mortgages"); *United States v. Sohrab Sharma*, No. 18 Crim. 340 (LGS), 2023 U.S. Dist. LEXIS 16389, at *2 (S.D.N.Y. Jan. 31, 2023) (all victims were "fraudulently induced … to transfer cryptocurrency"); *United States v. Durham*, 86 F.3d 70, 71 (5th Cir. 1996) (all victims lost funds to a fraudulent "loan brokerage business"); *United States v. Sze*, No. 22-0141 (ES), 2024 U.S. Dist. LEXIS 9098, at *2, *31 n.7 (D. N.J. Jan. 18, 2024) (all victims lost money to "an unlicensed money transmitting business" and the petitioners "failed to trace any assets transferred by them to the [d]efendant").

Dated: New York, New York
February 6, 2026

**LOEB & LOEB LLP**

By: */s/ Jay K. Musoff*

Jay K. Musoff (NDNY Bar No. 512488)
345 Park Avenue
New York, New York 10154
Tel. (212) 407-4000

Matthew C. Anderson (NDNY Bar No. 701311)
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
(310) 282-2000

*Attorneys for Cachet Financial Services*