**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v. 1:20-CR-199 (AMN/DJS)

MICHAEL T. MANN,

Defendant,

CACHET FINANCIAL SERVICES,

Third-Party Claimant.

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| U.S. DEPARTMENT OF JUSTICE<br>*Attorney for the United States of America*<br>445 Broadway, Room 218<br>Albany, New York 12207-2924 | CHRISTOPHER R. MORAN, ESQ.<br>CYRUS P. RIECK, ESQ. |
| LOEB & LOEB LLP<br>*Attorney for Cachet Financial Services*<br>345 Park Avenue<br>New York, New York 10154-0037 | JAY K. MUSOFF, ESQ. |
| LOEB & LOEB LLP<br>*Attorney for Cachet Financial Services*<br>10100 Santa Monica Boulevard, Suite 2200<br>Los Angeles, California 90067 | MATTHEW ANDERSON, I, ESQ. |

**DANIEL J. STEWART**
**United States Magistrate Judge**

# REPORT-RECOMMENDATION and ORDER

## I. PROCEDURAL HISTORY

On August 26, 2020, the District Court entered a Preliminary Order of Forfeiture (the "Preliminary Order"). Dkt. No. 35. On May 13, 2021, Cachet Financial Services

("Cachet") filed a Third-Party Petition (the "Petition") seeking adjudication of its legal interests in three Bank of America ("BOA") accounts identified in the Preliminary Order. Dkt. No. 51. The District Court referred the Petition to the undersigned for a hearing pursuant to 21 U.S.C. § 853(n) and a report-recommendation on the Petition. Dkt. No. 53. On February 22, 2022, Cachet filed an Amended Third-Party Petition (the "Amended Petition"). Dkt. No. 120, Am. Pet. Following denial of the Government's Motion to Dismiss the Amended Petition, the matter proceeded to a hearing. Dkt. Nos. 132 & 157.

## II. STANDARD

21 U.S.C. § 853 governs criminal forfeiture proceedings. *See* 21 U.S.C. § 853; *see also United States v. Swartz Fam. Tr.*, 67 F.4th 505, 513 (2d Cir. 2023). "Once [a] district court determines that [a] criminal defendant's interest in . . . property is forfeitable," the statute "vests" the United States with "right, title, and interest" in such property. *United States v. Swartz Fam. Tr.*, 67 F.4th at 513 (quoting 21 U.S.C. § 853(c)) (internal quotation marks omitted). A "[t]hird part[y] may claim an interest in the property deemed forfeitable" by filing a "petition [with] the court for a hearing to adjudicate the validity of [the third party's] alleged interest in the property." *Id.* (quoting 21 U.S.C. § 853(n)(2)) (internal quotation marks omitted); *see also DSI Assocs. LLC v. United States*, 496 F.3d 175, 183 (2d Cir. 2007) ("It is . . . well settled that section 853(n) provides the exclusive means by which a third party may lay claim to forfeited assets . . . after the preliminary forfeiture order has been entered.").

Thereafter, a "hearing on the petition shall . . . be held," 21 U.S.C. § 853(n)(4), at which testimony and evidence may be presented, *id.* at § 853(n)(5), and the court will

"determine[] whether the third party has a valid interest in the property." *United States v. Swartz Fam. Tr.*, 67 F.4th at 513. "The . . . court must then either amend or leave unaltered the final order of forfeiture." *Id.* (citations omitted). The order of forfeiture shall be amended if:

> the court determines that the petitioner has established by a preponderance of the evidence that--
>
> > (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section . . . .

21 U.S.C. § 853(n)(6)(A). "Following the court's disposition of all petitions . . . , the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee." *Id.* at § 853(n)(7).

## III. THE HEARING

On October 14, 2025, a Forfeiture Hearing (the "Hearing") was held in Albany, New York. *See* Dkt. No. 218; Text Minute Entry dated October 14, 2025. In advance of the Hearing, the parties filed certain materials with the Court. This included, but was not limited to, a brief by each party, Dkt. Nos. 237 & 239, as well as a joint Pretrial Stipulation, wherein the parties, among other things, stipulated into evidence certain exhibits and delineated certain facts not in dispute. Dkt. No. 234, Joint Pretrial Stipulation ("JPS"). During the Hearing, two representatives of Cachet—Hanan Succar ("Succar") and Aberash Asfaw ("Asfaw")—testified at length, and documentary evidence was presented. *See generally* Dkt. No. 250, Transcript ("Tr."). Additionally, the Government

called Alyssa Daversa ("Daversa") to testify regarding the financial analysis she performed of three BOA accounts that were seized by the Government. *See generally* Tr. at pp. 155-205. The parties thereafter filed additional briefing in further support of their positions. Dkt. Nos. 251, 257, & 260.

## A. Cachet's Operations

Before ceasing operations in November of 2019, Tr. at 7:6-7, 50:5-8, & 120:18-21, Cachet was a third-party automated clearing house ("ACH") processor for the payroll industry, and specifically serviced "remarketers," which are "vendor[s] that businesses use to outsource their payroll services." *Id.* at 7:8-12, 7:18-8:2, 119:13-15, & 121:6-9. An ACH transaction is "an electronic fund transfer." *Id.* at 7:13-17. In a "typical ACH payroll transaction using Cachet's system," Cachet used the information it was provided to transfer funds "from the employer's [bank] account to the Cachet settlement account,"[1] which was a "holding account" at Bancorp Bank, and then transferred funds from the Cachet settlement account "to the employee's [bank] account." *Id.* at 8:7-19; *see* Am. Pet. at ¶¶ 4-5. To initiate an ACH transaction, "[t]he employer would enter the payroll information through their payroll software" in order for an ACH file to be created, which was then submitted to and processed by Cachet. Tr. at 9:1-9; *see* Am. Pet. at ¶¶ 4-5.

## B. Cachet's Agreement with MyPayrollHR

For over ten years, MyPayrollHR was a remarketer and a customer of Cachet. Tr. at 28:21-29:2 & 122:6-12. Succar acknowledged that nothing was different about

[1] Throughout this decision, Cachet's account is referred to as both a "settlement" and a "clearing" account. These terms are intended to be synonymous and are used interchangeably herein.

Cachet's relationship with MyPayrollHR compared to its relationship with other remarketers. *Id.* at 50:25-51:4.

Succar and Asfaw testified that MyPayrollHR was owned by Michael Mann ("Mann"). *Id.* at 29:3-4 & 122:21-22. The Government admits that "Mann owned MyPayrollHR.com LLC through his ownership and control of Value Wise Corporation." Jt. Ex. 15 at p. 2. However, the Government contends that Mann did not own and control MyPayrollHR at all relevant times and for the entirety of Cachet's relationship with MyPayrollHR. Dkt. No. 257, Gov.'s Br. at p. 3. Specifically, the Government notes that Cachet and MyPayrollHR signed a Remarketer Agreement in March 2007, but "Mann was not involved with MyPayrollHR in 2007 and did not assume ownership or control until October 2013." *Id.* (citing JPS ¶ 7; Jt. Ex. 4; Tr. at 55:8-14 & 110:24-111:5).

The written contract entered between Cachet and MyPayrollHR contained certain terms and conditions (the "Terms and Conditions"). Tr. at 29:5-15; Jt. Ex. 6. Succar testified that it was Cachet's understanding that it was going to provide MyPayrollHR with direct deposit services for payroll and payroll-related transactions. Tr. at 30:7-15 & 31:8-10. Cachet's Terms and Conditions with MyPayrollHR: stated that the agreement was "confidential and proprietary"; indicated that payroll information and the software utilized to process transactions would "be kept in the strictest confidence"; acknowledged that "Cachet has applied for patents" for the methods used in its transactions; and agreed that the parties would not "divulge any aspect of this agreement to any outside party." Tr. at 32:15-34:20; Jt. Ex. 6 at p. 2. MyPayrollHR also agreed to use Cachet's services in compliance with state and federal law, Tr. at 30:7-11 & 32:5-10; Jt. Ex. 6 at p. 1; *see also*

Tr. at 35:10-15; Jt. Ex. 5 at p. 1, and agreed to "immediately pay Cachet the amount of each debit entry returned." Tr. at 37:25-38:10; Jt. Ex. 6 at p. 1.

Cachet also provides an ACH Specifications Guide ("Guide") to "every new remarketer." Tr. at 10:2-3 & 10:19-20; *see also* Jt. Ex. 14. The Guide contains "all the information remarketers need to set up the ACH file." Tr. at 10:17-18. The Guide's cover page states that it "is a privy and confidential document," and has a watermark stating "confidential, restricted, proprietary." *Id.* at 10:24-11:3 & 11:9-13; Jt. Ex. 14 at pp. 1-2.

Asfaw testified that Cachet supplied MyPayrollHR with "a proprietary user ID and password . . . to log in to Cachet['s] system and upload the file." Tr. at 121:25-122:2; *see also* Tr. at 122:13-16. She further testified that MyPayrollHR provided Cachet with its bank account number that would be debited for services. Tr. at 122:17-20.

**C. Cachet's Oversight of MyPayrollHR**

Since 2011, Succar has worked as Cachet's director of operations. *Id.* at 5:10-13 & 5:25-6:1. Until September 2019, she "oversaw the operations department," which involved "making sure . . . all . . . staff that reported to [her] were doing all of their tasks, the on-boarding for remarketers, which is [Cachet's] clients, making sure that the returns that are received are handled timely, [and] the processing is done daily on time." *Id.* at 6:2-10. She reported to Asfaw, who has served as Cachet's president since approximately 2012. *Id.* at 6:11-15 & 119:22-23.

Prior to September 2019, Cachet was aware of three instances in which MyPayrollHR did not use Cachet's settlement account in processing ACH transactions. *Id.* at 38:13-18. In response, Cachet reached out to MyPayrollHR and was told that the

mistake was human error. *Id.* at 38:22-39:6. Based on the explanation provided by MyPayrollHR, Cachet continued to process transactions for MyPayrollHR. *Id.* at 39:6-7.

Specifically, in June 2015, Cachet "noticed that there was a file process that was not going through the settlement or clearing account, and [Cachet] reached out asking why and [stated] it needs to be corrected." *Id.* at 64:4-7. Succar testified that Mann explained that the issue was the result of "human error," and that Cachet had informed Mann "that's not something they should be processing." *Id.* at 64:24-65:6. Thereafter, *id.* at 65:4-6, on June 4, 2015, a representative of MyPayrollHR emailed Cachet a letter from Mann regarding the issue. Jt. Ex. 9. That letter stated that Mann was "aware that [MyPayrollHR] did not submit payroll through the clearing account," expressed awareness "that the direct deposits need to go through the clearing account," and concluded that MyPayrollHR had "addressed [its] issue/problem and will not let this happen again." Jt. Ex. 10.

On April 10, 2018, representatives from Cachet and MyPayrollHR communicated via email regarding direct deposit funds that were again not flowing through Cachet's clearing account. Jt. Ex. 8 at p. 2. Cachet informed MyPayrollHR that Cachet had "flagged" certain files that had been uploaded by MyPayrollHR because "funds were not flowing through Cachet's clearing account for the direct deposits as [the parties'] agreement states." *Id.* at pp. 2-3. Cachet then provided a list of files that "were not following the guidelines th[at] month." *Id.* at p. 3. MyPayrollHR responded that the issue would be "look[ed] into" and stated that it might have arisen because "the person who

normally processes ACH was on vacation." *Id.* at p. 2. Succar testified at the Hearing that the files at issue were large and involved a lot of money. Tr. at 67:13-68:15.

A month later, on May 10, 2018,[2] Succar emailed MyPayrollHR stating that the "accounts reflect[] that 7 files uploaded between 05/07/2018 to 5/09/2018 are not going thru the Cachet clearing account." Jt. Ex. 8 at p. 1. Succar stated "[t]he file ranges from $55,000 to $17 million." *Id.* At that time, Succar expressed concern that "[t]he larger files not going thru the clearing house are a huge exposure to Cachet," and conveyed that MyPayrollHR was "in breach of the contract that requires that all direct deposit funds must settle to the Cachet clearing account." *Id.* Succar recognized that this was a repeat issue, stating "this was addressed previously" and indicating she had "other communications dating back over a year where we addressed this matter as well." *Id.* MyPayrollHR responded that the cause of the issue was that it had "just released a new set of enhancements to [its] payroll system." Jt. Ex. 7 at p. 4. At the Hearing, Succar acknowledged she had learned of transactions not going through Cachet's settlement account and admitted that is contrary to Cachet's contract and policies. Tr. at 64:13-20.

Shortly thereafter, also on May 10, 2018, Cachet stated that it had reviewed files MyPayrollHR had uploaded that day and noticed an additional issue—namely, that "none of the[] [files] are pertaining to direct deposit transactions." Jt. Ex. 7 at p. 3. Cachet further observed that "[a]ll of the multi-million dollar transactions are moving funds from

---

[2] Joint Exhibit 8 does not contain any further communications between Cachet and MyPayrollHR indicating what transpired in the month between: (1) the April 10, 2018 email wherein Cachet acknowledged MyPayrollHR's statement that it would investigate the issue further; and (2) the May 10, 2018 email wherein Cachet identified additional issues it had discovered. Jt. Ex. 8 at pp. 1-2.

the clients [sic] account to an account ending with 7099 (P2binvestor For Weitz) or to an account ending with 5999 (Millennium Funding)." *Id.* Succar testified that she was "suspicious" and that "[t]he account names did not look like employee names." Tr. at 75:9-23. She also stated that she would not expect disbursements to be going into a corporate account. *Id.* at 76:9-11. Succar testified that the transactions "did not look like direct deposit transactions" and that those were "the only type of transactions they were authorized." *Id.* at 39:20-22. She also agreed that she was concerned that the transactions were not payroll transactions. *Id.* at 76:17-19.

MyPayrollHR replied that "these transactions are actually vendor payments that are for 1099 contractors that get processed through our payroll system." Jt. Ex. 7 at p. 3. Upon learning this, Asfaw responded cautioning that "Cachet does not service accounts payable transactions" and informed MyPayrollHR that "the transactions in question should be suspended and/or cancelled." *Id.* at p. 2. MyPayrollHR responded that Succar had "just [said] . . . that this was alright" and sought confirmation regarding if "1099s are not allowed to be processed[.]" *Id.* Succar answered that, "[p]er [their] conversation, MyPayrollHR will cancel the 9 vendor transfer files and will handle the payments via wire," and told MyPayrollHR that Cachet would prepare a separate agreement "to be able to assist for future merchant/vendor transactions." *Id.* at p. 1.

Despite these events, Succar testified that, prior to September 2019, she did not ever suspect that MyPayrollHR or Mann were engaging in fraudulent activities, and asserts Cachet was not informed by any other bank that MyPayrollHR or Mann were suspected to have engaged in suspicious or fraudulent activities. Tr. at 44:9-20.

Later, and following the underlying fraud incident, Cachet prepared a spreadsheet to identify non-payroll transactions processed for MyPayrollHR. *Id.* at 40:16-19. Daversa testified that, based on her analysis of the seized bank accounts and transactions related thereto, there were a number of non-payroll transactions that MyPayrollHR and/or Mann effectuated using Cachet's ACH system. *See*, *e.g.*, *id.* at 172:13-25, 175:2-5, 176:22-177:8, 179:11-16, 181:10-15, 183:11-16, 184:19-24, 190:3-9, & 197:6-12.

**D. Cachet's Alleged Loss**

Cachet alleges that, in September 2019, it suffered a loss of eight million dollars related to direct deposits that needed to be made to employees. *Id.* at 45:1-7 & 123:25-124:4. Specifically, Succar and Asfaw testified that MyPayrollHR and/or Mann manipulated the file so that the collection from employers went to Mann's account at Pioneer Bank ("Pioneer") rather than to Cachet's settlement account. *Id.* at 45:10-16, 123:25-124:13, & 124:24-125:2. They also testified that, after Pioneer received the funds, it "rejected the release of the funds to the employees," "froze the disbursement portion," and "all of those were rejected as account frozen." *Id.* at 45:10-16 & 125:4-6; *see also id.* at 48:7-8. Cachet instead paid the employees. Tr. at 45:20-46:2 & 125:4-10.

Additionally, Succar and Asfaw testified that MyPayrollHR uploaded batch files to Cachet's server that caused approximately nineteen million dollars to be debited from various accounts at Pioneer and credited to the Cachet settlement account, and then debited from the Cachet settlement account and credited to various accounts, including at the BOA. *Id.* at 46:8-21 & 125:11-21; Am. Pet. at ¶ 6. However, no funds were received by Cachet's settlement account because the accounts at Pioneer were frozen, so no funds



D J S

D J S

were withdrawn from Pioneer. Tr. at 48:7-8; Am. Pet at ¶ 7. The money was nonetheless debited from Cachet's settlement account and credited to various accounts without Cachet's settlement account receiving a corresponding amount. Tr. at 46:15-21; Am. Pet at ¶ 7. Succar explained that the money was disbursed from Cachet's settlement account to the BOA and other banks, even despite that money not being collected from Pioneer, because the rules provide that "the receiving bank[], in this case Pioneer Bank, has 48 hours to return a transaction, so by the time [Cachet] received the return notification, the disbursement had already gone out." Tr. at 48:9-15. Cachet contends that fifteen of the nineteen million dollars that Cachet lost "was taken by the DOJ . . . [f]rom [BOA]." *Id.* at 48:16-20. Cachet now seeks to recover those funds. *Id.* at 48:21-24.

## IV. DISCUSSION

The parties principally dispute Cachet's entitlement to a constructive trust. *Compare* Dkt. No. 251, Cl.'s Br. at pp. 7-14 *with* Gov.'s Br. at pp. 12-21. "[T]he Second Circuit has determined that . . . a constructive trust . . . qualifies as a 'legal right' in property under § 853(n)(6)(A) and warrants an amendment of an order of forfeiture if the property ordered forfeited is traceable to property held in constructive trust." *United States v. Lesak*, 2009 WL 1788411, at *5 (S.D.N.Y. June 23, 2009) (citing *United States v. Schwimmer*, 968 F.2d 1570, 1574 (2d Cir. 1992)); *Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 242 (2d Cir. 2011) (citing *United States v. Schwimmer*, 968 F.2d at 1581-83) ("We have held that a constructive trust qualifies as a 'legal right, title, or interest in the property' that 'may be a superior interest' to a defendant's interest for the purposes of a forfeiture statute analogous to 21 U.S.C. § 853(n)(6)(A).").

"[D]istrict courts should evaluate whether a constructive trust should be recognized pursuant to the applicable state law and based on the facts of the particular case at issue." *Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d at 245. Consequently, "[s]tate law determines a petitioner's legal interest in the property at issue." *Id.* at 242; *see United States v. Lesak*, 2009 WL 1788411, at *5 (citing *Pacheco v. Serendensky*, 393 F.3d 348, 353 (2d Cir. 2004)).

"Under New York law, a constructive trust may be imposed where four factors are present: (1) a promise, express or implied; (2) a transfer in reliance on the promise; (3) a fiduciary or confidential relationship; and (4) unjust enrichment." *United States v. Lesak*, 2009 WL 1788411, at *5 (citing *Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978)). "Although these factors provide 'important guideposts, the constructive trust doctrine is equitable in nature and should not be rigidly limited.'" *Id.* (quoting *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 362 (2d Cir. 1999)); *see also Counihan v. Allstate Ins. Co.*, 194 F.3d at 362 ("New York Courts do not insist that a constructive trust must fit within the framework of these elements."); *Simonds v. Simonds*, 45 N.Y.2d at 241 ("Although the factors are useful in many cases constructive trust doctrine is not rigidly limited."). After all, "[a] constructive trust is an equitable remedy," and thus must "necessarily [be] flexible to accomplish its purpose," which "is to prevent unjust enrichment." *Counihan v. Allstate Ins. Co.*, 194 F.3d at 361. Thus, "[w]hat the New York courts do insist upon is a showing that property is held under circumstances that render unconscionable and inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment." *Id.* at 362.

## A. Precondition: Traceability

"[I]n a forfeiture context, '[i]t is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer.'" *United States v. Lesak*, 2009 WL 1788411, at *5 (quoting *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985)) (citation omitted).

Here, the Amended Petition asserts an interest in all funds contained in two of the three BOA accounts subject to the Preliminary Order—namely, $7,713,562.99 in Account No. 6103 and $5,363,936.77 in Account No. 6843. Am. Pet. at p. 1. In its pre-Hearing briefing, "[t]he Government acknowledge[d] that the Seized Funds . . . are traceable to Cachet." Dkt. No. 239 at p. 3.[3] Further, in its Response to Cachet's First Request for Admissions, the Government admitted that: (1) "$7,713,026.23 . . . can be traced directly to the 6103 Account"; (2) "$5,363,936.77 . . . can be traced directly to the 6843 Account"; and (3) "$1,444,975.16 . . . can be traced directly to the 9506 Account." Jt. Ex. 15 at ¶¶ 24, 30, & 36.

Given that the parties do not dispute traceability, the Court recommends finding that Cachet has satisfied this precondition to imposition of a constructive trust, and so turns to consideration of the relevant factors.

## B. Factors 1 and 2: A Promise and Transfer in Reliance on the Promise

In determining whether to impose a constructive trust, courts consider whether a promise has been made. *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (citation

---

[3] The term "Seized Funds" was defined by the Government to mean "all of the funds that the Government has seized from Mann – $14,522,474.90 . . . , formerly contained within three [BOA] accounts." Dkt. No. 239 at p. 1.

omitted). Even where there is no express promise, "[a] promise may be implied or inferred from the very transaction itself." *Counihan v. Allstate Ins. Co.*, 194 F.3d at 362 (quoting *Sharp v. Kosmalski*, 40 N.Y.2d 119, 122 (1976)). For example, "[a] promise may be implied where it is inconceivable that the transfer would have occurred in its absence." *In re St. Theresa Props., Inc.*, 152 B.R. 852, 858 (Bankr. S.D.N.Y. 1993) (citations omitted).

In the present case, Cachet argues that "Mann promised to use Cachet's ACH processing system only for payroll-related purposes and in compliance with all laws, and to pay Cachet for all debits returned by a receiving bank." Cl.'s Br. at p. 12.[4] Cachet further asserts that, in reliance on those promises, it "executed the transactions at issue pursuant to the instructions submitted by MyPayrollHR." *Id.* at p. 13. In response, the Government notes that, "[w]hen asked to identify where, in Cachet's agreement, MyPayrollHR promised to only use the ACH system for payroll or payroll-related purposes," Succar referred only to "the first paragraph of Cachet's Terms and Conditions (JX 6)." Gov.'s Br. at p. 20 (citing Tr. 55:18-57:24). In a footnote and without citation to legal authority, the Government contests that the provision contains "nothing more than meaningless boilerplate language." *Id.*

[4] Cachet also calls attention to various promises made by Mann and other contacts at MyPayrollHR that the money Cachet lost would be returned to it, including the money that went to the BOA accounts. Cl.'s Br. at p. 12 (citing Tr. at 49:5-13 & 126:25-127:8). The Court is unpersuaded by this point. In determining whether to impose a constructive trust, courts consider both whether there was "a promise," as well as whether there was "a transfer made in reliance on that promise." *Jaffer v. Hirji*, 887 F.3d at 114. It cannot be said that Cachet made its earlier transfer of money based on later promises that said money would be returned to Cachet.

The provision in dispute states that Cachet would provide MyPayrollHR with ACH processing services. Jt. Ex. 5 at p. 1. Other terms contained in the parties' agreements further discuss how Cachet would provide services to MyPayrollHR specifically related to "payroll." *See*, *e.g.*, Jt. Ex. 4 at pp. 1 & 3; Jt. Ex. 5 at p. 1; Jt. Ex. 6 at p. 1; *see also* Jt. Ex. 6 at ¶ 3.D (discussing termination of an employer). Succar testified at the Hearing that, in general, Cachet's customers were "payroll processors," which are "vendor[s] that businesses use to outsource their payroll services." Tr. at 7:18-24. She also testified that, to her knowledge, MyPayrollHR was engaged in the payroll business. *Id.* at 31:8-10. Consequently, it was Cachet's understanding that it was going to provide MyPayrollHR with direct deposit services for payroll transactions. *Id.* at 30:7-15 & 31:8-10; *see also* Jt. Ex. 13 at p. 5 (stating that "Cachet is a national financial services company that provides services to the Payroll Service Industry," and that "Cachet primarily offers its services to payroll servicing companies").

Communications between Cachet and representatives of MyPayrollHR likewise confirm the parties' understanding that Cachet would provide MyPayrollHR with ACH processing services for payroll transactions. For example, on one occasion, Succar alerted MyPayrollHR that Cachet had discovered batch files that MyPayrollHR uploaded that were not going through the Cachet settlement account, and stated: "As previously advised, the agreement with Cachet is to transmit ACH files for Payroll and Payroll related transactions." Jt. Ex. 7 at p. 4. In response, a representative of MyPayrollHR explained that the transactions were "vendor payments that are for 1099 contractors that get processed through [MyPayrollHR's] payroll system," and expressed his belief that

those transactions "should be within the bounds of [the parties'] agreement." *Id.* at p. 3; *see* Tr. at 49:5-6. Succar countered that "Cachet does not service accounts payable transactions" and stated that "the transactions in question should be suspended and/or cancelled." Jt. Ex. 7 at p. 2.

The Government also insists, however, that, to establish a constructive trust, the promise must be one on which it was reasonable to rely. Gov.'s Br. at p. 20 (citing *Scarlett-Brown v. Pilgrim Baptist Church, Inc.*, 208 A.D.3d 703, 705 (2d Dep't 2022)). In this respect, the Government contends that Cachet's reliance on Mann's promise was unreasonable because "Cachet knew, as of May 10, 2018, that Mann was using Cachet's ACH system for non-payroll purposes." *Id.*

Initially, the Court notes that the Government's reliance on *Scarlett-Brown v. Pilgrim Baptist Church, Inc.* for the proposition that Cachet's reliance must be reasonable is misplaced. Gov.'s Br. at p. 20 (citing *Scarlett-Brown v. Pilgrim Baptist Church, Inc.*, 208 A.D.3d at 705). Notably, the court in *Scarlett-Brown* made the statement quoted by the Government in the context of analyzing the plaintiff's claim for promissory estoppel—not in relation to plaintiff's claim for constructive trust—stating:

> Although *promissory estoppel* with respect to an oral agreement regarding a conveyance of real property may be an exception to the statute of frauds upon a showing that application of the statute of frauds would result in unconscionability, here, the *plaintiff failed to assert any allegations that show a clear and unambiguous promise by the Church to convey the property to her upon which the plaintiff could have reasonably relied*. The plaintiff *also failed to allege facts sufficient to establish that a constructive trust should be imposed* on the property.

*Scarlett-Brown v. Pilgrim Baptist Church, Inc.*, 208 A.D.3d at 705 (emphasis added). In any event, the Government's contention that Cachet knew that Mann was using its ACH system for non-payroll purposes is not germane to the present consideration of whether there was a promise and transfer in reliance on that promise. Instead, it is, at heart, an equitable argument, which the Court finds is more properly addressed in relation to the fourth factor of unjust enrichment. *See infra* section IV.D.

Thus, the Court recommends finding that there was both a promise and transfer in reliance on that promise. This weighs in favor of granting a constructive trust.

**C. Factor 3: Fiduciary or Confidential Relationship**

"A confidential or fiduciary relationship exists between two persons or entities when one of them is under a duty to act for or to give advice for the benefit of the other upon matters within the scope of the relation." *Speedfit LLC v. Woodway USA, Inc.*, 432 F. Supp. 3d 183, 220 (E.D.N.Y. 2020) (quotation omitted). "Such a relationship exists where confidence is reposed on one side, and there is resulting superiority and influence on the other." *Id.* (quotation omitted). "An ordinary contractual relationship will not typically give rise to such a relationship, absent some special circumstances that go beyond the mere existence of the contract." *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 395 (W.D.N.Y. 2010) (citation omitted); *see also In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 353 (2d Cir. 1992) (citing cases) ("Purely commercial transactions do not give rise to a fiduciary relationship."), *aff'd in part sub nom. Refco F/X Assocs., Inc. v. Mebco Bank, S.A.*, 1992 WL 200748 (S.D.N.Y. July 31, 1992). Cachet cannot satisfy this factor.

Here, Cachet argues that "there was a relationship of trust and confidence between Cachet and Mann and MyPayrollHR based on extended prior business dealings." Cl.'s Br. at p. 9. However, "where parties deal at arms length in a commercial transaction," "[e]ven a longstanding relationship" spanning many years "is insufficient to establish a fiduciary relationship." *McKenzie v. Fishko*, 2015 WL 685927, at *9 (S.D.N.Y. Feb. 13, 2015) (quotation omitted).

Cachet also relies on the "written agreements [that] governed the relationship" between Cachet and MyPayrollHR, including "the Rules, Regulations, and Binding Policies . . . and the Cachet Terms and Conditions." Cl.'s Br. at p. 10. Cachet notes that these agreements contained terms concerning, among other things, MyPayrollHR having access to Cachet's proprietary information, that it would maintain such information in strict confidence, and that release of such confidential information may result in irreparable damage, as well as Cachet having access to and maintaining employers' payroll and payroll tax data. *Id.* Noticeably absent is a specific agreement among Cachet and MyPayrollHR to enter a fiduciary relationship. *See N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 104 (S.D.N.Y. 2013) (citing cases). In any event, as the Government observes, Cachet "cannot turn to the conclusory labels of the [parties'] [a]greement[s] in an effort to construe the relationship between the parties in a manner sufficient to establish a constructive trust." Gov.'s Br. at p. 18 (quoting *LFD Operating, Inc. v. Ames Dep't Stores, Inc.*, 2004 WL 1948754, at *1 (S.D.N.Y. Sept. 1, 2004), *aff'd sub nom. In re Ames Dep't Stores, Inc.*, 144 F. App'x 900 (2d Cir. 2005)).

That Cachet and MyPayrollHR entered into agreements to protect against the disclosure of sensitive information does not create a fiduciary or confidential relationship. *See PulseCard, Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. 1478, 1484 (D. Kan. 1996); *RRC Aruba, Ltd. v. Lionstone Grp., Inc.*, 2006 WL 8433543, at *5 (S.D. Fla. June 12, 2006). Accepting Cachet's argument would require the imposition of a fiduciary or confidential relationship, regardless of the parties' intentions, any time two businesses enter into a contract containing provisions governing the treatment of sensitive information. *See PulseCard, Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. at 1484; *RRC Aruba, Ltd. v. Lionstone Grp., Inc.*, 2006 WL 8433543, at *5.

D

Further, that MyPayrollHR may have "owed [Cachet] a duty not to disclose or otherwise exploit" Cachet's proprietary information does not necessitate a finding that "the parties had a relationship of higher trust independent of their obligations under the . . . agreements." *Speedfit LLC v. Woodway USA, Inc.*, 53 F. Supp. 3d 561, 582 (E.D.N.Y. 2014). "[A] fiduciary duty typically does not arise out of a contractual relationship between parties with comparable bargaining power where the duties of the parties are dictated by the terms of a contract," and there is no evidence here to suggest "that any noncontractual duty is imposed as a matter of social policy as between" Cachet and MyPayrollHR. *In re Ames Dep't Stores, Inc.*, 274 B.R. 600, 627 (Bankr. S.D.N.Y. 2002) (citations omitted), *aff'd sub nom. LFD Operating, Inc. v. Ames Dep't Stores, Inc.*, 2004 WL 1948754, *aff'd sub nom. In re Ames Dep't Stores, Inc.*, 144 F. App'x 900.

J

S

In *Ironforge.com v. Paychex, Inc.*, the court determined that the nature of the relationship between the parties, whereby "the parties contracted for [defendant] to

perform certain payroll-related services for [plaintiffs]," and the course of action that occurred while those services were performed, whereby "[defendant] made excessive, unjustified[,] and unauthorized withdrawals from plaintiffs' accounts," did not create a special, fiduciary relationship between the parties. 747 F. Supp. 2d at 395. The court further found unpersuasive "[p]laintiffs' argument that [defendant] had a fiduciary duty by virtue of its access to plaintiffs' bank accounts," explaining:

> That [defendant] may have been in a position to withdraw funds from plaintiffs' accounts does not make it a fiduciary. Although plaintiffs contend that this demonstrates that [defendant] occupied a position of trust vis-a-vis the plaintiffs, virtually all ongoing contractual relationships involve some degree of mutual trust, particularly where one party to the contract has temporary custody of the other party's assets or property. That does not automatically give rise to a fiduciary relationship, however. For example, a vehicle owner who drops his car off at a garage for service or repair trusts the garage not to perform any unnecessary repairs, not to steal any of the contents of the vehicle, and so on, but that does not render the garage or the mechanic who works on the car a fiduciary with respect to the customer. The only "trust" involved in that relationship is the trust that the garage will live up to its contractual obligations to the customer.

*Id.* at 396. In support of this position, the court in *Ironforge.com* relied on *Bridgestone/Firestone*, wherein the Second Circuit declined to find that defendant owed plaintiff a fiduciary duty distinct from its contractual obligations, and stated:

> [Defendant] did not occupy a position of trust or special confidence with regard to [plaintiff] that imposed obligations beyond the express agreements. He had little discretion to exercise, his obligations under the contract being straightforward and fixed. Whatever trust and confidence was placed in him had solely to do with his carrying out his obligations under the contract. Nor was he relied upon for advice or the exercise of judgment based on superior information or professional expertise.

*Id.* (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).

D J S

The same principles apply here. Cachet and MyPayrollHR "had certain well-defined, fixed obligations under the [agreements], which by their terms gave [the parties] little or no discretion with respect to carrying out those duties." *Id.* Cachet's "contractual duty was simply to withdraw funds from . . . accounts, and then disburse those funds as necessary, to satisfy . . . payroll . . . obligations." *Id.* "That did not involve the sort of discretion or control that would give rise to a fiduciary relationship." *Id.* Thus, any duties Cachet and MyPayrollHR owed to one another were pursuant to the agreements that they executed with one another; neither occupied a position of trust or special confidence to the other that imposed obligations beyond their express agreements. *See id.*

The Government properly emphasizes Asfaw's testimony "that the only access MyPayrollHR had to Cachet's system was the features that were necessary to upload batch files," Gov.'s Br. at p. 19 (citing Tr. at 136:6-25), and "the only 'proprietary' information a remarketer has access to is their user ID, password, [and] bank account information for [their] own clients." *Id.* (citing Tr. at 139:14-140:13).

As demonstrated in *Ironforge.com*, that Cachet had access to MyPayrollHR's bank account information and could withdraw funds from its accounts did not create a confidential or fiduciary relationship. *Ironforge.com v. Pay*chex, Inc., 747 F. Supp. 2d at 396 (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d at 20). Further, that Cachet provided MyPayrollHR with a user ID and password to its system also did not create a confidential or fiduciary relationship. Even assuming that information is confidential, "the 'mere communication of confidential information [is not] sufficient in and of itself to create a fiduciary relationship' between two parties."

*Pauwels v. Deloitte LLP*, 83 F.4th 171, 184 (2d Cir. 2023) (quoting *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (1st Dep't 1998)).

The Court, therefore, recommends finding that Cachet did not have a fiduciary or confidential relationship with MyPayrollHR, which weighs against granting a constructive trust.

**D. Factor 4: Unjust Enrichment**

The "most significant . . . factor[]" is "unjust enrichment, the deterrence of which is the purpose of a constructive trust." *Counihan v. Allstate Ins. Co.*, 194 F.3d at 362. Cachet argues "Mann was unjustly enriched because the BOA Accounts, which he owned and controlled, received $14,522,747.92 of Cachet's money to which Mann was admittedly not entitled, and Cachet was unable to recover that money." Cl.'s Br. at p. 8.

*1. Benefit*

In response, the Government first argues that "Mann was never unjustly enriched." Gov.'s Br. at p. 13. The Government asserts that, to prove unjust enrichment, Mann must have "'received money or a benefit at the expense of'" Cachet and maintains that did not occur here because "Mann never received the $14 million, nor did he benefit from it." *Id.* (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). Instead, the Government contends that "[t]he money moved from Cachet's settlement account to frozen [BOA] accounts, where it remained until the government seized it," and "[t]he only benefit Mann received from Cachet was the use of its ACH system for his kiting scheme." *Id.*

Of significance here is the Plea Agreement entered between the Government and Mann. That Agreement declares that Mann consented "to entry of an order directing

forfeiture to the United States" of BOA accounts bearing account numbers ending in 9506, 6843, and 6103. Jt. Ex. 1 at p. 2. And while admittedly the Plea Agreement states that assets were forfeited whether they were "in the possession or control of [Mann], a nominee, or some other third party," *id.* at p. 29, the Plea Agreement contains the following factual recitation agreed to by the Government and Mann:

> [Mann] submitted a digital ACH file to Cachet with instructions to transfer approximately $19,199,175.74 among his accounts at Pioneer and [BOA], as well as from his accounts to those of third parties to whom he owed money. Cachet effected those transfers using funds from its trust account. When Cachet attempted to debit $19,199,175,74 from [Mann]'s accounts, it could not do so because Pioneer and [BOA] had frozen the accounts.

*Id.* at p. 15. Likewise, the Government admitted the same in its Response to Cachet's First Request for Admissions. Jt. Ex. 15 at p. 3.

Thus, the Government has acknowledged that Cachet transferred funds to *Mann's* BOA accounts, and the record indicates those accounts were thereafter frozen sometime between that initial transfer and Cachet's later attempt to debit the funds back from the BOA accounts. The Government has not presented any evidence refuting this timeline or stating otherwise. In any event, the funds Cachet transferred were undoubtably received by Mann's BOA accounts, as evidenced by the Government's later seizure of said funds. The Court is aware of no legal basis for the proposition seemingly relied on by the Government that money is not received by a bank account merely because that bank account is frozen, and the Government has not provided any caselaw to that effect.

The Court is, consequently, unconvinced by the Government's unjust enrichment argument in this regard. Nevertheless, for the reasons explained in more detail below, the

Court agrees with the remaining unjust enrichment arguments presented by the Government, which strongly weigh against granting a constructive trust.

*2. Preclusion By Written Agreement*

Generally, a finding of unjust enrichment "only exist[s] where no prior agreement governed the rights of the parties" and is "bar[red] . . . in the face of a valid and enforceable written agreement." *In re First Cent. Fin. Corp.*, 377 F.3d 209, 213 (2d Cir. 2004) (citing *Miller v. Schloss*, 218 N.Y. 400 (1916)). The "principle . . . that the existence of a written agreement precludes a finding of unjust enrichment . . . applies to constructive trust claims." *Id.* "[A] constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate." *Id.* at 215 (quotation and citation omitted). "When a plaintiff has a contractual claim against a defendant, there is no reason to believe that a legal remedy is inadequate and the constructive trust claim is duplicative." *Usov v. Lazar*, 2014 WL 4354691, at *12 (S.D.N.Y. Sept. 2, 2014) (citing, *inter alia*, *Physician Mutual Insurance Co. v. Greystone Servicing Corp.*, 2009 WL 855648, *11 (S.D.N.Y. Feb. 11, 2004) (dismissing constructive trust claim because it "ar[o]se[] from the same operative facts as plaintiffs' contract breach claim")).

In the instant matter, Cachet had written agreements with MyPayrollHR, *see* Jt. Exs. 4-6, which the Government contends "precludes a finding of unjust enrichment." Gov.'s Br. at p. 14 (quoting *In re First Cent. Fin. Corp.*, 377 F.3d at 213-15) (citing Jt. Exs. 4-6). The Government notes that Cachet exercised adequate remedies at law "by obtaining money judgments against MyPayrollHR and Mann, recovering six-figure settlements from other parties, and continuing to litigate other claims." *Id.* at p. 15. The

Government also points out that the "Court granted Cachet's motion for default judgment on its breach of contract claim against MyPayrollHR" and its fraud claim against Mann, and found MyPayrollHR breached the agreements "'by fraudulently manipulating [Cachet]'s specifications batch files to cause the $19 Million to be diverted.'" *Id.* (quoting *Cachet Fin. Servs. v. MyPayrollHR*, 2020 WL 5232275, at *6 (N.D.N.Y. Sept. 2, 2020)). The motion was denied as to Cachet's unjust enrichment claims because "the relationship of the parties is contractual" such that Cachet "has no valid claim for unjust enrichment." *Id.* (quoting *Cachet Fin. Servs. v. MyPayrollHR*, 2020 WL 5232275, at *9).

While Cachet responds that it was unable to collect any funds in that action, Dkt. No. 260 at p. 6, that Cachet "may not be able to collect damages in a lawsuit" against MyPayrollHR and Mann "does not create an unjust enrichment claim." *Mangiardi Bros. Trucking v. Dewey Env't, LLC*, 2013 WL 1856338, at *3 (D.N.H. Apr. 30, 2013). "The existence of a 'remedy' which precludes application of unjust enrichment does not connote the ability to recoup [the] impoverishment by bringing an action against a solvent person. It merely connotes the ability to bring the action or seek the remedy." *Bank of Abbeville & Tr. Co. v. Commonwealth Land Title Ins. Co.*, 201 F. App'x 988, 992 (5th Cir. 2006) (quotation omitted). "Where a party has an adequate remedy at law . . . , regardless of whether the party actually recovers thereon, the party may not pursue a claim for unjust enrichment." *Naylor Farms, Inc. v. Anadarko OGC Co.*, 2011 WL 7267851, at *1 (W.D. Okla. June 15, 2011) (citing cases). Thus, even though Cachet may "not, in all probability, be made whole in the proceedings . . . does not mean its remedy is legally inadequate, simply that it is imperfect." *In re First Cent. Fin. Corp.*,

377 F.3d at 216; *see*, *e.g.*, *Brenner v. Heller*, 2011 WL 6011786, at *3 (N.D.N.Y. Nov. 30, 2011) (affirming bankruptcy court's denial of constructive trust, and finding appellants "ha[d] an adequate remedy at law in their contract claim against the debtor in the bankruptcy proceeding" regardless of the fact that "it appear[ed] that the[y] w[ould] not be made whole in the bankruptcy proceeding" because "that does not mean [their] remedy is legally inadequate, simply that it is imperfect").

*3. Equity*

The Government finally argues that "it would be unconscionable and inequitable for Cachet to recover all the forfeiture proceeds" "given Cachet's acquiescence to Mann's use of its ACH system for his kiting scheme." Gov.'s Br. at p. 13. Cachet disputes that there is "evidence that Cachet knew or had reason to know that Mann was engaging in fraudulent activity." Cl.'s Br. at p. 18.

Most significantly, the Government emphasizes several instances in which the Government maintains that Cachet knew that MyPayrollHR was violating Cachet's policies but did not take appropriate action in response. Specifically, the Government points to occasions in June 2015, April 2018, and May 2018 in which Cachet discovered that MyPayrollHR was not routing funds through Cachet's settlement account in violation of the parties' agreements. Gov's Br. at pp. 6-7 (citing, *inter alia*, JPS ¶ 16; Tr. at 63:9-20, 65:24-68:15, & 73:1-12); *see also* Jt. Exs. 7, 8, & 10; Tr. at 71:9-21. The Government also highlights how, in May 2018, Cachet noticed that several of the files MyPayrollHR uploaded were not "pertaining to direct deposit transactions" but rather were "multi-million dollar transactions . . . moving funds." Gov.'s Br. at pp. 20-21 (citing Jt. Ex. 7 at

pp. 2-3). The Government contends that, while Cachet recognized that these issues presented "huge exposure," *id.* at p. 7 (quoting Jt. Ex. 7 at p. 4), upon inquiring with MyPayrollHR as to the cause of these violations, Cachet "accepted [MyPayrollHR's] explanation[s] at face value" without further investigation. *Id.* at pp. 6-7.

In response, Cachet admits "there were approximately three instances where Cachet became aware that MyPayrollHR did not route funds through Cachet's settlement account as required by the Agreements and Cachet's ACH Specifications," but asserts that, "[i]n each instance, MyPayrollHR provided a plausible explanation and assured Cachet that it would not happen again." Cl.'s Br. at p. 19 (citing Tr. at 38:13-39:10). Additionally, Cachet acknowledges it "questioned MyPayrollHR regarding certain large payments to business entities," but explains that, "[a]fter MyPayrollHR represented to Cachet that these were 1099 payments to contractors (not vendors), Cachet determined that 1099 payments are sufficiently related to payroll to fall within the scope of the Agreements." *Id.* at pp. 19-20 (citing Tr. at 39:11-40:9). Notably, however, Succar's testimony was that the transactions "did not look like direct deposit transactions" and that those were "the only type of transactions they were authorized." Tr. at 39:20-22.

The Government makes several additional arguments that call into question Cachet's oversight of MyPayrollHR. The Government states that "Mann did not own and control MyPayrollHR for the entirety of Cachet's relationship with MyPayrollHR" because Cachet and MyPayrollHR signed a Remarketer Agreement in March 2007, but "Mann was not involved with MyPayrollHR in 2007 and did not assume ownership or control until October 2013." Gov.'s Br. at p. 3 (citing JPS ¶ 7; Jt. Ex. 4; Tr. at 55:8-14 &

110:24-111:5). The Government argues that Cachet failed to, but should have, followed "its typical set-up process for a new remarketer, which usually includes performing due diligence." *Id.* (citing Jt. Ex. 14; Tr. at 17:8-17 & 133:14-136:5). Further, the Government asserts that re-verifications should have occurred, and notes Succar's testimony that she could not recall any re-verifications of MyPayrollHR after 2007. *Id.* at p. 4 (citing Tr. at 111:6-25).

The Government also draws attention to the fact that, while Cachet represented that it was referring matters to its Risk Management Department, Cachet did not have a designated Risk Management Department and instead merely brought matters "to the attention of Cachet's management team," some of whom were also responsible for "keeping current clients and attracting new clients." *Id.* at p. 8 (citing, *inter alia*, Tr. at 15:17-25, 16:1-3, 60:9-13, & 60:17-19; Jt. Ex. 7 at pp. 3 & 5-6). In connection with this point, the Government notes that MyPayrollHR was Cachet's "17th most active remarketer by transaction volume in 2018." *Id.* (citing JPS at ¶ 7).

Lastly, the Government essentially argues that Cachet had the information it needed to discover that non-payroll transactions were being processed through its ACH system. *Id.* (citing Tr. 94:2-14, 95:17-96:14, & 96:16-17; Jt. Exs. 2-3). That information shows, among other things, that two payments of similar amounts were made to the same bank account and other transactions that were circular in nature, which the Government contends were "indicative of the kiting scheme to which Mann pleaded guilty." *Id.* at pp. 10-11 & 21 (citing, *inter alia*, Tr. at 103:1-104:14; Jt. Exs. 2 & 3).

In response, Cachet asserts it "had measures in place to prevent and detect fraudulent activity," which Cachet explains "included retaining an outside auditor to audit Cachet's procedures," and contends Cachet "had no notice of Mann's fraudulent conduct before September 2019." Cl.'s Br. at p. 19. Cachet emphasizes Succar and Asfaw's testimony that "no employee of Cachet had ever informed them that they suspected that MyPayrollHR or Mann were engaged in fraudulent activities," and "none of the banks that did business with MyPayrollHR . . . ever informed Cachet that they suspected that MyPayrollHR or Mann were engaged in suspicious or fraudulent activities" or that "they were going to file a suspicious activity report." *Id.* at p. 18. Cachet further asserts that "if Mann or MyPayrollHR were miscoding transactions, the receiving banks for those transactions – not Cachet – should have rejected those transactions as invalid," "[b]ut none of those banks ever did." *Id.* at p. 19 (citing Tr. at 13:25-15:9 & 44:1-6).

The Court recognizes that Succar and Asfaw testified that Cachet was unaware of Mann's fraudulent activities prior to September 2019. Nevertheless, the aforementioned events highlighted by the Government and acknowledged by Cachet demonstrate that, at minimum, Cachet was undoubtedly aware that, on several occasions, MyPayrollHR was not routing funds through Cachet's settlement account in violation of the parties' agreements. Cachet was also indisputably cognizant of the fact that MyPayrollHR was, at times, making large payments to business entities. Further, Succar testified that she recognized these payments were neither direct deposit transactions nor authorized by the parties' agreements, and stated that she found them suspicious.

While Cachet asserts that it utilized measures to prevent and detect fraudulent activity, the pertinent issue seems to instead be whether Cachet took appropriate measures once potential issues were discovered. The testimony at the Hearing reveals that, upon inquiring with MyPayrollHR and receiving its explanation, Cachet accepted that explanation. And while Cachet noted in emails to MyPayrollHR that it was referring matters to its Risk Management Department, Cachet has not demonstrated that any further investigation followed. That Cachet retained an outside auditor is of little significance in this regard, as the testimony presented at the Hearing reveals that Cachet retained WesPay Advisors to conduct an audit in October of 2018, which was after Cachet discovered Mann's fraud. Tr. at 19:23-20:14, 21:7-11, & 21:22-22:2.

"Under these circumstances, allowing [Cachet] to reap the benefit of a constructive trust . . . would . . . not serve an equitable purpose." *United States v. Emor*, 2013 WL 3005366, at *14 (D.D.C. June 18, 2013) (citing *United States v. $3,000 in Cash*, 906 F. Supp. 1061, 1066 (E.D.Va. 1995), *aff'd in part, rev'd in part*, 785 F.3d 671 (D.C. Cir. 2015).

**E. Balancing of the Factors**

Having considered the relevant factors in their totality, the Court recommends a finding that Cachet is not entitled to a constructive trust and, consequently, lacks both an identifiable legal interest in the assets seized by the Government and standing to contest the Preliminary Order. The parties do not seem to dispute that Cachet meets the prerequisite of traceability, and so the Court's analysis turns on the factors relevant to imposition of a constructive trust. The Court recommends finding that there was both a

promise and transfer in reliance on that promise, which weigh in favor of granting a constructive trust. However, the Court further recommends finding that Cachet has failed to establish the remaining factors, including a fiduciary and/or confidential relationship, as well as unjust enrichment, both of which weigh strongly against granting a constructive trust. As a result, the Court recommends that Cachet's Amended Petition be dismissed, and that the District Court decline to amend the Preliminary Order.

In so ruling, the Court has considered the Government's final argument that courts may simply deny constructive trusts "in cases involving multiple fraud victims as a matter of discretion," but finds it uncompelling. Gov.'s Br. at p. 22 (quoting *United States v. Ovid*, 2012 WL 2087084, at *7 (E.D.N.Y. June 8, 2012)); *see also* Gov.'s Br. at p. 23; Cl.'s Br. at pp. 14-18. The Court is more convinced by the approach taken in *Ovid*, which is relied on by the Government to support its position. *United States v. Ovid*, 2012 WL 2087084, at *7. In *Ovid*, the court clarified that caselaw "do[es] not require that outcome in every case," and explained that "does not mean a constructive trust is unavailable any time there are multiple victims of a common fraud." *Id.* In fact, the court in *Ovid* went on to "adhere to the 'orthodox approach to multiple-fraud cases,' which 'returns identifiable assets to their owners, turning to pro rata distribution only when specific identification or transactional tracing is impossible.'" *Id.* (quotations and citations omitted). As such, here, the Court's decision is based on an analysis of the four factors relevant to imposition of a constructive trust, not merely the number of victims who were allegedly defrauded by Mann and the similarities or differences among them.

## V. CONCLUSION

**ACCORDINGLY**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that Cachet's application for imposition of a constructive trust be **DENIED** and Cachet's Amended Third-Party Petition be **DISMISSED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[5] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Dated: November 10, 2026
Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

[5] If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).